UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| LAUREN SPENCER-SMITH, | Civil Action No. 23-cv-2652 |
| Plaintiff, | **COMPLAINT** |
| -against- | Plaintiff Demands<br>A Trial By Jury |
| DAVID M. EHRLICH, DAVID M. EHRLICH &<br>ASSOCIATES, P.C., DAVID M. EHRLICH P.C., ESQ.,<br>and SONG COLLECT, INC. d/b/a DME<br>MANAGEMENT, |  |
| Defendants. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Lauren Spencer-Smith ("Spencer-Smith" or "Plaintiff"), by her attorneys, Reitler Kailas & Rosenblatt LLP, as and for her Complaint against defendants David M. Ehrlich ("Ehrlich"), David M. Ehrlich & Associates, P.C. ("DME Associates"), David M. Ehrlich P.C., Esq. ("DME PC"), and Song Collect, Inc. d/b/a DME Management ("DME Management") (collectively hereinafter "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for declaratory, equitable, and monetary relief arising from the professional misconduct, self-dealing, and harassing and unprofessional conduct of defendant Ehrlich, a manipulative and untrustworthy attorney and personal manager, his management company, DME Management, and his law firms DME Associates and DME PC (collectively hereinafter, the "DME Firms"), who together have undermined and threatened the career and reputation of Ms. Spencer-Smith, a young and talented recording artist and songwriter.

2.    Ehrlich's wrongdoing began when, in breach of his fiduciary obligations to Ms. Spencer-Smith as her attorney, Ehrlich convinced Ms. Spencer-Smith to also engage him as her

personal manager without revealing his checkered management history or fully advising her as to her management options, in order to be paid additional compensation to perform substantially the same services he had already been rendering to her as her attorney.

3.     The management agreement that Ehrlich had Ms. Spencer-Smith sign was neither fair nor reasonable and Ehrlich thus violated Rule 1.8 of the New York Rules of Professional Conduct.

4.     After becoming her personal manager in addition to her lawyer, Ehrlich and, by extension, DME Management and the DME Firms, in breach of their contractual and fiduciary duties to Ms. Spencer-Smith, took a number of steps inimical to Ms. Spencer-Smith's best interests, damaged Ms. Spencer-Smith's relationship with her record label, lied to her, alienated her, and irreparably broke the manager-artist and attorney-client relationships between the parties such that a continued managerial and/or attorney relationship between them is no longer feasible.

## THE PARTIES

5.     Plaintiff Spencer-Smith is a musician, songwriter, and performer, and is a dual citizen of Canada and the United Kingdom who resides in Canada.

6.     Upon information and belief, defendant Ehrlich is a citizen of the State of New York.

7.     Upon further information and belief, Ehrlich is an attorney admitted to the Bar of the State of New York and regularly transacts business within the State and County of New York, including, but not limited to, in connection with DME Management and the DME Firms, and in connection with business on behalf of Ms. Spencer-Smith and other managerial and/or legal clients.

8.    Upon information and belief, defendant DME Associates is a New York professional corporation with a principal place of business located in New York, New York.

9.    Upon information and belief, defendant DME PC is a New York professional corporation with a principal place of business located in New York, New York.

10.    Upon information and belief, DME Associates and DME PC are both professional corporations through which Ehrlich renders legal services to clients.

11.    Upon further information and belief, Ehrlich is the sole owner and president of both DME Associates and DME PC and is an attorney associated therewith.

12.    Upon information and belief, defendant Song Collect, Inc. is a New York corporation doing business as "DME Management" with a principal place of business located in New York, New York, and is engaged in the business of managing the professional careers of entertainers.

13.    Upon information and belief, Ehrlich is the sole owner and president of DME Management.

**JURISDICTION AND VENUE**

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

15.    Venue lies in this district pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events and omissions giving rise to the claims herein occurred in the Southern District of New York, and at the time of commencing this action, Defendants maintain offices for the conduct of business within the County and State of New York and regularly conduct business in this District.  Defendants are therefore subject to personal jurisdiction in this District.

16.     Venue and Jurisdiction are also proper in this District as the written engagement agreement between Ms. Spencer-Smith, on the one hand, and DME Associates and DME PC, on the other hand, was entered into in the State of New York, and provides that "[i]f court actions or proceedings are commenced as a result of any controversies and disputes arising from or relating to this Agreement or the subject matter thereof, the federal and state courts located within New York County, State of New York, shall have the exclusive jurisdiction over any and all such actions and proceedings".

17.     Venue and Jurisdiction are also proper in this District as the written management agreement between Ms. Spencer-Smith and DME Management was entered into in the State of New York, and provides that "[a]ny controversy, or claim arising out of or relating to any provision of this Agreement, or the breach thereof, shall be brought in the State or Federal Courts located in New York County, New York, and not elsewhere."

## <u>BACKGROUND</u>

18.     Ms. Spencer-Smith is a dynamic and talented singer, performer, recording artist, and songwriter who rose to prominence in the United States when she appeared on and placed in the top 20 of the television show "American Idol" in 2020, when she was just 16 years old.

19.     Ms. Spencer-Smith's debut album, entitled "Unplugged Vol. 1", was nominated for a Juno Award in 2020 in the Best Adult Contemporary Album category.

20.     She also released an EP album in 2020 entitled "Mixed Emotions" and several non-album singles in 2021 and 2022, including the internationally popular and commercially successful songs "Fingers Crossed" and "Flowers."

21.     Ms. Spencer-Smith met Ehrlich, a veteran entertainment industry attorney, in early 2020, when she was 16 years old.

22.     At the time that she met Ehrlich, Ms. Spencer-Smith was in the process of separating from her then-personal manager.

### *The Formation of the Attorney-Client Relationship*

23.     In April 2020, Ms. Spencer-Smith (and her parents) engaged Ehrlich and the DME Firms to assist Ms. Spencer-Smith in unwinding her relationship with her personal manager and to act generally as Ms. Spencer-Smith's attorney in connection with her career in the entertainment industry.

24.     Upon information and belief, Ehrlich was admitted as an attorney to the New York bar in 1987, nearly two decades before Ms. Spencer-Smith was even born.

25.     Given the significant age gap between Ehrlich and Ms. Spencer-Smith, as well as Ehrlich's touted decades of experience as a sophisticated lawyer in the entertainment industry, Ms. Spencer-Smith trusted and relied upon Ehrlich to foster and guide her musical career.

26.     Ms. Spencer-Smith entered into a written engagement agreement with the DME Firms dated as of April 17, 2020 (the "Engagement Agreement").  A true and correct copy of the Engagement Agreement is annexed hereto as Exhibit A.

27.     As Ms. Spencer-Smith's attorneys, Ehrlich and the DME Firms owed Ms. Spencer-Smith a fiduciary duty to, at all times, advocate for their client, act in her best interest, and not participate in activities or arrangements inimical to Ms. Spencer-Smith's best interest.

28.     Per paragraph 1 of the Engagement Agreement, Ehrlich and the DME Firms were responsible "for rendering all legal services that may be necessary or desirable that are related to [Ms. Spencer-Smith's] services and activities through the entertainment industry including, but not limited to, [her] services as a recording artist, song writer, literary writer, producer of

music…and all other performances and activities throughout all fields of the entertainment industry."

29.    Per paragraph 2 of the Engagement Agreement, the parties agreed that Ehrlich and the DME Firms' compensation for their legal services would be a 5% commission on all gross monies earned or received by Ms. Spencer-Smith in connection with her services in the entertainment industry.

30.    Paragraph 2 of the Engagement Agreement also provided for the payment of an additional 5% "success fee" to Ehrlich and the DME Firms if they were "directly responsible for" Ms. Spencer-Smith obtaining an agreement for her entertainment services, except for the first year for which the Engagement Agreement provided for a 10% "success fee."

31.    Thus, Ehrlich's duties and responsibilities as Spencer-Smith's attorney encompassed the drafting and/or negotiation of entertainment industry contracts, such as record and publishing deals.

### *Ehrlich Selfishly Persuades Spencer-Smith To Hire Him As Her Manager*

32.    With Ehrlich's legal assistance, Ms. Spencer-Smith formalized her separation from her former manager in November 2020.

33.    Immediately thereafter, Ehrlich, who was already acting as Ms. Spencer-Smith's attorney for the past six (6) months, sought to be engaged by Ms. Spencer-Smith to be her exclusive personal manager in the entertainment industry through his personal management company, DME Management.

34.    However, as Ms. Spencer-Smith's attorney, Ehrlich was already charged with the duties and responsibilities of drafting and negotiating Ms. Spencer-Smith's entertainment industry

contracts on her behalf, duties which overlapped with and were substantially duplicative of the services to be provided by a personal manager.

35.    In seeking to become Ms. Spencer-Smith's personal manager in addition to her attorney, Ehrlich essentially wanted to increase his own compensation for work he was already doing from a 5% commission as her attorney to a 20% commission as her attorney and manager.

36.    In fact, prior to becoming her manager, Ehrlich intimated that he needed to be paid more for the work he was already doing for Ms. Spencer-Smith and further that he could no longer work for Ms. Spencer-Smith in any capacity if she did not also make him her manager.

37.    Upon information and belief, Ehrlich seriously exaggerated, if not misrepresented, his managerial credentials to Ms. Spencer-Smith in order to induce her to enter into a managerial relationship with him.  For example, Ehrlich told Ms. Spencer-Smith that he had managed Nickelback and discovered Wu Tang Clan, among other purported artists.  Upon information and belief, neither of those statements is true.

38.    Upon information and belief, and to the contrary, neither Ehrlich nor DME Management had ever managed a successful musical artist before Ms. Spencer-Smith.

39.    Upon further information and belief, Ehrlich and/or DME Management had been sued by at least one of their former management clients.

40.    Despite his position as a fiduciary to Ms. Spencer-Smith by virtue of his role as her attorney, neither Ehrlich nor the DME Firms advised Ms. Spencer-Smith of these circumstances.

41.    Nor did Ehrlich counsel Ms. Spencer-Smith on the advantages and disadvantages of selecting Ehrlich and/or DME Management to be her personal manager.

42.    Ehrlich also did not seek out an independent and well-established personal manager to manage Ms. Spencer-Smith's entertainment career on her behalf nor did he suggest to Ms. Spencer-Smith that she do so on her own behalf.  Instead, he took the opportunity for himself.

43.    Given Ms. Spencer-Smith's undeniable talent and her social media savvy and popularity, it is not surprising that Ehrlich sought to capitalize on, maximize, and exploit his association with her.

44.    As of January 2021, despite being so young and relatively inexperienced in the music industry, Ms. Spencer-Smith had already built up a substantial social media presence and following, with approximately:

- 315,000 subscribers to her YouTube channel;

- 450,000 followers on Facebook;

- 187,000 followers on Instagram; and

- one million followers on TikTok.

45.    By January 2021, a recording of a cover song Ms. Spencer-Smith made when she was just 15 years old had approximately 40 million views on Facebook, while another recorded cover song Ms. Spencer-Smith uploaded to Spotify had about 10 million streams.

46.    Ehrlich's determination to be Ms. Spencer-Smith's manager as well as her attorney (and to receive a larger share of her earnings) rather than counsel her to interview and engage a top full-time accomplished manager in the music industry was clearly a predatory, calculated and selfish effort.

### *The Unconscionable Management Agreement*

47.    Despite the fact that it was a clear conflict of interest and self-dealing for Ehrlich to recommend himself to be Ms. Spencer-Smith's manager, Ehrlich induced and ultimately

persuaded Ms. Spencer-Smith to enter into a written exclusive personal management agreement with his management company, DME Management, dated as of January 1, 2021 (the "Management Agreement").

48.    Although dated as of January 1, 2021, the Management Agreement was executed on or about February 19, 2021.

49.    When she signed the Management Agreement, Ms. Spencer-Smith was only 17 years old.

50.    Ehrlich and DME Management drafted the Management Agreement.

51.    Ehrlich sent Ms. Spencer-Smith an initial proposed draft of the Management Agreement on January 8, 2021 from his law firm email address.

52.    In Ehrlich's January 8, 2021 email, Ehrlich acknowledged that the Management Agreement sought to "memorialize" the relationship and services that Ehrlich had already been providing to Ms. Spencer-Smith.

53.    However, the draft management agreement presented by Ehrlich to Ms. Spencer-Smith contained numerous grossly unreasonable and unconscionable provisions which were beneficial to Ehrlich and inimical to Ms. Spencer-Smith's best interests.

54.    Thus, the mere presentment of the draft management agreement by Ehrlich to Ms. Spencer-Smith was an act of disloyalty by Ehrlich in breach of his fiduciary duties to her as her attorney.

55.    Although Ehrlich advised Spencer-Smith to retain her own counsel to review the proposed management agreement, and recommended two attorneys, presumably friends and/or business associates of Ehrlich, with whom he had already discussed the parties' relationship and who had already expressed to Ehrlich their willingness to represent Ms. Spencer-Smith in

connection with the proposed management agreement, Ehrlich sought to discuss the agreement directly with Ms. Spencer-Smith before she retained such counsel.

56.     One of the attorneys that Ehrlich recommended to Ms. Spencer-Smith was Jonathan Horn, an attorney with whom Ehrlich previously shared office space and who became a personal acquaintance of Ehrlich's.

57.     Given Ehrlich's recommendation, Ms. Spencer-Smith engaged Mr. Horn to review the Management Agreement before she signed it.

58.     However, despite Mr. Horn's retention to represent Ms. Spencer-Smith's interests in connection with the Management Agreement, there was very little negotiation of the proposed terms of the Management Agreement, virtually no substantive changes were made to the draft of the management agreement provided by Ehrlich and DME Management, and the executed version is substantially similar to the initial draft save for some minor edits.

59.     Ms. Spencer-Smith therefore did not have the effective assistance of independent counsel in connection with reviewing and signing the Management Agreement.

60.     Indeed, Mr. Horn never even sent a bill to Ms. Spencer-Smith for his services.

61.     Upon information and belief, Mr. Horn either rendered his services to Ms. Spencer-Smith as a favor to Ehrlich at no charge or was paid directly by Ehrlich for the engagement.

62.     Moreover, and despite the fact that Ehrlich owed Ms. Spencer-Smith certain fiduciary duties by virtue of his legal representation of her, the Management Agreement contains several provisions which are facially unreasonable in light of industry standards and detrimental to the best interests of Ms. Spencer-Smith.

63.     For example, the Management Agreement is for a term of five (5) years with no earnings benchmarks or thresholds for the, by industry standards, lengthy term.

64.     As another example, paragraphs 3(c)(i) and 3(c)(ii) of the Management Agreement require that Ms. Spencer-Smith pay commissions to Ehrlich and DME Management with respect to Gross Income received by her in connection with those recordings, musical compositions, intellectual properties, and/or service agreements released or entered into prior to or during the term of the Management Agreement "in perpetuity and without reduction."

65.     With respect to those recordings and musical compositions created, but not exploited, by Ms. Spencer-Smith during the term of the Management Agreement, paragraph 3(c)(iii) of the Management Agreement, i.e., the "sunset clause", provides for commissions to Ehrlich and DME Management with respect to such works on a sliding scale for an unreasonable and very lengthy fifteen-year period.

66.     Upon information and belief, these unfavorable post-term commission clauses in the Management Agreement are much less favorable to Ms. Spencer-Smith than the post-term commission clauses, if any, in management agreements that Ehrlich negotiated for recording artists in his capacity as their attorney.

67.     In fact, the terms of the Management Agreement proposed by Ehrlich were even more onerous than the terms of the management agreement between Ms. Spencer-Smith and her previous manager which Ehrlich had initially been retained to extricate Ms. Spencer-Smith from.

68.     As yet another example, paragraph 13(a) of the Management Agreement contained an attorneys' fee provision in favor of a prevailing party should a litigation ensue between Ehrlich/DME Management and Ms. Spencer-Smith.

69.     No prudent transactional attorney would have counseled their client to sign a management agreement that had such an attorneys' fee provision.

11

70.     Further, despite acknowledging that Ms. Spencer-Smith was a minor at the time of entering into the Management Agreement, the Management Agreement contains provisions mandating Ms. Spencer-Smith's ratification of the Management Agreement upon reaching the age of majority and expressly undermining Ms. Spencer-Smith's legal right to disaffirm written agreements entered into by her prior to attaining the age of majority.

71.     Paragraph 1(e) of the Management Agreement provides that upon reaching the age of majority, Ms. Spencer-Smith "shall ratify this [Management] Agreement or, if [she] fail[s] to do so, [Manager] may do so on your behalf via power of attorney."

72.     Paragraph 1(f) of the Management Agreement provides that Ms. Spencer-Smith "shall not at any time disaffirm this Agreement by reason of [her] minority."

73.     These provisions, inserted into the contract by Ehrlich, are contrary to applicable law as well as public policy, which permit a minor to disaffirm a contract if it has not been judicially approved.

74.     As Ms. Spencer-Smith's attorney, Ehrlich's conduct in drafting and executing an agreement containing these various self-serving provisions, among others, to the detriment of his client, Ms. Spencer-Smith, violated his fiduciary and ethical duties to his client to protect her from signing unfair or one-sided agreements to her disadvantage.

75.     Rule 1.8(a) of the New York Rules of Professional Conduct provides that a "lawyer *shall not* enter into a business transaction with a client if they have differing interests therein" unless, among other things, "the transaction is fair and reasonable to the client."

76.     The Management Agreement was neither reasonable nor fair to Ms. Spencer-Smith.

77.     Moreover, the terms of the Management Agreement are so egregious that they were unfair *ab initio*.

78.     In an egregious attempt to circumvent his fiduciary and ethical obligations, Ehrlich self-servingly included a waiver provision in the Management Agreement which purports to waive the inherent and unwaivable conflict of interest between Ehrlich's dual role as Ms. Spencer-Smith's attorney and her manager.

79.     The Management Agreement expressly acknowledges that Ms. Spencer-Smith had retained and regularly used Ehrlich and the DME Firms as "the law firm principally responsible for rendering legal services to [Ms. Spencer-Smith] in relation to the Entertainment Services and [her] career in the entertainment industry" and a copy of the Engagement Agreement is annexed as an exhibit to the Management Agreement.

80.     Per paragraph 1(g) of the Management Agreement, Ehrlich was designated to be "principally responsible for the management services" set forth in the Management Agreement "provided that [Ehrlich] may appoint other persons to render services…as long as Ehrlich at all times retains such principal responsibility."

81.     Ehrlich was, at all relevant times, Ms. Spencer-Smith's day-to-day manager pursuant to the Management Agreement.

82.     As her manager, Defendants Ehrlich and DME Management had a separate fiduciary relationship with Ms. Spencer-Smith obligating them to, at all times, conduct themselves in Ms. Spencer-Smith's best interest and to participate in no activities or arrangements inimical to Ms. Spencer-Smith's best interest.

83.     In accordance with a provision contained in the Management Agreement in which Ms. Spencer-Smith had agreed to ratify the Management Agreement upon reaching the age of majority, Ms. Spencer-Smith ratified the Management Agreement at Ehrlich's request on or about September 30, 2021, 2 days after her 18th birthday.

### *Ms. Spencer-Smith Secures A Recording Contract*

84.    On January 5, 2022, Ms. Spencer-Smith self-released a single entitled "Fingers Crossed" which went viral on TikTok and climbed the charts globally.

85.    Ehrlich had cautioned Ms. Spencer-Smith against self-releasing this single and recommended that she refrain from doing so.

86.    It was fortuitous that Ms. Spencer-Smith disregarded Ehrlich's advice, as record companies began contacting Ms. Spencer-Smith shortly after her single became popular inquiring about a potential record deal.

87.    A few weeks later Ms. Spencer-Smith entered into an exclusive recording agreement with Island Records and Republic Records, divisions of UMG Recordings, Inc. ("UMG").

88.    As a recording artist, Ms. Spencer-Smith's relationship with her record label, UMG, is paramount to her ability to succeed in the music industry.

89.    As a public figure and role model to other young women, her reputation is also extremely important to her.

### *Defendants' Misconduct*

90.    To date, and despite Ehrlich's wrongdoing, Ehrlich and the defendant companies have received nearly $1.5 million in management commissions and legal fees from Ms. Spencer-Smith for only two years of legal work and 15 months of managerial representation.

91.    Despite their very short tenure as her representatives and minimal contributions to her success, and the significant breaches of their respective fiduciary duties to Ms. Spencer-Smith leading up to and including the Management Agreement, Ehrlich and his companies claim to be entitled to millions of additional dollars from Ms. Spencer-Smith under the parties' agreements.

92.    However, while acting as her manager and attorney, Ehrlich and, by extension, DME Management and the DME Firms, engaged in further unprofessional and career-damaging behavior in breach of their contractual and fiduciary duties to guide, assist, and promote Ms. Spencer-Smith – a teenager – in connection with her musical career.

93.    From the beginning of his tenure as manager, Ehrlich insulated and isolated Ms. Spencer-Smith from all other advisors, including, but not limited to, her business managers (who, unbeknownst to Spencer-Smith at the time, were advised by Ehrlich not to directly communicate with Ms. Spencer-Smith or her parents about her own financial matters) exerting unwarranted control over her dealings and communications.

94.    Ehrlich also advised numerous third parties that they should not communicate with Ms. Spencer-Smith or her parents directly, should communicate only with him regarding Ms. Spencer-Smith, and further that they may not have, or must substantially limit, their personal contact with Ms. Spencer-Smith.

95.    Among the various persons that Ehrlich so directed were various music executives, including employees of Ms. Spencer-Smith's record label, UMG, members of Ms. Spencer-Smith's band, music producers and writers (including the manager of the producer of some of Ms. Spencer-Smith's hit songs), Ms. Spencer-Smith's business manager Andrew Britton, and attorney Doug Mark.

96.    With respect to attorney Doug Mark in particular, Mr. Mark was engaged by Ehrlich on behalf of Ms. Spencer-Smith to act as the day-to-day lawyer with respect to her entertainment industry activities.  Not only was Mr. Mark advised that he could not have direct communications with Ms. Spencer-Smith, the purported client, neither Ms. Spencer-Smith nor her parents were provided with any contact information for Mr. Mark.  Ehrlich was the conduit for

any and all communications with Mr. Mark regarding Ms. Spencer-Smith's career and Ehrlich arranged for himself, rather than Ms. Spencer-Smith, to pay Mr. Mark's fees.

97.    Notably, given that Mr. Mark was acting as Ms. Spencer-Smith's day-to-day attorney, there is no basis for the 5% Gross Compensation commission charged by Ehrlich and the DME Firms to Ms. Spencer-Smith for their purported legal services.

98.    Moreover, to the extent that the Engagement Agreement provided for Ehrlich and the DME Firms to receive a 10% commission, rather than 5%, if they were "directly responsible" for a particular arrangement or contract during the first year of the Engagement Agreement, such provision was inappropriate given the fact that Ehrlich (as manager) and DME Management had a managerial obligation to (and were already being paid to) directly procure arrangements and contracts for Ms. Spencer-Smith during at least some of the overlapping time period.

99.    Paragraph 13(j) of the Management Agreement purports to be a waiver of the conflict of interest between Ehrlich, in his capacity as "Manager", and Ehrlich, in his capacity as attorney.

100.    However, the subject conflict is, in fact, not waivable and incurable.

101.    In light of the allegations contained herein, any independent attorney would have advised Ms. Spencer-Smith to discontinue her relationship with Ehrlich and DME Management in light of his conduct.

102.    Ehrlich has also engaged in various behaviors that threatened Ms. Spencer-Smith's reputation and livelihood as well as caused her severe embarrassment and shame.

103.    In late April 2022, to further her musical career, UMG sent Ms. Spencer-Smith on a 3-week promotional tour in Europe (the "Tour").

104.    As her manager, Ehrlich accompanied Ms. Spencer-Smith, who was only 18 at the time, on the Tour to provide guidance, company, and supervision.

105.    While Ms. Spencer-Smith was flying from Sweden to France during the Tour with Ehrlich, and only Ehrlich, Ehrlich surreptitiously took numerous pictures of a Swedish flight attendant on his phone.

106.    The flight attendant caught Ehrlich taking these pictures and, in front of Ms. Spencer-Smith, voiced her displeasure and lack of consent with regard to Ehrlich's demeaning behavior, demanded that Ehrlich show her all of the pictures he had taken of her on his phone, and hovered over their seats to ensure that Ehrlich deleted all of the unwelcome photographs.

107.    Upon information and belief, based on communications with representatives of UMG, Ehrlich is also alleged to have surreptitiously taken numerous photographs of multiple other women – including young female UMG employees – without their knowledge or consent.

108.    Upon further information and belief, during the Tour, while in Sweden, Ehrlich complimented and inappropriately solicited a female UMG employee – a PR manager – to work for him in New York.  When the employee of Ms. Spencer-Smith's record label stated that she had never been to New York, Ehrlich then offered to fly her to New York at his expense and gave her his personal contact information.

109.    Ehrlich also made inappropriate commentary about multiple women – including young female UMG employees – either directly to Ms. Spencer-Smith or in her presence to others.

110.    Ehrlich also exhibited unprofessional, inappropriate, and disrespectful behavior towards members of Ms. Spencer-Smith's musical team, including berating a UMG employee in front of Ms. Spencer-Smith and her team, which resulted in many of Ms. Spencer-Smith's team members expressing to her their discomfort with Ehrlich's presence.

111.    Upon information and belief, and unbeknownst to Ms. Spencer-Smith at the time, certain of the UMG employees that had been subjected to Ehrlich's inappropriate conduct complained to UMG about Ehrlich and UMG thereafter conducted an internal investigation of the allegations.

112.    Upon further information and belief, and also unknown to Ms. Spencer-Smith at the time, upon concluding its investigation, on or about May 6, 2022, UMG advised Ehrlich directly that Ehrlich was no longer permitted to accompany Ms. Spencer-Smith on her Tour and further that, if he refused to leave, the Tour would be cancelled.

113.    Ehrlich's misconduct – indeed his very presence – directly jeopardized Ms. Spencer-Smith's tour and musical livelihood.

114.    In violation of his duties as a fiduciary, Ehrlich did not advise Ms. Spencer-Smith of the existence of the investigation or the results thereof, nor did he advise Ms. Spencer-Smith of UMG's demand that he leave the Tour.

115.    Rather, Ehrlich left the Tour abruptly, flew out his assistant to London in his stead, essentially abandoning Ms. Spencer-Smith in a foreign country without adequate representation of her interests, and lied to Ms. Spencer-Smith about his reason for doing so, claiming that it was just to "be with his wife".

116.    Ms. Spencer-Smith also later learned that UMG had made a determination that Ehrlich would not be permitted in a room alone with any woman from UMG on a going forward basis.

117.    Upon recently discovering the UMG investigation of and ultimatums to Ehrlich, Ms. Spencer-Smith realized both the extent of his abusive and sexually inappropriate behavior and that Ehrlich had lied to her and jeopardized her work.

118.    Learning this information has also caused Ms. Spencer-Smith to be concerned about Ehrlich's previous inappropriate comments to her about her – and her mother's – appearance (for example, "you look hot") and retroactively question Ehrlich's intentions and motives in taking an excessive number of photographs of Ms. Spencer-Smith in Puerto Rico, both alone and with her boyfriend in romantic situations in which Ms. Spencer-Smith was wearing revealing swimsuits.

119.    Since witnessing some of Ehrlich's behavior during the Tour and discovering the allegations lodged against Ehrlich by UMG employees, Ms. Spencer-Smith did not feel comfortable or safe being alone in the same room as Ehrlich, a powerful and controlling man many years her senior.

120.    In fact, Ms. Spencer-Smith actively sought out company to accompany her when she was meeting with Ehrlich.

121.    Any reasonable independent advisor would have counseled Ms. Spencer-Smith to immediately discontinue her relationship with Ehrlich, especially given her status as a public figure and role model to other young women.

### *The Management Relationship Is Validly Terminated*

122.    In a letter dated May 13, 2022, Ms. Spencer-Smith terminated the Management Agreement.  A true and correct copy of the May 13, 2022 letter is annexed hereto as Exhibit B.

123.    By letter dated June 1, 2022, Defendants Ehrlich and DME Management, through counsel, rejected Ms. Spencer-Smith's notice of termination of the Management Agreement, claiming that the Management Agreement was still binding and effective.  Defendants Ehrlich and DME Management further claimed that Ms. Spencer-Smith was in breach of the Management Agreement, threatened to file an injunction against Ms. Spencer-Smith, and advised Ms. Spencer-

Smith that Defendants Ehrlich and DME Management were unilaterally extending the term of the Management Agreement pursuant to paragraph 13(e) thereof until such time as Ms. Spencer-Smith cured her purported breaches.  A true and correct copy of the June 1, 2022 letter is annexed hereto as Exhibit C.

124.    By letter dated June 7, 2022, Ms. Spencer-Smith, through counsel, rejected Defendants Ehrlich and DME Management's claim of breach and reiterated that the managerial relationship between Ms. Spencer-Smith and Defendants Ehrlich and DME Management had been irretrievably damaged by Ehrlich.  A true and correct copy of the June 7, 2022 letter is annexed hereto as Exhibit D.

### *The Attorney-Client Relationship Is Also Validly Terminated*

125.    Ms. Spencer-Smith's May 13, 2022 letter to Ehrlich also operated as a termination of the attorney-client relationship between Ms. Spencer-Smith, on the one hand, and Ehrlich and the DME Firms, on the other hand and that Defendants Ehrlich and the DME Firms are no longer entitled to any compensation under the Engagement Agreement.

126.    Upon information and belief, Defendants Ehrlich and the DME Firms believe the parties' attorney-client relationship has not been terminated and/or that they are entitled to continued compensation under the Engagement Agreement.

127.    Despite the fact that Ehrlich was Ms. Spencer-Smith's attorney for only two years and her manager for less than 15 months, Ehrlich has received in excess of $1.5 million from Ms. Spencer-Smith and is claiming entitlement to millions more dollars.

### AS AND FOR A FIRST CLAIM
(Breach of Fiduciary Duty)
Against Defendants DME Associates, DME PC, and Ehrlich

128.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

through 127 hereof as if fully set forth herein.

129.    As Plaintiff's attorneys, Ehrlich and the DME Firms, at all times, owed Plaintiff the fiduciary duties of good faith and loyalty.

130.    As set forth above, Ehrlich and the DME Firms breached their respective fiduciary duties to Plaintiff to act in her best interests.

131.    By reason of the foregoing, Plaintiff has been damaged by Defendants Ehrlich's and the DME Firms' breaches of their respective fiduciary duties in an amount to be determined at trial.

## AS AND FOR A SECOND CLAIM
(Breach of Fiduciary Duty)
Against Defendants Ehrlich and DME Management

132.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 131 hereof as if fully set forth herein.

133.    As Plaintiff's managers, DME Management and Ehrlich, at all times, owed Plaintiff the fiduciary duties of good faith and loyalty.

134.    As set forth above, DME Management and Ehrlich breached their respective fiduciary duties to Plaintiff to act in her best interests.

135.    By reason of the foregoing, Plaintiff has been damaged by Defendants Ehrlich's and DME Management's breaches of their respective fiduciary duties in an amount to be determined at trial.

## AS AND FOR A THIRD CLAIM
(Breach of Contract)
Against Defendant DME Management

136.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 135 hereof as if fully set forth herein.

137.    Plaintiff has performed all of her obligations under the Management Agreement.

138.    As set forth above, due to the unprofessional and inappropriate behavior exhibited by Ehrlich and, by extension, DME Management towards Plaintiff, DME Management has materially breached its obligations under the Management Agreement.

139.    DME Management's breaches of the Management Agreement are incurable.

140.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

### AS AND FOR A FOURTH  CLAIM
(Declaratory Judgment that the Management Agreement is Void and/or Subject to Rescission)
Against Defendant DME Management

141.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 136 hereof as if fully set forth herein.

142.    Defendants DME Management's and Ehrlich's actions stated above constitute a breach of the Management Agreement that is so material and fundamental as to go to the core of the very purpose of the Management Agreement.

143.    Defendants DME Management's and Ehrlich's actions, which are not capable of cure, thus constitute a repudiation of the Management Agreement by DME Management, which relieves Plaintiff from any further obligation to perform thereunder.

144.    In the alternative, Defendants DME Management and Ehrlich's actions, which are not capable of cure, constitute grounds for Plaintiff to rescind the Management Agreement at Plaintiff's election.

145.    Plaintiff contends that the Management Agreement is no longer of any legal force or effect and is not binding upon Plaintiff.

146.    Defendants DME Management and Ehrlich contend that the Management Agreement is of legal force and effect and is binding upon Plaintiff.

147.    An actual and genuine justiciable controversy now exists between Plaintiff and Defendant DME Management concerning their respective rights and obligations under the Management Agreement.

148.    Plaintiff seeks a declaratory judgment that the Management Agreement has been repudiated by reason of Defendants DME Management and Ehrlich's material breaches thereof or, in the alternative, is subject to rescission at Plaintiff's election, and that Plaintiff no longer has any obligations under the Management Agreement and that the Management Agreement is no longer of any legal force or effect and is not binding upon Plaintiff.

149.    Plaintiff has no adequate remedy at law.

## AS AND FOR A FIFTH CLAIM
(Unconscionability)
Against All Defendants

150.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 149 hereof as if fully set forth herein.

151.    As Ms. Spencer-Smith's attorneys, at all times mentioned herein, Ehrlich and the DME Firms owed a fiduciary duty to Ms. Spencer-Smith to treat her with the highest degree of good faith, honesty, and loyalty, and to zealously protect Ms. Spencer-Smith's interests.

152.    Despite their duties of loyalty and honesty, Defendants Ehrlich and the DME Firms wrongfully induced Ms. Spencer-Smith to enter into the Management Agreement.

153.    The Management Agreement is an unconscionable contract.

154.    By reason of the aforementioned conduct of Ehrlich and the DME Firms, including, but not limited to, Ehrlich's stated refusal to continue working for Plaintiff if she did not hire him

as her manager, the significant disparity between the parties with respect to their age and industry experience, and the ineffective assistance of counsel provided to Ms. Spencer-Smith by Ehrlich's business associate, there was procedural unconscionability in the execution of the Management Agreement.

155.    The Management Agreement is substantively unconscionable as well because it unreasonably favored Defendants in every respect, including exceedingly unreasonable terms and excessive compensation for Ehrlich and his management company, and is highly detrimental to Ms. Spencer-Smith, as set forth in detail above and incorporated by reference herein.

156.    As a direct and proximate result of the unconscionable nature of the Management Agreement, Plaintiff is entitled to rescind the Management Agreement.

157.    Plaintiff has no adequate remedy at law.

### AS AND FOR A SIXTH  CLAIM
(Declaratory Judgment that the Engagement Agreement is Void and/or Subject to Rescission)
Against Defendants DME Associates and DME PC

158.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 157 hereof as if fully set forth herein.

159.    Defendants DME Associates, DME PC, and Ehrlich's actions stated above constitute a breach of the Engagement Agreement that is so material and fundamental as to go to the core of the very purpose of the Engagement Agreement and the attorney-client relationship between such defendants and Ms. Spencer-Smith.

160.    Defendants DME Associates, DME PC and Ehrlich's actions, which are not capable of cure, thus constitute a repudiation of the Engagement Agreement by DME Associates and DME PC, which relieves Plaintiff from any further obligation to perform thereunder.

24

161.    In the alternative, Defendants DME Associates, DME PC, and Ehrlich's actions, which are not capable of cure, constitute grounds for Plaintiff to rescind the Engagement Agreement at Plaintiff's election.

162.    Plaintiff contends that the Engagement Agreement is no longer of any legal force or effect and is not binding upon Plaintiff.

163.    Upon information and belief, Defendants DME Associates, DME PC, and Ehrlich contend that the Engagement Agreement is of legal force and effect and is binding upon Plaintiff.

164.    An actual and genuine justiciable controversy now exists between Plaintiff and Defendants DME Associates and DME PC concerning their respective rights and obligations under the Engagement Agreement.

165.    Plaintiff seeks a declaratory judgment that the Engagement Agreement has been repudiated by reason of Defendants DME Associates, DME PC, and Ehrlich's material breaches thereof or, in the alternative, is subject to rescission at Plaintiff's election, and that Plaintiff no longer has any obligations under the Engagement Agreement and that the Engagement Agreement is no longer of any legal force or effect and is not binding upon Plaintiff.

166.    Plaintiff has no adequate remedy at law.

**AS AND FOR A SEVENTH CLAIM**
(Faithless Servant)
Against All Defendants

167.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 166 hereof as if fully set forth herein.

168.    As employees of Plaintiff, Defendants, at all times during the course of their employment and representation of Plaintiff, owed Plaintiff the fiduciary duties of good faith and loyalty.

169.     As set forth above, Defendants breached their respective fiduciary duties to Plaintiff during the course of their employment and representation, acting directly against Plaintiff's best interests, and were faithless in carrying out their obligations to Plaintiff.

170.     Defendants were Plaintiff's "faithless servants."

171.     By reason of the foregoing, Plaintiff is entitled to (i) recover, and Defendants must disgorge, any and all commissions and monies paid to Defendants by Plaintiff, and (ii) an Order declaring that Plaintiff has no obligation to pay Defendants any further commissions.

172.     Plaintiff is also entitled to punitive damages against Defendants on this cause of action, as their aforementioned conduct, supra, was intentional and wanton.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment as follows:

(a)     On the First Cause of Action, an award of damages against the DME Firms and Ehrlich, and in favor of Plaintiff in an amount to be determined at trial, plus interest thereon at the statutory rate;

(b)     On the Second Cause of Action, an award of damages against DME Management and Ehrlich and in favor of Plaintiff in an amount to be determined at trial, plus interest thereon at the statutory rate;

(c)     On the Third Cause of Action, an award of damages against Defendant DME Management and in favor of Plaintiff in an amount to be determined at trial plus interest thereon at the statutory rate;

(d)     On the Fourth Cause of Action, a declaratory judgment that the Management Agreement has been repudiated by reason of DME Management's and Ehrlich's material breaches thereof or, in the alternative, is subject to rescission at Plaintiff's election, and that Plaintiff no

longer has any obligations under the Management Agreement and that the Management Agreement is no longer of any legal force or effect and is not binding upon Plaintiff;

(e)    On the Fifth Cause of Action, a declaration that the Management Agreement has been rescinded due to its unconscionability;

(f)    On the Sixth Cause of Action, a declaratory judgment that the Engagement Agreement has been repudiated by reason of the DME Firms' and Ehrlich's material breaches thereof or, in the alternative, is subject to rescission at Plaintiff's election, and that Plaintiff no longer has any obligations under the Engagement Agreement and that the Engagement Agreement is no longer of any legal force or effect and is not binding upon Plaintiff;

(g)    On the Seventh Cause of Action, an order requiring Defendants to disgorge and pay over to Plaintiff any and all commissions and monies received by Defendants from Plaintiff, and declaring that Plaintiff has no obligation to pay Defendants any further monies or commissions;

(h)    An award to Plaintiff of the costs, including attorneys' fees, and disbursements incurred in this action; and

(i)    Such other and further relief as the Court deems just and proper.

Dated: March 30, 2023

REITLER KAILAS & ROSENBLATT LLP

By: /s/ Brian D. Caplan
        Brian D. Caplan
        Julie B. Wlodinguer
885 Third Avenue, 20th Floor
New York, New York 10022
Tel: (212) 209-3050
bcaplan@reitlerlaw.com
jwlodinguer@reitlerlaw.com

*Attorneys for Plaintiff*