UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------------X
                                                        :
LAUREN SPENCER-SMITH,                                   :
                                                        :
                         Plaintiff,                     :
                                                        :
          -v-                                           :
                                                        :
DAVID M. EHRLICH et al.,                                :
                                                        :
                         Defendants.                    :
                                                        :
----------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  2/21/2024

23-cv-02652 (LJL)

<u>OPINION AND ORDER</u>

LEWIS J. LIMAN, United States District Judge:

Defendants David M. Ehrlich ("Ehrlich"), David M. Ehrlich & Associates, P.C. ("DME Associates"), David M. Ehrlich P.C., Esq. ("DME PC" and with DME Associates, the "DME Firms")) and Song Collect, Inc. d/b/a DME Management ("DME Management" and collectively with Ehrlich, DME Associates, and DME PC, "Defendants") move to dismiss Plaintiff Lauren Spencer-Smith's ("Plaintiff" or "Spencer-Smith") Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  Dkt. No. 21.

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the Amended Complaint as supplemented by the documents incorporated by reference therein.  *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020), *aff'd,* 847 F. App'x 35 (2d Cir. 2021) (summary order).

Spencer-Smith, a dual citizen of Canada and the United Kingdom, is a musician and songwriter.  Dkt. No. 14 ¶ 5.  Spencer-Smith presently resides in Canada.  *Id.*  In 2020, Spencer-Smith, then sixteen, rose to prominence after she placed in the top twenty singers of television show *American Idol. Id.* ¶ 18.  That same year, Spencer-Smith's debut album, "Unplugged Vol.

1," was nominated for a Juno Award in the Best Adult Contemporary Album Category.  *Id.* ¶ 19.
Spencer-Smith has continued producing music since.  *Id.* ¶ 20.

Ehrlich is an attorney and is admitted to the New York State Bar.  *Id.* ¶ 7.  Ehrlich is the
sole owner and president of the DME Firms, New York corporations through which Ehrlich
renders legal services to his clients.  *Id.* ¶¶ 8–11.  Ehrlich is also the sole owner and president of
DME Management, also a New York corporation, through which Ehrlich manages the
professional careers of entertainers.  *Id.* ¶¶ 12–13.

On April 17, 2020, Spencer-Smith and her parents entered into a written agreement with
the DME Firms (the "Engagement Agreement") for the DME Firms to act as her attorneys in
connection with her career in the entertainment industry, including in terminating her
relationship with her then-personal manager.[1]  *Id.* ¶¶ 23, 26; Dkt. No. 14-1.  The Engagement
Agreement provided that the DME Firms "will be responsible for rendering all legal services that
may be necessary or desirable that are related to [Spencer-Smith's] services and activities
throughout the entertainment industry."  Dkt. No. 14-1 ¶ 1.[2]  In exchange for the DME Firms'
services, the parties agreed that the DME Firms would receive a five percent commission on
Spencer-Smith's earnings made in connection with her work in the entertainment industry.  *Id.*
¶ 2.  The parties also agreed that the DME Firms would receive a ten percent "success fee" in the
first year of the Engagement Agreement and five percent thereafter if the DME Firms were

---

[1] The Engagement Agreement contains a forum-selection clause which designates New York as
the proper forum for adjudicating any disputes that arise from the agreement.  Dkt. No. 14 ¶ 16;
Dkt. No. 14-1 ¶ 4.
[2] The Engagement Agreement included a carve-out provision that excepted the DME Firms from
providing legal services that the Firms did not customarily provide, including, *inter alia*, the
registration and maintenance of trademarks, tax and estate planning, and mergers and
acquisitions.  Dkt. No. 14-1 ¶ 1.

directly responsible for obtaining, among other things, a recording agreement with a major record label. *Id.*

In November 2020, Spencer-Smith separated from her then-personal manager. Dkt. No. 14 ¶¶ 1, 32. Immediately after Spencer-Smith had separated from her then-personal manager, Ehrlich sought to become Spencer-Smith's personal manager through DME Management. *Id.* ¶ 33. Ehrlich intimated that he needed greater compensation for the work that he was already doing for Spencer-Smith, and that he could not continue to work for her in any capacity if she did not hire him as her personal manager. *Id.* ¶ 36. In seeking to become Spencer-Smith's personal manager in addition to her attorney, Ehrlich sought to increase his compensation from the five percent commission agreed upon in the Engagement Agreement to a twenty percent commission for work as both attorney and manager to Spencer-Smith. *Id.* ¶ 35.

On January 8, 2021, Ehrlich sent Spencer-Smith a draft personal management agreement (the "Management Agreement") via email, stating that the Management Agreement "memorialize[d]" their existing relationship. *Id.* ¶¶ 50–51. Ehrlich advised Spencer-Smith to retain her own independent counsel to review the proposed Management Agreement, and recommended two attorneys to Spencer-Smith, including Jonathan Horn, a personal acquaintance of Ehrlich's. *Id.* ¶¶ 54–55. Spencer-Smith engaged Horn to review the draft Management Agreement before she signed it. *Id.* ¶ 56. However, after engaging Horn, Spencer-Smith alleges that there was limited negotiation regarding the terms of the Management Agreement, and that the executed version of the Management Agreement is substantially similar to Ehrlich's initial draft. *Id.* ¶ 57. In addition, Horn never sent Spencer-Smith a bill for his services. *Id.* ¶ 59.

On February 19, 2021, the parties executed the Management Agreement, when Spencer-Smith was seventeen years old.[3]  *Id.* ¶¶ 46–48; *see* Dkt. No. 22-1.  The Management Agreement prohibited Spencer-Smith from disaffirming the Management Agreement because of her age and required her to ratify the Management Agreement once she turned eighteen.  Dkt. No. 14 ¶¶ 69–72.  In addition, the Management Agreement contained a conflict-of-interest waiver, which purports to waive Ehrlich's conflict of interest in acting as both Spencer-Smith's attorney and her personal manager.  *Id.* ¶ 113; Dkt. No. 22-1 ¶ 13(j).  The Management Agreement was signed by Spencer-Smith's parents who agreed to the terms on behalf of themselves and Spencer-Smith and agreed to be liable for any financial obligations incurred by Spencer-Smith prior to her eighteenth birthday.  Dkt. No. 22-1 at 14–15.  On or about September 30, 2021, Spencer-Smith ratified the Management Agreement, two days after she turned eighteen.  Dkt. No. 14 ¶ 96.

On January 5, 2022, Spencer-Smith self-released a single entitled "Fingers Crossed," which went viral on the video-sharing application TikTok.  *Id.* ¶ 98.  A few weeks later, Spencer-Smith entered into an exclusive recording agreement with Island Records and Republic Records, divisions of UMG Recordings, Inc. ("UMG").  *Id.* ¶ 101.

In April 2022, UMG sent Spencer-Smith on a three-week promotional tour in Europe ("the Tour").  *Id.* ¶ 117.  Ehrlich accompanied Spencer-Smith on the Tour.  *Id.* ¶ 118.  While on the Tour, Ehrlich allegedly took pictures of women without their consent, solicited a female UMG employee to work for him in New York, commented inappropriately about multiple women, and berated a UMG employee.  *Id.* ¶¶ 119–124.  After UMG received complaints from its employees about Ehrlich, UMG is alleged to have conducted an internal investigation into the

---

[3] Like the Engagement Agreement, the Management Agreement contained a forum-selection clause designating New York as the jurisdiction in which any disputes arising from the Agreement would be adjudicated.  Dkt. No. 14 ¶ 17.

allegations of Ehrlich's misconduct.  *Id.* ¶ 125.  UMG then allegedly advised Ehrlich to leave the Tour, and threatened to cancel the remainder of the Tour if he refused to do so.  *Id.* ¶ 126. Ehrlich did not advise Spencer-Smith of the existence or results of UMG's investigation, left for the United States, and sent his assistant to replace him on the Tour.  *Id.* ¶¶ 127–129.

On May 13, 2022, Spencer-Smith purported to terminate the Management Agreement by letter to Ehrlich.  *Id.* ¶ 136; Dkt. No. 14-2.  On June 1, 2022, Ehrlich and DME Management rejected Spencer-Smith's notice of termination, claiming that the Management Agreement was still effective, and that Spencer-Smith was in breach of that Agreement.  Dkt. No. 14 ¶ 137; Dkt. No. 14-3.  Ehrlich and DME Management purported to invoke the provision of the Management Agreement that gave them the power to extend the term of the Management Agreement indefinitely until Spencer-Smith cured her breaches.  Dkt. No. 14 ¶ 137; Dkt. No. 22-1 ¶ 13(e). On June 7, 2022, Spencer-Smith rejected Ehrlich and DME Management's claim of breach and asserted that the relationship between herself and Ehrlich and DME Management had been irretrievably damaged by Ehrlich's conduct.  Dkt. No. 14 ¶ 138; Dkt. No. 14-4.  Spencer-Smith also purported to terminate her attorney-client relationship with Ehrlich and the DME Firms in her May letter.  Dkt. No. 14 ¶ 139.

## PROCEDURAL HISTORY

On March 30, 2023, Plaintiff initiated this action against Defendants asserting two claims for breach of fiduciary duty, one against Ehrlich and the DME Firms acting in their capacity as Plaintiff's counsel, and one separately against Ehrlich and DME Management acting in their capacity as Plaintiff's managers; breach of contract against DME Management; and a claim for faithless servant against all Defendants.  *See* Dkt. No. 1.  Plaintiff also sought declaratory relief in the form of a judgment that the Management Agreement was void or subject to rescission, that

the Management Agreement was unconscionable, and that the Engagement Agreement was void or subject to rescission. *Id.*

On May 18, 2023, the Court consolidated this action with a separate action that had been filed in this District by some of the Defendants against Plaintiff. *See* Dkt. No. 8. In that action, Ehrlich, DME Management, and DME Associates asserted claims for breach of the Management Agreement, breach of the Engagement Agreement, and defamation *per se*. *Ehrlich v. Spencer-Smith*, CM-ECF 23-cv-2653, Dkt. No. 1. They also sought declaratory judgment adjudging the Management and Engagement Agreements to be valid, binding, and enforceable contracts. *Id.*

On June 23, 2023, Plaintiff filed her Amended Complaint. Dkt. No. 14. On June 26, 2023, Defendants filed their First Amended Complaint. Dkt. No. 16. On July 28, 2023, Defendants filed this motion to dismiss Plaintiff's Amended Complaint along with a memorandum of law and the declaration of Jonathan D. Davis in support of the motion to dismiss. Dkt. Nos. 21–24. On September 15, 2023, Plaintiff filed a memorandum of law in opposition to the motion to dismiss and the declaration of Julie B. Wlodinguer in support. Dkt. Nos. 30–31. On September 29, 2023, Defendants filed a reply in support of their motion to dismiss. Dkt. No. 32.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has

facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx v. Siracusano*, 563 U.S. 27, 46 (2011).

In considering a Rule 12(b)(6) motion, which "challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, [a court] do[es] not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alterations adopted) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n. 2 (2d Cir. 2016)). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Id.*; *see also Nam v. Permanent Mission of Republic of Korea to United Nations*, 581 F. Supp. 3d 643, 647 (S.D.N.Y. 2022) ("The Court may consider only the allegations in the complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or 'documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit.'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

"To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)).  Documents that are "integral" to a complaint such that they can be considered on a motion to dismiss despite not being incorporated by reference are those "where the complaint relies heavily upon [their] terms and effect." *Goel*, 820 F.3d at 560 (quoting *Chambers*, 282 F.3d at 153).  "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Id.* (internal alterations and quotation marks omitted).  Rather, in determining whether a document is integral to a complaint, a court will consider whether the contents of the document "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff was] entitled to relief.'" *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)).  "[A] necessary prerequisite" to a finding that a material is integral to a complaint "is that the 'plaintiff[ ] *rel*[*y*] on the terms and effect of [the] document in drafting the complaint . . . ; mere notice or possession is not enough.'" *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (emphasis in original) (quoting *Chambers*, 282 F.3d at 153).  And "[w]hen a court takes judicial notice of a document on a motion to dismiss, it should generally do so only 'to determine what statements the documents contain not for the truth of the matters asserted.'" *McKeefry*, 2019 WL 6498312, at *3 (alterations omitted) (quoting *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011)).  Finally, "even if a document is 'integral' to the complaint," a court may not consider it on a motion to dismiss if a "dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC*

*Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

Defendants submit, and ask the Court to consider, the Management Agreement, Ratification Agreement, the Notice of External Counsel Engagement of Doug Mark ("Mark Agreement"), and the contract with Spencer-Smith's former personal manager ("Former Management Agreement"), on the view that each of the documents is incorporated by reference. Dkt. No. 24 at 5 n.3.  Plaintiff does not dispute that the Court may consider the Management Agreement and the Ratification Agreement, but contends that the Mark Agreement and the Former Management Agreement should not be considered.  Dkt. No. 31 at 12 n.5.

The Mark Agreement does not qualify for consideration.  First, the document is not incorporated by reference into the Amended Complaint. The Amended Complaint states:

> With respect to attorney Doug Mark in particular, Mr. Mark was engaged by Ehrlich on behalf of Ms. Spencer-Smith to act as the day-to-day lawyer with respect to her entertainment industry activities.  Not only was Mr. Mark advised that he could not have direct communications with Ms. Spencer-Smith, the purported client, neither Ms. Spencer-Smith nor her parents were provided with any contact information for Mr. Mark.  Ehrlich was the conduit for any and all communications with Mr. Mark regarding Ms. Spencer-Smith's career and Ehrlich arranged for himself, rather than Ms. Spencer-Smith, to pay Mr. Mark's fees.

Dkt. No. 14 ¶ 110.  "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003).  However, nowhere in the Amended Complaint is there any reference to the Mark Agreement. *See generally* Dkt. No. 14.  Nor has Plaintiff relied on its terms in the Amended Complaint. *See, e.g.*, *Bongiorno v. Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y. Sept. 20, 2021) (recognizing that a document can be incorporated by reference if the pleading party relies on it in making its claims).  Paragraph 110 is not a "clear, definite and substantial"

reference to the Mark Agreement, and it is not enough to show that the Mark Agreement is incorporated by reference.

Second, the Mark Agreement is not "integral" to the complaint. "[A] necessary prerequisite" to a finding that materials are integral to a complaint "is that the 'plaintiff *rely* on the terms and effect of [the] document in drafting the complaint; mere notice or possession is not enough.'" *Glob. Network Commc'ns*, 458 F.3d at 156 (emphasis in original) (alterations and quotation marks omitted). "This generally occurs when the material considered is a 'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (quoting *Glob. Network Commc'ns*, 458 F.3d at 157). None of Plaintiff's claims here "stand[] or fall[]" on the Mark Agreement. *Id.* Rather, Plaintiff's claims rely on the Management Agreement, which is properly incorporated by

reference, and Ehrlich's alleged misconduct before entering into the Management Agreement, and after.[4]

## DISCUSSION

Defendants argue that each of the claims in the Amended Complaint are deficiently pled. Defendants argue that Plaintiff has not sufficiently pleaded: (1) either the existence of a fiduciary relationship vis-à-vis Ehrlich and Plaintiff when Ehrlich was acting as her manager, breach or damages sufficient to support either of Plaintiff's claims for breach of fiduciary duty; (2) performance, breach by Ehrlich and DME Management, and damages sufficient to support a claim for breach of contract. As to the validity of the contracts at issue, Defendants assert that the Engagement Agreement and Management Agreement are not subject to rescission and are not void. Defendants argue further that the Management Agreement is not unconscionable. Finally, Defendants argue that the claim for faithless servant is deficiently pled. The Court addresses each in turn.

---

[4] The Amended Complaint does not incorporate the Former Management Agreement because it makes one lone reference to it. Dkt. No. 14 ¶ 66. It is a closer question, but one that the Court need not address, whether the Former Management Agreement should be deemed "integral" to the Amended Complaint. Plaintiff suggests that the Management Agreement should be deemed unconscionable because its terms are "more onerous" than the terms of the Former Management Agreement. *Id.* This one statement does not render the Amended Complaint "heavily reli[ant] upon [the Former Management Agreement's] terms and effect." *DiFolco*, 622 F.3d at 111. In any case, Plaintiff does not rely on that comparison in her opposition to Defendants' motion to dismiss. *See* Dkt. No. 31 at 27–28. Indeed, Plaintiff's arguments regarding the substantive unconscionability of the Management Agreement are squarely based upon the terms of the Management Agreement standing alone. *See id.* Nor do any of Plaintiff's claims "stand[] or fall[]" on that comparison. *Nicosia*, 834 F.3d at 231. The Management Agreement could be substantively unconscionable even if its terms were less onerous than the Former Management Agreement. By the same token, even if the Management Agreement at issue here were more onerous than the Former Management Agreement, that would not mean that it was substantively unconscionable. The Court therefore need not and does not consider the Former Management Agreement to determine whether the Plaintiff has stated a claim for unconscionability.

## I.      Breach of Fiduciary Duty

Plaintiff's Amended Complaint alleges that Defendants breached their fiduciary duty to Plaintiff in two principal ways: first, she contends that Ehrlich and the DME Firms, acting in their capacity as Plaintiff's attorneys, breached their fiduciary duty to Plaintiff by inducing her to enter into the Management Agreement.  Dkt. No. 14 ¶¶ 2, 39, 53, 85, 105.  Second, Plaintiff alleges that Ehrlich the DME Firms, and DME Management breached their fiduciary duties to Plaintiff when Ehrlich allegedly engaged in inappropriate conduct on the Tour.  *Id.* ¶¶ 4, 106, 128.

A fiduciary is "a person who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, trust, confidence, and candor."  *United States v. Smith*, 985 F. Supp. 2d 547, 601 (S.D.N.Y. 2014), *aff'd*, 654 F. App'x 23 (2d Cir. 2016) (summary order) (quoting *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012)); *see also Fed. Ins. Co. v. Int'l Bus. Machines Corp.*, 965 N.E.2d 934, 938 n.3 (N.Y. 2012).  Fiduciary relationships are "grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions."  *Oddo Asset Mgmt. v. Barclays Bank PLC*, 973 N.E.2d 735 (N.Y. 2012). Under New York law, a claim for "[b]reach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the defendant; (2) a breach of that duty; and (3) resulting damages." *Jones v. Voskresenskaya*, 5 N.Y.S.3d 16, 17 (1st Dep't 2015); *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). The Court addresses in turn each of Plaintiff's claims that (1) Ehrlich and the DME Firms, as Plaintiff's counsel, violated their fiduciary duties to her by inducing Plaintiff to enter into the Management Agreement; and (2) all Defendants breached their fiduciary duties by engaging in inappropriate conduct on Tour.

A.      The Management Agreement

The Amended Complaint alleges that Ehrlich emailed Spencer-Smith an initial proposed draft of the Management Agreement on January 8, 2021 from his law firm email address, and stated in the email that the draft sought to "memorialize" the relationship and services that Ehrlich had already been providing to Spencer-Smith.  Dkt. No. 14 ¶¶ 50–51.  Spencer-Smith contends that Ehrlich and the DME Firms breached their fiduciary duties to her in the course of their negotiations and execution of the Management Agreement both (1) by "present[ing] . . . the draft management agreement" to her, *id.* ¶ 53; and (2) by referring her to another attorney who was Ehrlich's "personal acquaintance" to represent her in the negotiation of the Management Agreement, thereby allegedly depriving her of "effective assistance of independent counsel in connection with reviewing and signing the Management Agreement," *id.* ¶¶ 54–58.  Neither allegation suffices to state a claim for breach of fiduciary duty.  The Court begins with the second allegation, as it reflects why Ehrlich owed no fiduciary duty to Spencer-Smith in his capacity as a party to the Management Agreement in the first instance, and thus defeats both of Spencer-Smith's specific allegations.[5]

Spencer-Smith has failed to plausibly allege that Ehrlich, in his capacity as the counterparty to the Management Agreement, owed a fiduciary duty to Spencer-Smith at all.  It is

_____

[5] Although the Court is mindful of the fact that "New York courts generally avoid dismissing a claim of breach of fiduciary duty under Rule 12(b)(6) because it usually involves a question of fact," courts have dismissed such claims where the complaint "does not allege facts that establish a fiduciary relationship."  *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 26 (S.D.N.Y. 2009), *aff'd sub nom.*, 382 F. App'x 107 (2d Cir. 2010) (summary order).  Because here the facts alleged, "as a matter of law, are insufficient to establish a fiduciary relationship," *Iannuzzi v. Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 139 (E.D.N.Y. 2010) (Bianco, J.), the Court deems it appropriate to dismiss the breach of fiduciary duty claim insofar as it relates to the parties' entry into the Management Agreement, *see, e.g.*, *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 349 (S.D.N.Y. 2010).

undisputed that Ehrlich and Spencer-Smith had, at the time that Ehrlich and Spencer-Smith began negotiating the Management Agreement, a pre-existing attorney-client relationship—the parties had entered into the Engagement Agreement governing the terms of that relationship. *See* Dkt. 14-1. And it is hornbook law that an attorney owes fiduciary duties to his clients. *See, e.g.*, *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 865 N.Y.S.2d 14, 20 (1st Dep't 2008). But Spencer-Smith has not established that, in the course of the Management Agreement negotiations and execution, Ehrlich was acting in his capacity as her attorney rather than as an arms-length transactor to a contract. "When parties deal at arm[']s length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir.), *cert. denied sub nom.*, *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield*, 537 U.S. 882 (2002); *see also Bd. of Managers of Brightwater Towers Condo. v. FirstService Residential N.Y., Inc.*, 147 N.Y.S.3d 78, 81 (2d Dep't 2021) ("An arm's-length business relationship does not give rise to a fiduciary obligation, as the core of a fiduciary relationship is a higher level of trust than normally present in the marketplace between those involved in arm's-length business transactions."). In the negotiation and execution of the Management Agreement, Ehrlich and the DME Firms were acting simply as arm's-length transactors to the contract. By "advis[ing] Spencer-Smith to retain her own counsel to review the proposed management agreement," Dkt. No. 14 ¶ 53, Ehrlich made clear that, in negotiating the terms of the Management Agreement, he was not acting as Spencer-Smith's counsel. And certainly by the time Spencer-Smith retained counsel to act on her behalf with respect to the Management Agreement at Ehrlich's urging, Ehrlich no longer had any responsibility to act as her lawyer on the same subject.

14

"It is well-settled that 'a fiduciary duty arises when a lawyer deals with persons who . . . he has or should have reason to believe rely on him.'" *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at *9 (S.D.N.Y. Feb. 15, 2013) (quoting *Koppel v. 4987 Corp.*, 2001 WL 47000, at *11 (S.D.N.Y. Jan.19, 2001)).  To determine whether "an attorney should know that a person is relying on him, courts look to whether a pre-existing attorney-client relationship existed, and if such a relationship existed, whether the lawyer made 'a clear and forthright statement to his clients that he was no longer their attorney and that they should obtain outside counsel' for the matter." *Id.* (quoting *Croce v. Kurnit,* 565 F. Supp. 884, 890 (S.D.N.Y. 1982), *aff'd*, 39 F. App'x 633 (2d Cir. 2002) (summary order)); *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 259 (S.D.N.Y. 2008) (explaining that "the suggestion to retain independent counsel is a repudiation of any special or fiduciary relationship and a powerful indicator that the attorney's interests are not aligned with those of the putative client").  "Generally, where parties have entered into a contract, courts look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency.'" *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (quoting *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 624 N.E.2d 129 (N.Y. 1993)).

Here, the complaint offers no plausible basis from which Spencer-Smith could believe that she could rely on Ehrlich to represent her interests in the negotiation of the Management Agreement.  This is because Ehrlich made a clear and forthright statement that she should obtain outside counsel, and Plaintiff followed up on that advice and hired outside counsel.  Plaintiff

acknowledged as much in the executed Management Agreement,[6] which stated that she had been "advised of her right to retain independent legal counsel," and had "been represented by such independent legal counsel that was selected independently . . . free from [Ehrlich's] influence." Dkt. No. 22-1 ¶ 13(j).  She also acknowledged that, although Ehrlich "had provided legal advice and counsel . . . in the past and may in the future," Ehrlich could not do so "in connection with th[e] Agreement."  *Id.*  Under New York law, by informing Spencer-Smith to retain counsel to represent her in connection with the Management Agreement, Ehrlich relieved himself of the duty to provide her advice in connection with that agreement.  When Plaintiff actually hired counsel, she had her own lawyer with fiduciary duties to represent her competently and independently and zealously within the bounds of the law.  *See, e.g.*, Code of Prof. Resp., Canon 6, N.Y. McKinney's Judiciary Law App. ("A Lawyer Should Represent a Client Competently."); *id.* Canon 5 ("A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client."); *id.* Canon 7 ("A Lawyer Should Represent a Client Zealously Within the Bounds of the Law.").  Ehrlich could not even communicate with Spencer-Smith on the subject of the Management Agreement save in the presence of her attorney and, if that attorney chose not to allow Ehrlich to speak to Spencer-Smith, Ehrlich would have no right to speak to her regarding the negotiation of the Management Agreement.  *See, e.g.*, N.Y. Comp. Codes R. & Regs., tit. 22, § 1200.0 ("In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be

---

[6] It is well settled that parties may limit the scope of fiduciary duties by contract.  *Chase Manhattan Bank, N.A. v. Remington Prods., Inc.*, 865 F. Supp. 194 (S.D.N.Y. 1994), *aff'd*, 71 F.3d 407 (2d Cir. 1995); *see also Baker v. Andover Assoc. Mgmt. Corp.*, 924 N.Y.S.2d 307 (N.Y. Sup. Ct. 2009).  "A contractual relationship and a fiduciary relationship can co-exist at the same time and between the same parties."  *Regan v. Conway*, 768 F. Supp. 2d 401, 411 (E.D.N.Y. 2011).

represented by another lawyer in the matter."); *see also S.E.C. v. Lines*, 669 F. Supp. 2d 460, 463 (S.D.N.Y. 2009) (explaining that this rule "applies even though the represented person initiates or consents to the communication").  Spencer-Smith cannot save her claim by simply alleging that she "trusted and relied upon Ehrlich" generally, Dkt. No. 14 ¶ 25, because "unilateral trust or confidence 'does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well," *Musalli Factory*, 261 F.R.D. at 26 (quoting *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001)).  "[N]o acceptance of this duty by the Defendants is alleged in the Complaint."  *Id.*  Instead, Ehrlich disclaimed such a duty throughout the negotiations and in the Management Agreement itself.  Accordingly, notwithstanding the fact that Ehrlich continued to represent Spencer-Smith in other matters, there is no basis to find a fiduciary relationship "given that [Ehrlich] quashed any reasonable belief that he would be [Spencer-Smith's] attorney or represent [her] interests in the transaction by

suggesting that they hire [independent counsel]." *See Matsumura*, 542 F. Supp. 2d at 259 & n.3.[7]

Plaintiff's suggestion that Ehrlich was obliged to advise her with respect to the "advantages and disadvantages of selecting Ehrlich and/or DME Management to be her personal manager," or to "seek out an independent and well-established personal manager" thus is unavailing.  Dkt. No. 14 ¶¶ 40–41.  Once Ehrlich informed Plaintiff to retain her own counsel, Ehrlich's duties to her on the subject of whether to enter into the Management Agreement and on what terms ended.  Ehrlich was not required, as Spencer-Smith asserts, to argue against his own interests or to provide her advice in negotiating the Management Agreement.  *See, e.g.*, *Ehrenkranz v. 58 MHR, LLC*, 18 N.Y.S.3d 578 (N.Y. Sup. Ct. 2015) ("As a party contracting at arms length with [an entity], [the contracting party] did not owe that entity . . . a fiduciary

---

[7] This case is thus easily distinguishable from cases such as *Beltrone v. Gen. Schuyler & Co.*, 675 N.Y.S.2d 198 (3d Dep't 1998), where an attorney engaged in a business transaction with a client who did not have other representation after providing "legal advice and [making] a number of representations to plaintiff, including the nonnecessity of obtaining his own legal counsel, without fully advising plaintiff of the consequences of the various transactions the partnership took." *Id.* at 200.  Courts have found that an attorney breached his fiduciary duty to a client where the attorney entered into a transaction with their client without advising them to retain, or without the client actually retaining, independent counsel.  *See, e.g.*, *Matter of Lyons*, 177 N.Y.S.3d 161, 167 (2d Dep't 2022) (finding that an attorney "engaged in a conflict of interest by entering into several business transactions with his clients where the [attorney] and his clients had differing interests without, inter alia, disclosing and transmitting, in writing, the full terms of the transactions and failing to advise his clients, in writing, of seeking the advice of independent legal counsel"); *Sotiriou v. Billis*, 782 N.Y.S.2d 917, 918 (2d Dep't 2004) (dismissing attorney's complaint in an action to foreclose his client's mortgage because the attorney failed "to provide full disclosure to his client [] regarding [the] parties' divergent interests as borrower and lender, [the] potential for conflict, [the] consequences of default," or advise him to consult with independent counsel); *Schlanger v. Flaton*, 631 N.Y.S.2d 293, 295 (1st Dep't 1995) (finding that an attorney breached his fiduciary duty to his client when he, among other things, failed to counsel his client as to the "consequences that might result from [the attorney] becoming a 50% shareholder or the management of [two commercial] propert[ies], and the [attorney] did not suggest that [his client] consult independent counsel").

duty.").  Doing so might only have placed him in conflict with the counsel that Spencer-Smith retained to represent her in the negotiation.

Plaintiff's contention that Ehrlich referred Plaintiff to Horn, an attorney with whom Ehrlich was personally acquainted and with whom he was friendly, and that Horn provided her with inadequate representation, does not alter the analysis.  There is no prohibition against referring existing or prospective clients to other lawyers.  *See, e.g.*, *Estate of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907 (S.D.N.Y. 1997) (Sotomayor, J.).  Frequently, it is precisely because a lawyer is familiar with a colleague from long practice together that she is able confidently to provide a favorable recommendation.  One expects cordial and friendly relations among members of the bar even if they are fierce adversaries in the courtroom or at the negotiating table.  That Ehrlich recommended a lawyer whom he knew and liked does not suggest that he compromised Plaintiff's interests.  To have suggested someone with whom Ehrlich was unfamiliar may have verged on the incompetent.  That Ehrlich suggested two lawyers, one of whom he knew and liked, suggests he was attentive to Plaintiff's interests and not neglectful of them.  *See, e.g.*, *Rothberg v. Phil's Main Roofing, LLC*, 2016 WL 2344882, at *3 (S.D.N.Y. May 2, 2016).  Nor does the fact that Spencer-Smith's lawyer was referred by Ehrlich suggest that he compromised Spencer-Smith's interests in favor of those of Ehrlich.  Horn had the same ethical duties as any other barred attorney who Spencer-Smith could have hired to independently, competently, and vigorously represent her, regardless of the source of the referral.  *See* N.Y. Rules of Prof'l Conduct 1.1, 1.3; *see also Aiello v. Adar*, 750 N.Y.S.2d 457,

465 (N.Y. Sup. Ct. 2002) (explaining that a referral "does not create an ethical obligation of the referring lawyer to supervise the activities of the receiving lawyer").[8]

Rule 1.8 of the New York Rules of Professional Conduct ("NYRPC") expressly contemplates that an attorney may enter into a business relationship with a current client.  It provides that:

> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:
>
> (1) the transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

N.Y. Rules of Prof'l Conduct R. 1.8.  Rule 1.8 invites a "twofold inquiry": "The first [question] is whether the transaction itself is one in which the lawyer and client have differing interests *and* in which the client expects the lawyer to exercise the lawyer's independent professional judgment on the client's behalf.  If the answers are yes, then, as a second step, the lawyer must assure that the terms are fair and reasonable to the client and fully disclosed in a writing that includes not only the deal's essential terms and the lawyer's role in shaping them, but also the desirability of the client seeking independent legal advice."  N.Y. Bar Ass'n Comm.

---

[8] Even if there were a cognizable conflict of interest, "such a conflict is . . . waivable by a client through informed consent."  *Johnson*, 660 F.3d at 139; *see also Snyder v. Snyder*, 870 N.Y.S.2d 192, 193 (4th Dep't 2008) ("[A] client may provide consent to a conflict of interest after full disclosure.").  Here, Spencer-Smith signed exactly such a waiver in which she acknowledged that Ehrlich did not provide legal advice in connection with the Management Agreement.  *See* Dkt. No. 22-1 ¶ 13(j) (paragraph entitled "Attorney Representation/Conflict Waiver").

On Prof'l Ethics, Op. 913 (2012) (emphasis in original).  Here, not only did Ehrlich advise Plaintiff in writing of the desirability of seeking independent legal counsel, but she availed herself of that opportunity.  Once she did so, it was up to her counsel to negotiate the agreement with Ehrlich and to ensure it was fair and reasonable.  Any grievances she has with respect to the negotiation of the terms of that Agreement is thus with the counsel she retained expressly for that purpose and not with the lawyer who, with respect to the Management Agreement, was on the other side of the transaction.[9]  *See* N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 1055 n.1 (2015); N.Y.C. Bar Ass'n Comm. on Prof'l Ethics, Op. 2019-5 at 7 (2019) ("[I]f the client . . . is represented by separate counsel, it is unlikely that the client expects the lawyer to exercise professional judgment for the client.").

And Spencer-Smith's first argument, that Ehrlich breached his fiduciary duty by simply presenting the draft Management Agreement to Ehrlich as a starting point for the parties' negotiations, also fails.  Even assuming that Ehrlich had a fiduciary duty to Plaintiff in his capacity as an opposing party to a contract negotiation, simply presenting a draft of the proposed contract does not constitute misconduct.  New York law "recognizes that the attorney-client relationship imposes on the attorney 'the duty to deal fairly, honestly, and with undivided loyalty . . . including maintaining confidentiality, avoiding conflicts of interest, operating

---

[9] Even if Rule 1.8 applied, and Ehrlich and the DME Firms were found to have violated Rule 1.8, a violation of the NYRPC alone does not establish a claim for breach of fiduciary duty.  *See Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 629 F. Supp. 2d 259, 263 (S.D.N.Y. 2007), *aff'd sub nom. Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 F. App'x 472 (2d Cir. 2009) (summary order) ("[I]t is well-established that the violation of a disciplinary rule, without more, does not establish a claim for breach of fiduciary duty."); *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (summary order) (an "attorney's breach of a disciplinary rule does not *per se* give rise to a cause of action for breach of fiduciary duty"); *Renaud v. Young Men's Christian Ass'n Ret. Fund*, 2012 WL 363561, at *1 (S.D.N.Y. Feb. 3, 2012) ("[A]lleged violations of the [NYRPC] do not in and of themselves give rise to a breach of fiduciary duty claim.").

competently, safeguarding client property and honoring the clients' interests over the lawyer's.'"
*Gottsch v. Eaton & Van Winkle LLP*, 343 F. Supp. 3d 372, 377 (S.D.N.Y. 2018) (quoting *Ulico*,
865 N.Y.S.2d at 20).  But the Court finds no basis for the proposition that by merely presenting a
contract draft as a starting point for the parties' negotiations, Ehrlich violated one of these duties.
In other words, here, Plaintiff "failed to establish that defendant engaged in any misconduct."
*Tuper v. Tuper*, 956 N.Y.S.2d 739, 740 (4th Dep't 2012).  Accordingly, Plaintiff fails to state a
claim for breach of fiduciary duty for conduct arising out of the negotiation and execution of the
Management Agreement.

### B.      During the Term of the Management Agreement

Plaintiff also alleges that Defendants breached their fiduciary duties to Plaintiff when
Ehrlich allegedly engaged in inappropriate conduct on the Tour to his benefit and to Plaintiff's
detriment.  Dkt. No. 14 ¶¶ 4, 106, 128.  Plaintiff asserts that Ehrlich engaged in "various
behaviors that threatened [her] reputation and livelihood as well as caused her severe
embarrassment and shame," specifically, that Ehrlich "surreptitiously took numerous pictures" of
women, including young female UMG employees, "without their knowledge or consent," that
Ehrlich "inappropriately solicited" a young UMG employee to work for him in New York, and
that he "exhibited unprofessional, inappropriate, and disrespectful behavior towards members of
[Plaintiff's] musical team."  *Id.* ¶¶ 116, 119–22, 124.  When UMG learned of Ehrlich's conduct
from an employee who had been subject to Ehrlich's harassment, UMG conducted an internal
investigation and ultimately instructed Ehrlich to leave the Tour or risk its cancellation entirely.
*Id.* ¶¶ 125–26.  Ehrlich left the Tour abruptly, and lied to Plaintiff about his reason for doing so,
stating he was leaving to "be with his wife," without informing her of UMG's investigation and
demand.  *Id.* ¶ 129.

Defendants do not dispute the existence of a fiduciary relationship or that they owed

fiduciary duties to Plaintiff as Plaintiff's manager,[10] *see, e.g., Gershunoff v. Panov*, 430

N.Y.S.2d 299, 300–01 (1st Dep't 1980) (finding a fiduciary relationship between a manager and

ballet dancers), but contend that Plaintiff has not alleged a breach of duty or damages sufficient

to support her claims.  Defendants assert specifically that "a breach of fiduciary duty must be

based on 'unfair, fraudulent or wrongful act[s],' such as 'misappropriation of trade secrets,

misuse of confidential information, . . . or usurpation of [an] employer's business opportunity.'"

Dkt. No. 24 at 16 (quoting *Dewitt Stern Grp., Inc. v. Eisenberg*, 257 F. Supp. 3d 542, 585

(S.D.N.Y. 2017), *aff'd*, 734 F. App'x 48 (2d Cir. 2018) (summary order)).  Because Spencer-

Smith did not specifically allege misappropriation of trade secrets, misuse of confidential

information, or usurpation of business opportunity, Defendants posit that she has failed to state a

claim for breach of fiduciary duty.  *Id.* at 16–17.

Defendants read the New York law of fiduciary duty too narrowly.  Although claims of

breach of fiduciary duty commonly involve misappropriation of trade secrets, misuse of

confidential information, or usurpation of a business opportunity, those are not the exclusive

---

[10] Although typically "a conventional business relationship" created by a management contract "does not create a fiduciary relationship in the absence of additional factors," *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 299 (S.D.N.Y. 1995), courts have found a fiduciary relationship where the parties specifically so agree or if "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party," *Calvin Klein Trademark Tr. v. Wachner*, 123 F. Supp. 2d 731, 733–34 (S.D.N.Y. 2000).  In cases where a musician and their manager were friends and co-owners of a business, courts have found a fiduciary relationship.  *See, e.g.*, *Reznor v. J. Artist Mgmt., Inc.*, 365 F. Supp. 2d 565, 568–70 (S.D.N.Y. 2005).  Here, Plaintiff also alleges that Ehrlich had a "special position as trusted advisor."  *Id.* at 574; *see also Apple Recs., Inc. v. Capitol Recs., Inc.*, 529 N.Y.S.2d 279 (1st Dep't 1988) (finding fiduciary relationship between artists and manager); *Penato v. George*, 383 N.Y.S.2d 900, 905 (2d Dep't 1976) ("A [fiduciary] relationship might be found to exist, in appropriate circumstances, between close friends or even where confidence is based upon prior business dealings." (internal citations omitted)); *cf. Theroux v. Resnicow*, 168 N.Y.S.3d 69 (1st Dep't 2022).

means by which a fiduciary may breach his duties to one whose trust he has assumed. A fiduciary is obligated not to take the trust reposed in him and use it for his own personal benefit and to the detriment of the *cestui que* trust. *See, e.g.*, *106 N. Broadway, LLC v. Lawrence*, 137 N.Y.S.3d 148, 155 (2d Dep't 2020). The duty of loyalty precludes "not only blatant self-dealing, but also requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 83 (S.D.N.Y. 2015) (quoting *Birnbaum v. Birnbaum*, 539 N.E.2d 574 (N.Y. 1989)); *see also Blondell v. Bouton*, 2019 WL 12338323, at *10 (E.D.N.Y. Mar. 29, 2019). "[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Khaldei*, 135 F. Supp. 3d at 83 (quoting *Birnbaum*, 539 N.E.2d at 574); *see also Meinhard v. Salmon,* 164 N.E. 545 (N.Y. 1928) ("A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."); *Matter of Cooperman,* 633 N.E.2d 1069, 1070 (N.Y. 1994).

Although the question is close, on this set of facts, Plaintiff adequately states a claim for breach of Defendants' fiduciary duties. Although not every one of Plaintiff's allegations would, if true, give rise to a claim for breach of fiduciary duty, Plaintiff has alleged enough to cross the line from the possible to the plausible. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. The complaint need not have "detailed factual allegations" as Defendants appear to suggest. *Iqbal*, 556 U.S. at 663. Plaintiff does not just allege that Ehrlich engaged in unruly or improper activity on his own private time or in Plaintiff's company to unsuspecting victims, certain of Plaintiff's allegations suggest that Ehrlich took the trust that was reposed in him as Plaintiff's agent and bartered that trust for his own personal benefits and at the expense of Plaintiff. *See, e.g.*, Dkt. No. 14 ¶ 122. It is not necessary that such benefits were financial, as Defendants seems to

suggest.  New York law has not excluded the possibility that a fiduciary can breach his duties by compromising the interests of one who has placed trust in him for a non-financial benefit.[11]

### C.     Damage

Plaintiff has sufficiently pled that Defendants' alleged misconduct on the Tour caused her damage.  "[A]ctual injury'—or 'damage'—is an essential element of a breach of fiduciary duty claim under New York law." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 244 n.17 (2d Cir. 2020).  To satisfy this element, Plaintiff must allege "'damage' (harm or injury)," rather than "damages." *Id.* at 241.

Defendants argue that the breach of fiduciary duty claim should be dismissed because the Amended Complaint fails to sufficiently allege damages.  Dkt. No. 24 at 17–18; Dkt. No. 32 at 8–9.  Defendants complain that the Amended Complaint does not identify any "actual damages" Spencer-Smith suffered because of her relationship with Defendants.  Dkt. No. 24 at 18.  Plaintiff responds that she is not required to plead damages to establish a claim of breach of fiduciary duty but only injury and that, in any event, she suffered injury in the form of the fees she paid Defendants pursuant to the Management Agreement.  Dkt. No. 31 at 17–18.

Defendants' arguments are mistaken.  The Second Circuit, interpreting New York law, has held that a plaintiff need only plead damage or injury and not compensable damages to state a claim for breach of fiduciary duty.  *Yukos Cap.*, 977 F.3d at 241.  "Damage" refers to "[l]oss or injury to person or property," while damages refers to "[m]oney claimed by, or ordered to be

---

[11] The Court notes that, although no such allegations are made here, Delaware courts have found that a claim of breach of fiduciary duty lies where a defendant abuses his position of trust in exchange for sexual favors or sexual gratification.  *See, e.g.*, *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652 (Del. Ch. Ct. 2023); *see also* Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 COLUM. L. REV. 1583 (2018).  New York courts have looked to the law of Delaware to define the nature and extent of fiduciary duties.  *See, e.g.*, *Matter of Kenneth Cole Prods., Inc. S'holder Litig.*, 27 N.Y.3d 268, 278 (N.Y. 2016); *see also Cement Masons Loc. 780 Pension Fund v. Scleifer*, 61 N.Y.S.3d 190 (N.Y. Sup. Ct. 2017).

paid to, a person as compensation for loss or injury." *Id.* at 245–46 (quoting Black's Law Dictionary (11th ed. 2019)).  As the Second Circuit has explained, "[e]ven though most New York courts refer to [the third] element [of a claim of breach of fiduciary duty] as requiring 'damages,'" the better reasoned view is "that element requires proof of 'damage' (harm or injury)." *Id.* at 241; *see Miami Firefighters' Relief & Pension Fund v. Icahn*, 158 N.Y.S.3d 44, 46 (1st Dep't 2021) ("[D]amages 'ha[ve] never been considered to be an essential requirement for a cause of action founded on a breach of fiduciary duty.'" (quoting *Diamond v. Oreamuno*, 248 N.E.2d 910 (N.Y. 1969))).  If there is no injury, there is no claim for breach of fiduciary duty.

Plaintiff plausibly pleads that she was injured as a result of Ehrlich's alleged breach of fiduciary duty on the Tour.  She alleges that his conduct caused her "damage," in that it "undermined and threatened the career and reputation of Ms. Spencer-Smith," "damaged Ms. Spencer-Smith's relationship with her record label," and "directly jeopardized Ms. Spencer-Smith's tour and musical livelihood," among other allegations.  Those allegations are sufficient for her claim to go forward to discovery.[12]

## II.    Breach of Contract

Defendants next move to dismiss Plaintiff's claim against Ehrlich and DME Management for breach of contract.  "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021) (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)).

---

[12] The Court need not decide whether Plaintiff's payment of $1.5 million in fees can satisfy the damage element of the breach of fiduciary duty claim with respect to Ehrlich's alleged misconduct on the Tour.

"New York law and the *Twombly–Iqbal* standards of federal pleading require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached. Otherwise, the complaint must be dismissed."  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015); *see Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016), *aff'd*, 759 F. App'x 42 (2d Cir. 2019) (summary order) ("[C]ourts in the Second Circuit . . . have held that plaintiffs must at least allege . . . the relevant breached provisions of th[e] contract."); *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 496 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) (summary order) ("For a breach of contract claim to exist, the Plaintiff[] 'must identify what provisions of the contract was breached as a result of the acts at issue.'" (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001))); *Generation Next Fashions Ltd. v. JP Morgan Chase Bank, N.A.*, 2023 WL 6812984, at *5 (S.D.N.Y. Oct. 16, 2023) ("[A] breach of contract claim will be dismissed where a plaintiff fails to allege 'the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated.'" (quoting *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644–45 (S.D.N.Y. 2011))); *Annabi v. New York Univ.*, 2023 WL 6393422, at *10 (S.D.N.Y. Sept. 29, 2023); *see also Manes v. JPMorgan Chase Bank, N.A.*, 2022 WL 671631, at *7 (S.D.N.Y. Mar. 7, 2022) (stating that the plaintiff's omission of the specific contract terms that the defendant purportedly breached is grounds for dismissal); *Hudson Neurosurgery, PLLC v. UMR, Inc.*, 2022 WL 902107, at *4 (S.D.N.Y. Mar. 28, 2022) (same) (collecting cases); *Caro Capital, LLC v. Koch*, 2021 WL 1595843, at *6 (S.D.N.Y. Apr. 23, 2021).

It is undisputed that Plaintiff, Ehrlich, and DME Management entered into a contract, *i.e.*, the Management Agreement.  *See* Dkt. No. 22-1.  But Plaintiff nevertheless fails to state a claim because she fails to identify the specific provisions of the Management Agreement that Ehrlich

and DME Management are alleged to have breached.  The language in the Amended Complaint identifying the obligation that Ehrlich and DME Management allegedly breached states: "Ehrlich and, by extension, DME Management and the DME Firms, engaged in further unprofessional and career-damaging behavior in breach of their contractual . . . duties to guide, assist, and promote Ms. Spencer-Smith."  Dkt. No. 14 ¶ 106.  However, that paragraph does not identify the specific terms of the Management Agreement that Ehrlich and DME Management are alleged to have breached.  It may be possible for Spencer-Smith to plead a claim for breach of contract, but on the basis of the current pleading before the Court, she has not done so.

Accordingly, Plaintiff's claim of breach of contract against Ehrlich and DME Management is dismissed.

## III.   Declaratory Relief

Plaintiff seeks declaratory judgments that Defendants' actions constitute repudiation of both the Engagement Agreement and the Management Agreement, or in the alternative, that both agreements are rescindable by virtue of Defendants' material breaches.  Dkt. No. 14 ¶¶ 162, 179.  Plaintiff also contends that the Management Agreement is void because several provisions violate public policy.  Dkt. No. 31 at 23–25.  The Court first addresses whether Plaintiff has plausibly alleged that the Engagement Agreement and Management Agreement are subject to rescission, and then turns to whether the Management Agreement is void.[13]

### A.   Rescission

Plaintiff contends that both agreements are rescindable because Defendants materially breached each agreement.  However, because Plaintiff has failed to identify a provision that

---

[13] Plaintiff's Amended Complaint also seeks a declaration that the Engagement Agreement is void, but Plaintiff does not state specifically why the Engagement Agreement is void in her Amended Complaint or in her memorandum of law in opposition to Defendants' motion to dismiss.

Defendants breached, and therefore has failed to allege breach of either agreement, Plaintiff's claims that she is entitled to rescission of both the Engagement Agreement and Management Agreement fail as a matter of law.

"Under New York law, rescission is an extraordinary remedy" that is "appropriate only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2016 WL 5719749, at *2 (S.D.N.Y. Sept. 29, 2016) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000)). To warrant rescission, a plaintiff must allege "fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof." *Id.* (quoting *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998)); *see Babylon Assocs. v. County of Suffolk*, 475 N.Y.S.2d 869, 874 (2d Dep't 1984)). Rescission is an equitable remedy and "available only if damages would not be a 'complete and adequate' remedy and 'the status quo may be substantially restored' by equitable relief." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) (quoting *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972)); *see also Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 121 (S.D.N.Y. 2020).

Plaintiff's claim that the Engagement Agreement is subject to rescission fails because her Amended Complaint does not allege that Ehrlich and the DME Firms breached any terms of the parties' Engagement Agreement.[14] Defendants contend that "[w]ith regard to the Engagement

---

[14] Plaintiff states briefly that the Engagement Agreement's provision that provided for a 5% success fee was inappropriate, but not that Ehrlich and the DME Firms breached the Engagement Agreement in any manner. Dkt. No. 14 ¶ 112.

Agreement, Spencer-Smith's pleading makes no attempt to allege any breach – let alone to identify any breached provision." Dkt. No. 24 at 22.  In response, Plaintiff fails to identify any provision that Ehrlich and the DME Firms purportedly breached, stating only in generalities that: "Plaintiff has sufficiently pled Defendants' fundamental breach of [both] Agreements; the totality of the Complaint's allegations demonstrate Defendants' utter subversion of the parties' objectives – to retain Defendants as her trusted legal and managerial advisors to promote, enhance, and assist her in the pursuit of her entertainment career – in entering into those contracts." Dkt. No. 31 at 24.  Plaintiff states that "[t]he [Amended] Complaint amply alleges the specifics of how Defendants undermined, damaged, and impeded her career, and the irretrievable breakdown of the parties' relationship such that the . . . Agreements cannot persist." *Id*.  Since Plaintiff has failed to allege any breach of the Engagement Agreement, let alone one that is "material and willful, or, if not willful, so substantial and fundamental," the Engagement Agreement is not subject to rescission.  *See Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45 (2d Cir. 2008) (summary order) ("While we have cautioned that district courts are ill-equipped to make judgments regarding rescission at the early stages of litigation, here the claim of rescission was not 'plausible' on its face, and the District Court did not err in dismissing it."). The Court need go no further.

Similarly, Plaintiff's claim that the Management Agreement is subject to rescission fails because Plaintiff has not alleged that Ehrlich and DME Management breached any terms of the Management Agreement, as discussed in Part II, *supra*.  Dkt. No. 24 at 21–23; *see Logfret, Inc. v. Gerber Fin., Inc.*, 559 F. Supp. 3d 348, 367 (S.D.N.Y. 2021) (dismissing plaintiff's claim for rescission because plaintiff's breach of contract claim was dismissed).

### B.       Plaintiff Has Failed to Allege the Management Agreement is Void

The Court dismisses Plaintiff's claim insofar as Plaintiff asserts that the Management Agreement is void because its provisions violate public policy, because any violative provisions are severable.  "There is no magic formula for determining when a contract—or a particular provision of a contract—is void as against public policy."  *See SI Venture Holdings, LLC v. Catlin Specialty Ins.*, 118 F. Supp. 3d 548, 551 (S.D.N.Y. 2015); *Anders v. Verizon Commc'ns Inc.*, 2018 WL 2727883, at *9 (S.D.N.Y. June 5, 2018).   A contractual provision may be unenforceable "where the public policy in favor of freedom of contract is overridden by another weighty and countervailing public policy" in the "the law of the State, whether found in the Constitution, statutes or decisions of the courts."   *159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 133 & n.4 (N.Y. 2019).

Plaintiff contends that the Management Agreement's provisions prohibiting minor disaffirmance and requiring her to ratify the contract are violative of public policy because the provisions abridge her right to disaffirm a contract she entered into as a minor.  Dkt. No. 14 ¶¶ 70-74; Dkt. No. 22-1 ¶¶ 1(e)–(f).  New York courts have held that "an infant's contract is voidable and the infant has an absolute right to disaffirm."[15]  *See Hantash v. V Model Mgmt. N.Y., Inc.*, 2007 WL 2324326, at *1 (S.D.N.Y. Aug. 7, 2007) (quoting *Scott Eden Mgmt.,* 563 N.Y.S.2d at 1002); *see also CBS, Inc. (Cbs Recs. Div.) v. Tucker*, 412 F. Supp. 1222, 1226

---

[15] However, courts have stated that a minor is precluded from disaffirming a contract when she would be placed in a better position than she was in before entering into the contract.  *See I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 210 (S.D.N.Y. 2015) (infant prohibited from disaffirming a contract because "she would be in a superior position than at the time she entered the [T-shirt design] contest—owning the copyright to a design . . . already featured in an extensive catalogue of clothing and accessories"); *see also Scott Eden Mgmt. v. Kavovit,* 563 N.Y.S.2d 1001, 1003 (N.Y. Sup. Ct. 1990) (enforcing infant actor's personal management contract because "the infant would be put in a position superior to that which he would have occupied had he never entered into the contract with plaintiff").

(S.D.N.Y. 1976) ("[T]he right of the infant to disaffirm the contract is virtually certain.")
(collecting cases).

Even assuming the provisions prohibiting minor disaffirmance and requiring ratification
violate public policy, Plaintiff has failed to plead the contract as a whole is void or that those
provisions are not severable.  Under New York law, "[w]here part of a contract is contrary to
public policy, and therefore unenforceable, a court may nevertheless enforce the remainder of the
contract." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573,
580–81 (2d Cir. 2006) (collecting cases).  A court "may sever the illegal aspect and enforce the
legal one, so long as the 'illegal aspects are incidental to the legal aspects and are not the main
objective of the agreement.'" *Lanza v. Carbone*, 13 N.Y.S.3d 472, 476 (2d Dep't 2015) (quoting
*Donnell v. Stogel*, 560 N.Y.S.2d 200 (2d Dep't 1990)).  The question of whether a contract is
severable is "generally a question of intent, 'to be determined from the language employed by
the parties, viewed in the light of the circumstances surrounding them at the time they
contracted." *Id.*; *see also In re Balfour MacLaine Int'l Ltd.,* 85 F.3d 68, 81 (2d Cir. 1996).
Under New York law, the presence of a severability clause is evidence that the parties intended
that if one provision of a contract is deemed invalid, valid provisions of the contract should
remain in full force.  *See Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *5–6
(S.D.N.Y. Mar. 19, 2009), *aff'd sub nom.*, *Samba Enters., Ltd. v. iMesh, Inc.*, 390 F. App'x 55
(2d Cir. 2010) (summary order).

Here, the parties clearly expressed their intent that any invalid provisions should be
severed through the Management Agreement's severability clause.  *See* Dkt. 22-1 ¶ 13(f) ("If any
provision of this Agreement or the application hereof is held invalid, the invalidity shall not
affect other provisions or application of this Agreement that can be given effect without the

invalid provisions or application, and to that end the provisions of this Agreement are declared to

be severable."); *see also Christian v. Christian*, 365 N.E.2d 849, 856 (N.Y. 1977) ("Here the

parties had a right to and did, by expressly stipulating that if any provision of the separation

agreement be held invalid or unenforceable all other shall nevertheless continue in full force,

make the agreement within reasonable limits divisible, and there is little room for

construction.").  Accordingly, to the extent Plaintiff's claim for declaratory judgment seeks a

declaration that the Management Agreement is void because it violates public policy, it is

dismissed because any provisions that might violate public policy can be severed and the

remainder of the contract can be enforced.[16]

## IV.    Unconscionability of the Management Agreement

Plaintiff argues that the Management Agreement is unconscionable.  An unconscionable

contract is "one which 'is so grossly unreasonable or unconscionable in the light of the mores

and business practices of the time and place as to be unenforcible [sic] according to its literal

terms.'"  *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (quoting 1

Corbin on Contracts § 128).  Generally, for a contract to be deemed unconscionable, Plaintiff

must show that "the contract was both procedurally and substantively unconscionable when

made."  *Id.*; *NML Cap. v. Republic of Arg.*, 621 F.3d 230, 237 (2d Cir. 2010).  Procedural

unconscionability "requires an examination of the contract formation process and the alleged

lack of meaningful choice," examining factors such as "the size and commercial setting of the

---

[16] Plaintiff also contends that the Management Agreement is void because it contained a
provision that required her to waive any claims she might have otherwise been able to advance in
connection with Ehrlich's alleged conflict of interest.  Although "[c]ourts take a critical view of
'blanket' future conflicts waivers," *Am. E Grp. LLC v. Livewire Ergogenics Inc.*, 2020 WL
209903, at *5 & n.4 (S.D.N.Y. Jan. 14, 2020) (quoting *Univ. of Rochester v. G.D. Searle & Co.*,
2000 WL 1922271, at *10 (W.D.N.Y. Dec. 11, 2000)), Plaintiff does not point to any cognizable
state public policy that prohibits the inclusion of conflict waivers in contracts.  In any event, the
provision would be severable and therefore does not invalidate the contract as a whole.

transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."  *Gillman,* 534 N.E.2d at 828.  Substantive unconscionability looks to "the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged."  *Id.*

Plaintiff asserts that the process by which she entered into the Management Agreement was procedurally unconscionable.  Plaintiff states that she was younger and less experienced than Ehrlich; she trusted Ehrlich to act in her best interest; she had relied on Ehrlich to perform managerial functions; Ehrlich had threatened to discontinue serving as her lawyer, if she did not sign the Management Agreement; and Ehrlich recommended his acquaintance, Horn, to serve as her lawyer in reviewing the Management Agreement, but Horn failed to provide her adequate advice or make substantial changes to the draft Management Agreement.  Dkt. No. 14 ¶¶ 22–23, 25, 36–37, 43–45, 54–57.

Plaintiff's allegations fail because they do not plausibly suggest that Plaintiff lacked a meaningful choice in continuing her relationship with Ehrlich and the DME Firms as her lawyer, or in expanding her relationship with Ehrlich and DME Management.  First, Plaintiff's Engagement Agreement with Ehrlich and the DME Firms for legal services allowed her to terminate her relationship with him, Dkt. No. 14-1 ¶ 4, and she does not allege that she had no other lawyers or managers that she could hire in his place, *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571–72 (S.D.N.Y. 2009) (rejecting a plaintiff's claim that an arbitration agreement was unconscionable in part because the plaintiff could receive the services at issue from other entities); *Ranieri v. Bell Atl. Mobile*, 759 N.Y.S.2d 448, 449 (1st Dep't 2003) ("It does not avail plaintiff to argue that the . . . provision is unconscionable without offering

34

evidence that he could not have chosen another service provider."); *Accurate Copy Serv. of Am., Inc. v. Fisk Bldg. Assocs. L.L.C.*, 899 N.Y.S.2d 157, 159 (1st Dep't 2010) (affirming lower court's dismissal where plaintiffs "were free to walk away from [commercial] lease negotiations at any time and rent space elsewhere").  Second, as noted in Part I, Plaintiff selected and was represented by independent counsel during the negotiation.  Third, Plaintiff had an opportunity to review, and propose changes to, the Management Agreement with counsel's advice.  Fourth, Plaintiff's parents signed the Management Agreement and it is reasonable to assume that they acted to protect Plaintiff's interests.  *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979).  In addition, that Plaintiff had both an attorney and her parents alongside her during the negotiation and execution of the Management Agreement mitigates the disparity in the parties' age and experience.  Finally, although Plaintiff may have been a minor when she originally signed the Management Agreement, she affirmed and ratified it upon reaching the age of majority, when she surely knew its terms.[17]  *See Spinelli*, 903 F.3d at 208 (citing *King v. Fox*, 458 F.3d 39, 40 (2d Cir. 2006)) (holding that a party can ratify an unconscionable agreement).

Nor is the Management Agreement substantively unconscionable.  "Only in 'exceptional cases' is 'a provision of [a] contract . . . so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone.'"  *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 781 (S.D.N.Y. 1990) (quoting *Gillman*, 534 N.E.2d at 829).  Plaintiff contends in her Amended Complaint that the Management Agreement's provisions pertaining to the length of the

---

[17] Plaintiff contends, in her memorandum of law in opposition to Defendants' motion to dismiss, that she ratified the Management Agreement at Ehrlich's request, and "under the threat of Ehrlich exercising his power of attorney to ratify it on her behalf." Dkt. No. 31 at 8 n.3.  However, Plaintiff does not allege in her Amended Complaint that she ratified the Management Agreement because Ehrlich threatened to exercise his power of attorney. Dkt. No. 14 ¶ 96.  Plaintiff alleges only that she ratified it at Ehrlich's request. *Id.*

agreement's term, the definition of gross income, post-term commissions, attorneys' fees,

determinations about offers of employment, and engagements with DME Management affiliates,

are unreasonable in light of industry standards.[18]  Dkt. No. 14 ¶¶ 61–65.  However, Plaintiff does

not plead what these purported industry standards are that would make her agreement

substantively unconscionable, and courts have enforced similar contracts because the provisions

were standard in the industry.[19]  *See Reznor*, 365 F. Supp. 2d at 569–70, 577 & n.5 (holding that

a personal management agreement with a five-year term, twenty percent commissions on gross

compensation, and post-term compensation was not unconscionable as a matter of law); *cf. Scott

Eden Mgmt.*, 563 N.Y.S.2d at 1003–04 (enforcing personal management contract provisions that

provided for fifteen percent commissions on gross compensation and post-term compensation).

## V.      Faithless Servant Doctrine

Lastly, Plaintiff alleges that Defendants were "faithless servants," and thus Plaintiff is

entitled to (1) recover all monies paid to Defendants by Plaintiff; and (2) an order declaring that

Plaintiff has no obligation to pay Defendants.  Dkt. No. 14 ¶¶ 184–185.[20]

---

[18] Plaintiff also claims that the Management Agreement "omits any reference to Ms. Spencer-Smith's schooling, her need of a chaperone when traveling for professional purposes, [and/or] other common considerations that are typically addressed in personal management agreements with minors."  Dkt. No. 14 ¶ 81.

[19] To be sure, parts of the agreement that entitle Defendants to commissions in perpetuity could be read to raise questions about their enforceability.  *See Mandel v. Liebman*, 100 N.E.2d 149, 153–54 (N.Y. 1951).  But even if those provisions were found to be unconscionable in isolation, they would not void the entire Management Agreement.  Rather, under New York law, courts may sever unconscionable provisions that are incidental to the legal provisions of a contract and enforce the remainder of the contract.  *See Christian*, 365 N.E.2d at 856 (stating that an unconscionable provision within a separation agreement could be severed and the remainder of the agreement enforced); *see also Curtis v. JPMorgan Chase Bank, N.A.*, 2024 WL 283474, at *5 (S.D.N.Y. Jan. 25, 2024) (collecting cases that permit severance of unconscionable provisions within arbitration agreements).

[20] Plaintiff pleads faithless servant as a separate claim for relief rather than as an element of damages.  Dkt. No. 14 ¶¶ 181–186.  The Court notes that New York law is not clear as to whether the faithless servant doctrine speaks to the relief available for a claim of breach of fiduciary duty or constitutes an independent tort.  *See Ebel v. G/O Media, Inc.*, 2021 WL

Under the faithless servant doctrine, the faithless agent forfeits to his principal all compensation paid or earned during the period of his disloyalty. *Mar. Fish Prods., Inc. v. World-Wide Fish Prods., Inc.*, 474 N.Y.S.2d 281, 287 (1st Dep't 1984); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (per curiam); Restatement (Third) of Agency § 8.01 cmt. d ("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty."). "New York's faithless servant doctrine holds that '[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary.'" *CBRE, Inc. v. Pace Gallery of N.Y., Inc.*, 2021 WL 1198644, at *11 (S.D.N.Y. Mar. 30, 2021) (quoting *Yukos Cap.*, 977 F.3d at 229; *see Feiger v. Iral Jewelry*, 363 N.E.2d 350, 351 (N.Y. 1977) ("One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary."). "[T]he purpose of the doctrine is not to dissolve the 'well-established' boundaries of [an agent's] fiduciary duty, . . . but to provide a remedy for [a principal] if an [agent] breaches that duty and 'it is difficult to prove that harm resulted from the breach or . . . the [agent] realizes no profit through the breach.'" *Sanders v. Madison Square Garden, L.P.,* 2007 WL 1933933, at *4 (S.D.N.Y. July 2, 2007) (Lynch, J.) (quoting Restatement (Third) of Agency § 8.01 (2006)); *Webb v. Robert Lewis Rosen Assoc., Ltd.*, 2003 WL 23018792, at *5–6 (S.D.N.Y. Dec. 23, 2003) ("[T]he faithless servant doctrine[] provides an additional mechanism for relief, notwithstanding that [the plaintiff] suffered no damage.").

---

2037867, at *4 (S.D.N.Y. May 21, 2021). Because Plaintiff pleads the claim as an independent tort and Defendants do not contend otherwise, the Court treats the claim as such for purposes of this motion.

"New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture,' and the New York Court of Appeals has not resolved which one applies in particular circumstances." *Yukos Cap.*, 977 F.3d at 237 (quoting *Phansalkar*, 344 F.3d at 200–01). "The key distinction between the two concerns whether the breach of fiduciary duty must be 'substantial.'" *Robinson v. De Niro*, 2023 WL 4862772, at *55 (S.D.N.Y. May 25, 2023) (quoting *Yukos Cap.*, 977 F.3d at 237). Under one standard, articulated by the New York Court of Appeals in 1885, a disloyal employee forfeits promised compensation only when the "misconduct and unfaithfulness . . . substantially violates the contract of service," *Turner v. Konwenhoven*, 2 N.E. 637 (N.Y. 1885), and courts have "found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior," *Phansalkar*, 344 F.3d at 201–02. Under the second standard, also articulated by the Court of Appeals,

> An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.

*Murray v. Beard*, 7 N.E. 553, 554 (N.Y. 1886). The more forgiving *Murray* standard "suggests that misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture." *Phansalkar*, 344 F.3d at 202. "New York courts have not reconciled any differences" between the two tests. *Id.* The doctrine "is limited to matters relevant to affairs entrusted to the employee." *Sanders*, 2007 WL 1933933, at *4. "[U]nethical conduct unrelated to employment [does not] violat[e] the faithless servant doctrine unless such business or behavior adversely affects the employee's job performance." *Id.*

The reporters of the Restatement (Third) of Agency, to which the New York courts turn for guidance, *see, e.g.*, *G.K. Alan Assoc., Inc. v. Lazzari*, 840 N.Y.S.2d 378, 385–86 (2d Dep't

2007), have analyzed the New York cases and suggested that they turn not on the basis of the substantiality of the breach but on whether the effects of it can be segregated: "The better rule permits the court to consider the specifics of the agent's work and the nature of the agent's breach of duty and to evaluate whether the agent's breach of fiduciary duty tainted all of the agent's work or was confined to discrete transactions for which the agent was entitled to apportioned consideration," Restatement (Third) of Agency § 8.01 cmt. d.  If the breach tainted all of the work during the period of disloyalty, then all of the compensation that the agent earned during that period must be forfeited.  *Musico v. Champion Credit Corp.*, 764 F.2d 102, 114 (2d Cir. 1985) (recognizing cases that did not limit forfeiture where the breaches "tainted all the dealings between the parties"); *Battle Fowler v. Brignoli*, 765 F. Supp. 1202, 1205 (S.D.N.Y.), *aff'd*, 952 F.2d 393 (2d Cir. 1991) (refusing to limit forfeiture because a corporate officer's misconduct "tainted all dealings"); *Royal Carbo Corp. v. Flameguard, Inc.*, 645 N.Y.S.2d 18, 19 (2d Dep't 1996) (employees forfeited all compensation during period of disloyalty); *cf. Sanders*, 2007 WL 1933933, at *4 (suggesting that standard for faithless servant relief is equivalent to that for breach of fiduciary duty).

Plaintiff has stated a claim for faithless servant for the limited period during which Ehrlich accompanied Plaintiff on the Tour.  Accepting the allegations of the Amended Complaint as true, Ehrlich betrayed Plaintiff's trust by using his position to engage in inappropriate behavior that resulted in UMG providing an ultimatum that Ehrlich either leave the Tour or the Tour would be cancelled.  Dkt. No. 14 ¶ 126.  As a result, Ehrlich left the Tour abruptly, flying his assistant to London "in his stead" and leaving Spencer Smith "without adequate representation of her interests."  *Id.* ¶ 129.  From those allegations, it is plausible that Defendants' alleged breach of fiduciary duty, if proved, related to matters entrusted to

Defendants and "actually affected . . . job performance." *Sanders*, 2007 WL 1933933, at \*4. Albeit barely, Plaintiff has pleaded "enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.

## CONCLUSION

Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Defendants' motion to dismiss Plaintiff's Third, Fourth, Fifth, and Sixth Claims for Relief is granted. Defendants' motion to dismiss Plaintiff's First, Second, and Seventh Claims for Relief is denied. The Third Claim for Relief is dismissed without prejudice. The remainder of the claims are dismissed with prejudice.[21] The Clerk of Court is respectfully directed to close Dkt. No. 21.

SO ORDERED.

Dated: February 21, 2024
New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[21] If Plaintiff repleads her claim for breach of contract, she may also plead the remedy of rescission based on a material breach of contract. The Court need not now address whether any such breach could give rise to a claim for rescission.