UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/04/2024
```

-----------------------------------------------------------------------X
:
LAUREN SPENCER-SMITH,                          :
:
Plaintiff,              :
:
:                    23-cv-2652 (LJL)
-v-                         :
:                    MEMORANDUM AND
DAVID M. EHRLICH et al.,                        :                         ORDER
:
Defendants.             :
:
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants, the Ehrlich Parties,[1] move to compel the production of documents that were

withheld by Plaintiff Lauren Spencer-Smith ("Spencer-Smith") on the grounds of attorney-client

privilege and attorney work product. Dkt. Nos. 70–71. Spencer-Smith opposes the motion. Dkt.

No. 72.

This case generally arises from a contract dispute centering on two agreements (an

Engagement Agreement and Management Agreement) between Spencer-Smith and her former

manager and attorney, David Ehrlich. *See generally* Dkt. No. 60 at 1–4. Spencer-Smith's

parents initially signed the contracts for her because she was a minor until September of 2021,

but Spencer-Smith ratified the agreements upon reaching majority. In early 2022, the Ehrlich

Parties brought on Mark Music & Media Law P.C. and its attorney, Doug Mark, to render legal

services on behalf of Spencer-Smith jointly with the Ehrlich Parties. By May 13, 2022, the

relationship between Spencer-Smith and Ehrlich had deteriorated to the point where Spencer-

Smith purported to terminate the agreements. *Id*. at 4. The termination occurred shortly after an

---

[1] The Ehrlich Parties are David Ehrlich, David M. Ehrlich Esq., P.C. (d/b/a David M. Ehrlich &
Associates, P.C.), and Song Collect, Inc. (d/b/a DME Management).

April 2022 promotional European Tour on which Ehrlich accompanied Spencer-Smith and during which Ehrlich allegedly engaged in inappropriate behavior including taking pictures of women without their consent and making inappropriate comments about women. *Id*. at 3. Ehrlich's behavior allegedly caused Spencer-Smith's record label to conduct an internal investigation and force him to leave the tour under the threat that if he did not, Spencer-Smith's tour would be cancelled. *Id*. at 3. Spencer-Smith initiated her case in this Court on March 30, 2023. The Court granted in part and denied in part Defendants' motion to dismiss on July 3, 2024. *Id*.

Three categories of documents are at issue: (1) confidential communications during the period May 6, 2022 to May 13, 2022 between Spencer-Smith and the law firm Mark Music & Media Law (and Doug Mark of that firm) and among Spencer-Smith and her counsel at Mark Music & Media Law and Reitler Kailas & Rosenblatt LLP (Spencer-Smith's counsel in this litigation) concerning Spencer-Smith's dispute with Ehrlich; (2) confidential communications between Spencer-Smith and her long-term partner Matthew O'Dell in May 2022 and March 2023, which are claimed to reflect work product of counsel in respect of Spencer-Smith's dispute with Ehrlich and the subject matter of this litigation; and (3) communications between Spencer-Smith and her parents, many of which occurred during the time period May 8, 2022 to May 15, 2022. Dkt. No. 70. Spencer-Smith claims that the first category of documents is protected by the attorney-client privilege and the second and third categories of documents are protected under the attorney work product doctrine. Dkt. No. 72. For the reasons that follow, the motion to compel production of these documents is granted in part and denied in part.

## LEGAL STANDARDS

The attorney-client privilege and work product doctrine, though often discussed together, are distinct. In a diversity case such as this one, they are governed by different law. They are

also based on separate policies and accordingly, the standards for when they apply and when they are waived differ.  In either case, the party claiming the privilege has the burden to establish its applicability.  *See Bowne of N.Y. City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470, 473 (S.D.N.Y. 1993).

## I.    **Attorney-Client Privilege**

State law governs privilege regarding a claim or defense for which state law supplies the rule of decision.  Fed. R. Evid. 501.  Thus, "[i]n diversity cases such as this, where state law governs the claims, the Court looks to state law for determining [attorney-client] privilege." *Kleeberg v. Eber*, 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019); *see Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013).  The contracts at issue in this case are governed by New York law, *see* Dkt. Nos. 61-1, 61-2, and neither party has suggested that another state's law is applicable.  The Court therefore looks to New York law on the issue of attorney-client privilege.

"The attorney-client privilege shields from disclosure any confidential communications between an attorney and his or her client made for the purpose of obtaining or facilitating legal advice in the course of a professional relationship."  *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 57 N.E.3d 30, 34 (N.Y. 2016).  A party asserting attorney-client privilege must "show[] that the communication at issue was between an attorney and a client 'for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship,' that the communication was predominantly of a legal character, that the communication was confidential and that the privilege was not waived."  *Id.* at 34–35 (quoting *Rossi v. Blue Cross & Blue Shield of Greater N.Y.*, 540 N.E.2d 703, 706 (N.Y. 1989)).  The burden may be met by a showing based on "competent evidence, usually through affidavits, deposition testimony, or other admissible evidence."  *Egiazaryan,* 290 F.R.D. at 428.  The existence of an attorney-client

relationship "is not dependent upon the payment of a fee or an explicit agreement." *Pellegrino v. Oppenheimer & Co.,* 851 N.Y.S.2d 19, 24 (1st Dep't 2008).  However, "a party cannot create the relationship based on his or her own beliefs or actions." *Id.*; *see United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 2018 WL 11217867, at *1 (S.D.N.Y. Aug. 21, 2018).

"[A]n attorney-client relationship may encompass a preliminary consultation when undertaken with a view toward retention of the client." *Egiazaryan*, 290 F.R.D. at 429 (quoting *Pellegrino,* 851 N.Y.S.2d at 19); *see Hopkins v. Booth*, 2019 WL 4941863, at *2 (W.D.N.Y. Oct. 8, 2019) (same).  "This is so even if a client does not ultimately retain the attorney." *Cohen v. Cohen*, 2015 WL 745712, at *5 (S.D.N.Y. Jan. 30, 2015).  Indeed, the attorney-client privilege is not tied to the contemplation of litigation because legal advice is often sought precisely to avoid that outcome.  *See Spectrum Sys. Intern. Corp. v. Chemical Bank*, 78 N.Y.2d 371, 380 (N.Y. 1991).  The attorney-client privilege is meant to "foster[] the open dialogue between lawyer and client that is deemed essential to effective representation." *Id*. at 377.  It applies both to communications from client to attorney and from attorney to client.  *Id*.  It is limited to communications, not the facts underlying those communications.  *Id*.

As a general rule, the attorney-client privilege is waived when communications are made in the presence of a third party whose presence is known to the client or when the client subsequently reveals the communications to a third party.  *See Ambac Assur.*, 57 N.E.3d at 35.  Notwithstanding that rule, the privilege may be maintained where the third party's presence is necessary to enable the attorney-client communication—for example, when the third party is an interpreter or agent of the attorney or when the third party shares a common legal interest.  *Id*. at 35–36; *see also United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) (Friendly, J.).

## II.     Work Product Doctrine

"'While state law generally provides the rules of decision for questions of privilege in diversity actions, 'federal law governs the applicability of the work product doctrine in all actions in federal court.'" *Weber v. Paduano*, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003) (quoting *Mount Vernon Fire Ins. Co. v. Try 3 Bldg. Servs.*, 1998 WL 729735, at *4 (S.D.N.Y. Oct. 16, 1998)); *see Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, 2016 WL 3260370, at *3 (S.D.N.Y. June 10, 2016).  For a document to be protected as work product it must be prepared in anticipation of litigation by or for a party or by or for her representative.  *Weber*, 2003 WL 161340, at *3.  Documents prepared in anticipation of litigation are those that, 'in light of the nature of the document and the factual situation in the particular case . . . can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'"  *Id.* (quoting *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (emphasis in original)).  Work product protection thus does not apply to documents that were prepared "in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation . . . even if such documents might also help in preparation for litigation."  *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015) (quoting *Adlman*, 134 F.3d at 1202).

"The work product doctrine, codified for the federal courts in Federal Rule of Civil Procedure 26(b)(3), is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  *Adlman*, 134 F.3d at 1196.  The doctrine was originally articulated by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947).  In that case, following a fatal tugboat accident, an attorney working for the owners of the tugboat conducted interviews of the survivors and others likely to have relevant information.  When the opposing party sought those files during the litigation, the tugboat owners objected that such files were "privileged matter

obtained in preparation for litigation" and turning over "counsel's private files" would essentially involve turning over "the thoughts of counsel." *Id*. at 499. The Supreme Court went on to explain that the memoranda, statements, and mental impressions at issue fell outside the attorney-client privilege and thus were not protected on that basis but nonetheless they were protected as the "work product of the lawyer." *Id*. at 392–93. If opposing counsel could obtain such materials, "much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practice would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Id*. at 393–94; *see Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981).

The work product doctrine has since been incorporated into Federal Rule of Civil Procedure 26, which provides:

*(3) Trial Preparation: Materials.*

> (A) *Documents and Tangible Things*. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> >
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) *Protection Against Disclosure*. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.
>
> [. . .]

Fed. R. Civ. Proc. 26(b)(3).

There is no categorical requirement that the document be created by an attorney to receive work product protection.  Fed. R. Civ. Proc. 26(b)(3) (work product protection applies to documents created "*by or for* another party *or its representative* (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)) (emphasis added).  Documents prepared by agents enlisted by legal counsel to perform investigative or analytical tasks to assist in preparing for litigation can be work product.  *See, e.g.*, *Costabile v. Westchester*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008); *United States v. Noble*, 422 U.S. 225, 238–39 (1975).  A narrative of events prepared by the client to assist her lawyer in preparing for litigation may also be work product.  *See, e.g.*, *Lapaix v. City of N.Y.*, 2014 WL 11343854, at *2–3 (S.D.N.Y. Aug. 15, 2014) (client's drafts of his complaint and "legal narrative" document were work product); *see also Schanfield v. Sojitz Corp. of Am.*, 258 F.R.D. 211, 216 (S.D.N.Y. 2009) (work product protection applied to emails that were clearly prepared in anticipation of litigation by client shared with his close relatives).  The key is that the documents "result from the conduct of investigative or analytical tasks to aid counsel in preparing for litigation."  *Wultz*, 304 F.R.D. at 394 (internal citation omitted).  Indeed, "[c]ommon sense and the practicalities of litigation define the limits of the work product doctrine."  *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993).

The work product doctrine extends to the mental impressions and strategies of counsel, as well as to factual material including the result of a factual investigation.  "The difference lies in the degree of protection afforded.  That which reflects the mental processes of an attorney— opinion work product—is entitled to virtually absolute protection.  Fact or 'ordinary' work product, by contrast, may be ordered disclosed upon a showing of substantial need."  *United States v. Ghavami*, 882 F. Supp.2d 532, 540 (S.D.N.Y. June 5, 2012).

"Unlike the attorney-client privilege, work product protection is not waived merely because the material is disclosed to a third party." *In re Lifetrade Litig.*, 2022 WL 3644357, at *3 (S.D.N.Y. Aug. 24, 2022); *cf. Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 448 (S.D.N.Y. 1995) (notwithstanding a waiver of attorney-client privilege, documents may still be protected as work product because waiver principles applicable to attorney-client privilege are not identical to those applicable to work product). The protection is only waived if disclosure of the work product to the third party has substantially increased the opportunity for potential adversaries to obtain the information. *See* Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Fed. Prac. & Proc. Civ. § 2024 (3d ed.); *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 341 F.R.D. 10, 14 (S.D.N.Y. 2022); *Schanfield*, 258 F.R.D. at 214.

## DISCUSSION

### I.    Communications with Doug Mark and Reitler Kailas & Rosenblatt

Spencer-Smith has met her burden of demonstrating that her communications with Mark and his law firm, Mark Music & Media Law, and with counsel at Mark Music & Media Law and Reitler Kailas & Rosenblatt during the period May 6 to May 13, 2022 are protected by the attorney-client privilege. Mark and his law firm were Spencer-Smith's lawyers. It is undisputed and supported by deposition testimony that Mark and his firm began rendering legal services for Spencer-Smith as early as the middle of January 2022. Dkt. No. 72-1 at ECF p. 4; Dkt. No. 72-2 at ECF p. 3. Spencer-Smith has also established by deposition testimony that she consulted with Mark prior to terminating her relationship with Ehrlich in May 2022, and that those communications began on May 6, 2022. Dkt. No. 72-2 at ECF pp. 4–5; Dkt. No. 72-3 at ECF pp. 4–5. Spencer-Smith ultimately terminated her relationship with the Ehrlich Parties on May 13, 2022. Dkt. No. 72 at 1.

There is also no dispute that the communications were predominantly of a legal character. Spencer-Smith consulted counsel regarding her options for terminating her engagement with Ehrlich.  Dkt. No. 72-2 at ECF p. 8.  The communications also were confidential.  *Id.* at ECF p. 5.  Although Spencer-Smith did not formally engage Mark to represent her in connection with her dispute with Mr. Ehrlich, the communications plainly were with an eye towards representation.  Spencer-Smith contacted Mark "as someone she considered her lawyer . . .  to discuss these issues," Dkt. No. 72-3 at ECF p. 5; *see also id.* at ECF p. 7 ("Lauren obviously viewed me as her lawyer.  I thought I was her lawyer."), and Mark ultimately referred her to new counsel to take on the representation, *id.* at ECF p. 11.[2]  Spencer-Smith has established that she approached Mark in a professional capacity with the intent to secure legal advice from him and his firm.  *See Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 100 (S.D.N.Y. 2009).

The Ehrlich Parties argue that Mark could not have represented Spencer-Smith and given her legal advice with respect to her relationship with Ehrlich because Ehrlich and Mark were in a co-entertainment counsel relationship with respect to Spencer-Smith and "Mr. Mark counseled Mr. Ehrlich regarding his business relationship with their joint client."  Dkt. No. 71 at 3.  Those arguments are not availing.  The existence of the attorney-client privilege turns upon the client's reasonable expectation that her communications with counsel will be kept confidential.  *See United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988).  Although Spencer-Smith might not have had a reasonable expectation that her communications with Mark in his capacity as co-entertainment counsel would be kept confidential from Ehrlich and communications made by

---

[2] It is undisputed that Spencer-Smith engaged Reitler Kailas & Rosenblatt LLP on or about May 12, 2022.  Dkt. No. 72 at 1.

Spencer-Smith to Mark could be shared with Mr. Ehrlich without destroying the privilege because both Mark and Ehrlich were her co-counsel with respect to entertainment matters, *see, e.g.*, *Stix Prods., Inc. v. United Merchs. & Mfrs., Inc.*, 47 F.R.D. 334, 339 (S.D.N.Y. 1969) (communications between co-counsel retain privilege); *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 520 (S.D.N.Y. 2001) (privilege not destroyed when documents shared between counsel or parties who share same legal interest), she has demonstrated that she had a reasonable expectation of confidentiality as to the communications with Mark in his capacity as her legal counselor regarding the distinct matter of whether and how to separate from Ehrlich, *see Roberts v. Corwin*, 2012 WL 4512895, at *3 (N.Y. Sup. Ct. 2012). That expectation was satisfied. The communications were kept confidential.

The Ehrlich Parties claim that Mark could not have represented Spencer-Smith without violating attorney ethical rules, pointing to New York Rules of Professional Conduct Rules 1.7(b) and 4.3(a). Dkt. No. 70 at 3. But the ethical rules cited by the Ehrlich Parties are inapplicable. Those rules concern conflicts of interest for current clients and communications on behalf of a client with unrepresented individuals. *See* New York Rules of Professional Conduct Rules 1.7(b), 4.3(a). Mark was not Ehrlich's lawyer. Mark and Ehrlich were co-counsel. Ehrlich does not claim, nor could he credibly claim, that he had any understanding that Mark owed duties of loyalty to him as his counsel. In any event, the attorney-client privilege belongs to the client. *People v. Osario*, 549 N.E.2d 1183, 1185 (N.Y. 1989). Spencer-Smith's right to invoke the attorney-client privilege is not destroyed by Mark's personal relationship with Ehrlich. An attorney's alleged "violation of the ethical rules does not, standing alone, vitiate an otherwise available evidentiary privilege." *Bonde v. Wexler & Kaufman, PLLC*, 345 F.R.D. 31, 43 (S.D.N.Y. 2023).

The motion to compel disclosure of communications with Mark, Mark Music & Media Law and Reitler Kailas & Rosenblatt is denied.[3]

## II.    Communications with O'Dell and Noble

Spencer-Smith claims that the communications with her long-time partner Matthew O'Dell and her mother Kerry Noble are protected by the work product doctrine.  Dkt. No. 72 at 2–3.[4]  She asserts that the text messages contain communications in which she confided in the two her attorney's thoughts and strategies and conveyed her counsel's impressions as to the subject matter of the litigation.  *Id.*  She contends that the protection she enjoyed over the thoughts and strategies of counsel was not waived by the disclosure of those thoughts to her partner and mother because the disclosure did not substantially increase the opportunity for potential adversaries to obtain the information.  *Id.*  The Ehrlich Parties argue that the communications could not be protected by the attorney-work product doctrine because they "reflect stray comments . . . interspersed among text messages" which predate the May 13, 2022, date of Mr. Ehrlich's termination, and thus were prior to the date on which any threat of litigation was communicated to Ehrlich.  Dkt. No. 71 at 2.  The Ehrlich Parties further argue that text messages sent by Spencer-Smith's mother are per se unprotectible.  *Id.* at 3.[5]

---

[3] Defendants stated that Spencer-Smith's mother "participated in a telephone call" with Spencer-Smith and her attorney, Doug Mark.  Dkt. No. 82.  But such participation in one telephone call has no bearing on whether the documents at issue are privileged.  Even if Spencer-Smith's mother participated in one telephone call with Spencer-Smith and Mark, there is no evidence that during that call, Spencer-Smith or Mark shared the written communications at issue on this motion and her participation in the call thus does not cause all Spencer-Smith's communications with her attorneys to lose their attorney-client or work product privilege.

[4] Plaintiff submitted the communications with O'Dell and Noble ex parte and the Court has reviewed them in camera.  *See U.S. v. Zolin*, 491 U.S. 554, 557 (1989); *Rubis v. Hartford Fire Ins. Co.*, 2013 WL 12284916, at *2 (D. Conn. Mar. 28, 2013) (citing *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 184 (2d Cir. 2007)).

[5] The Ehrlich Parties do not argue that there is a substantial need for the requested communications.

First, the fact that the text messages predate the May 13, 2022 termination of Spencer-Smith' relationship with Ehrlich does not deprive those messages of attorney work product protection.  The availability of work product protection turns upon whether the communications embody thoughts, mental impressions, or work that was generated after litigation was reasonably anticipated and generated because of the anticipation of litigation.  *See Adlman*, 134 F.3d at 1195 (documents created because of litigation which tend to reveal mental impressions, conclusions, opinions, or theories concerning litigation are protected by work product doctrine); *S.E.C. v. NIR Grp, LLC*, 283 F.R.D. 127, 131 (E.D.N.Y. 2012) (documents are prepared in anticipation of litigation when they would not have been prepared in substantially the same form absent prospect of litigation); *A.I.A. Holdings v. Lehman Bro., Inc.*, 2002 WL 31556382, at *5 (S.D.N.Y. Nov. 15, 2002) (lawsuit need not have been filed for work product to be created in anticipation of litigation and in many instances, expected litigation may be concrete notwithstanding that all events giving rise to the litigation have yet to occur) (internal citations omitted); *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (for work product protection to apply, lawyer must have had at least subjective belief that litigation was a real possibility and belief must have been objectively reasonable).  It does not turn upon whether, at the time the work was generated by one party, his adversary was aware of the potential threat of litigation against him.   Persons who anticipate bringing claims not infrequently obtain the opinion of counsel regarding their prospects before informing their adversary of their plans.  That the adversary does not know at the time the work product is generated that he will be the target of litigation does not deprive the material of work product protection.

Spencer-Smith has shown that litigation was anticipated as early as May 8, 2022, and that some (but as discussed below not all) of the communications at issue were generated because of

the prospect of litigation.  In particular, the evidence before the Court, including that presented

*ex parte*, demonstrates that Spencer-Smith was anticipating litigation and was consulting with

Mark regarding the possibility of litigation as early as that date.  *See, e.g.*, Dkt. No. 75-2 at 12,

14 (message on May 8, 2022, reflecting that Spencer-Smith was consulting Mark with regard to

her rights under the contracts with Ehrlich); Dkt. No. 72-2 at 5, 8 (Spencer-Smith testimony that

she consulted with Mark prior to terminating the Ehrlich Parties); Dkt. No. 75-2 at 5 (text

messages from May 8, 2022, between Spencer-Smith and her mother where Spencer-Smith

reports that she spoke with her lawyer about Ehrlich not managing her); *see also* Dkt. No. 72

(noting that Spencer-Smith engaged outside counsel on May 12, 2022, and terminated her

relationship with the Ehrlich parties on May 13, 2022); Dkt. No. 75-2 at 41 (messages on May

14, 2022, indicating that Spencer-Smith and her mother anticipated potential legal fight with

Ehrlich).

By the same token, the fact that a communication post-dates the date upon which

litigation is reasonably anticipated is not enough to enshrine every subsequent thought or work of

counsel with work product protection.  *See Baxter Int'l, Inc. v. AXA Versicherung*, 320 F.R.D.

158, 163–64 (N.D. Ill. 2017) (documents created after the inception of litigation are not work

product per se, and a party must establish more than just that the documents were created after

the filing of a lawsuit); *In re Grand Jury Proceedings*, 2001 WL 1167497, at *14 (S.D.N.Y. Oct.

3, 2001) ("It is not enough that a document is created after the threat of litigation becomes real,

but it is also necessary that the motivation for creating that document be the litigation."); *cf.*

*Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (even where there

is little doubt that a party contemplated litigation, document is not entitled to work product

protection if it would have been created in essentially similar form irrespective of litigation).  A

lawyer may be engaged by her client to perform more than one task—some may be related to litigation while others may not. It is only that work and those communications that are generated "because of" litigation or the anticipation of litigation, and not those that postdate litigation that are entitled to work product protection. *Adlman*, 134 F.3d at 1202.

Second, that Spencer-Smith may have shared her attorney's thoughts and mental impressions in anticipation of litigation in the form of text messages in which she also conveyed her personal views about her relationship with Ehrlich and discussed matters other than litigation or Ehrlich also would not deprive those messages that revealed the thoughts and mental impressions of counsel of work product protection. Although Rule 26(b)(3)(A) is framed in terms of "documents and tangible things," Fed. R. Civ. P. 26(b)(3), the protection of the attorney work product doctrine does not turn upon the form in which the work product is embodied, but upon its character. *See Hickman*, 329 U.S. at 511 (lawyer's work product in preparing his client's case is "reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways"); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 2002 WL 31296430, at *5 (S.D.N.Y. Oct. 11, 2002) (work product doctrine is broader than what is encompassed by Rule 26 and applies to attorney's analysis regardless of whether it was memorialized in writing). The attorney work product doctrine extends to "intangible work product" as well as to tangible work product. *See Alexander v. F.B.I.*, 192 F.R.D. 12, 17 (D.D.C. 2000). "The fortuity of whether an attorney's thought processes have been memorialized should not determine whether they must be laid bare to an adversary." *Ghavami*, 882 F. Supp. 2d at 540. A litigant has no greater right to ask his adversary's attorney questions at deposition regarding the attorney's legal analysis than he does to ask for the memorandum embodying that analysis. *See Shelton v. Am. Motors Corp.*,

805 F.2d 1323, 1329 (8th Cir. 1986) (sustaining objection to deposition questions that would reveal counsel's mental impressions, which are protected as work product); *Schreib v. Am. Family Mut. Ins. Co.*, 304 F.R.D. 282, 287–88 (W.D. Wash. 2014) (work product doctrine protects against deposition questions that would improperly tend to elicit the mental impressions, opinions or legal theories of parties' attorneys); *Sanchez v. Matta*, 229 F.R.D. 649, 659 (D.N.M. 2004) (work product doctrine prevented deposition questions to investigator hired by attorney that would reveal attorney's thoughts, opinions, or strategies); *Alexander*, 192 F.R.D. at 19–20; *Phoenix Nat. Corp., Inc. v. Bowater United Kingdom Paper Ltd.*, 98 F.R.D. 669, 671 (N.D. Ga. 1983). Indeed, the rule protects "against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3).

It follows from that proposition and the proposition that the attorney's mental processes and intangible work product can be shared by a client with a third party where such disclosure does not appreciably increase the risk of disclosure to the litigation adversary that the fact that Spencer-Smith shared her attorney's thoughts with her mother and partner does not deprive those thoughts of work product protection. A publisher who commissions its lawyers to prepare a memorandum evaluating the litigation risks it takes in publishing in the face of a cease-and-desist letter can share the contents of that memorandum orally with the author whose book is at issue without fear that the author will be forced to disclose the work product when litigation later ensues, *cf. United States v. Adlman*, 134 F.3d at 1199, just as the company who shares its lawyers' analysis of litigation claims with its auditor orally may also do so without waiving its or its lawyer's work product protection. Even if Spencer-Smith's attorneys originally conveyed their thoughts in anticipation of litigation orally, Spencer-Smith has not lost the protection of the

work product doctrine by sharing those thoughts in confidential communications with her mother and partner. *See Schanfield*, 258 F.R.D. at 216 (emails from Plaintiff to family members that contained legal strategy and drafts of legal letters were protected by work product doctrine).

At the same time, the fact that a communication conveys an opinion of counsel to a third party, even one under an obligation of confidentiality, after the date of litigation, is not alone enough to protect the communication from production. The opinion or thought must be attorney work product. It is not sufficient that it is privileged. When the client shares with a third party not an agent, an otherwise privileged communication the communication loses its protected status because privileges are narrowly construed. The attorney-client privilege "stands in derogation of the public's right to every man's evidence and as an obstacle to the investigation of the truth." *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (internal quotations omitted); *Trudeau v. N.Y. State Consumer Protection Bd.*, 237 F.R.D. 325, 336 n.8 (N.D.N.Y. 2006); *see also Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg*, 171 F. Supp. 3d 136, 140 (S.D.N.Y. 2016). There is no privilege protecting correspondence with a confidante simply because the person is a confidante.[6] When a client speaks to her lawyer, that conversation is

---

[6] This is not to say that there is no circumstance under which truly private communications may not be protected from disclosure. Rule 26 contains relevancy and proportionality principles, albeit construed broadly. *See, e.g.*, *Smith v. Pergola 36 LLC*, 2022 WL 17832506, at *2 (S.D.N.Y. Dec. 21, 2022). There may be instances where such protection is appropriate, whether in the form of a protective order, confidentiality agreement, or redactions. *See, e.g.*, Lauren E. Aguiar et al., *Privacy: What You Should Know About New Laws and Their Impact on E-Discovery in U.S. Litigation*, New York Law Journal (Feb. 1, 2019), https://www.law.com/newyorklawjournal/2019/02/01/privacy-what-you-should-know-about-new-laws-and-their-impact-on-e-discovery-in-u-s-litigation/; David J. Kessler et al., *Redactions Are Not the Problem, They Are a Solution*, New York Law Journal (Jan. 31, 2020), https://www.law.com/newyorklawjournal/2020/01/31/redactions-are-not-the-problem-they-are-a-solution/ (arguing that in the digital age courts should be more accepting of redactions to protect irrelevant information from production in civil discovery). No objections based on privacy are asserted here.

privileged, but because the privilege is narrow, if the client tells the same thing to her best friend, that conversation is not privileged. *See, e.g.*, *People v. Fentress*, 425 N.Y.S. 2d 485, 496 (N.Y. Cnty. Ct. 1980) (where defendant shared information with lawyer and then later shared same information with friend, latter disclosure was not privileged). It is only when the information conveyed is work product—*i.e.*, where the lawyer's legal strategy is protected to enhance and not to impede the adversarial process and the truth-finding function of trial—that the information can be shared without destroying its protection from production. *Cf. Am. Oversight v. U.S. Dep't of Justice*, 45 F.4th 579, 593 (2d Cir. 2022) ("[T]he purpose for which the law affords work-product protection is to ensure a vital adversarial process, which, in turn, serves the proper administration of justice.").[7]

Thus, the upshot is that it is the specific content of the text messages—rather than their date, form, author, or recipient—that is critical to the question of whether such messages are protected under the work product doctrine. If the text messages contain attorney work product, the disclosure by Spencer-Smith to her mother and long-time partner would not constitute a waiver because such disclosure did not substantially increase the chances that the information would come into the hands of her adversary. On the other hand, if the text message simply relays attorney-client communication, sharing it with a third party who was not necessary to the

---

[7] Indeed, unlike the attorney-client privilege, which belongs fully to the client, the work product privilege can be asserted by counsel herself. *See* 6 Moore's Federal Practice, § 26.70[1] (3d ed. 2023) (purpose of work product doctrine is to protect attorney's mental processes, and work product protection may be claimed by either attorney or client). Some courts have held that at least with respect to opinion work product (i.e., work product containing attorney's opinion, judgments and thought processes as opposed to work product containing only facts), an attorney can contest any purported waiver of such work product by a client. *See In re Circle K Corp.*, 199 B.R. 92, 99 (S.D.N.Y. Br. 1996); *Buck by Buck v. Aetna Life & Cas. Co.*, 1992 WL 130024, at *2 (E.D. Pa. 1992); *see also In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir. 1979) (while client may also be able to assert work product protection, it should not be divulged on client's waiver alone).

rendering of legal advice waives privilege.  *See, e.g.*, *In re Lifetrade Litigation*, 2022 WL 3644357, at *2.  Likewise, if the text messages are not attorney work product reflecting counsel's legal impressions, opinion, or strategy but instead represent Spencer-Smith's own impressions or opinions and are not documents created because of the prospect of litigation, they are not work product.  The critical question is whether what was shared retains the core qualities of attorney work product (i.e., opinions, analysis, thoughts, or preparation because of litigation) or instead simply represents a client's own impressions divorced from and uninformed by the preparation of litigation strategy.  *Cf. Phoenix Nat. Corp.*, 98 F.R.D. at 671 (whether deposition questions were appropriate under the work product doctrine hinged on whether they went to deponent's own knowledge of the facts or whether they went to counsel's theory of the case or invaded the privacy of the trial preparation process).

>    **A.    Communications with O'Dell**

Plaintiff withheld from production three text message chains between Spencer-Smith and her boyfriend, O'Dell, on the basis of the work product doctrine.  The text message chains are dated March 21, 2023, March 22, 2023, and March 30, 2023.  Dkt. No. 75-3.  Plaintiff also applied minimal redactions to two other text message chains between Spencer-Smith and O'Dell.  The redacted text message chains are from May 11, 2022, and May 13, 2022.  Dkt. No. 75-4.

None of the three withheld documents merit full withholding on the basis of the attorney work product doctrine.  First, many of the messages in the withheld chains have nothing to do with Ehrlich, this litigation, or Spencer-Smith's consultation with any lawyers.  *See, e.g.*, Dkt. No. 75-3 at 3–4 (discussing personal matters), 8–9 (discussing a sports match); 19–23 (discussing a family member's medical issues).

With respect to the portions of the withheld chains that do relate to Ehrlich, some of them are not attorney work product.  First, a number of messages reflect Spencer-Smith's or O'Dell's

personal feelings towards Ehrlich. Spencer-Smith expresses that she "hate[s] David" and that he is an awful person, Dkt. No. 75-3 at 6, and O'Dell expresses that when Spencer-Smith commences litigation, Ehrlich might "realize[] his shit pile and back[] out," *id.* at 14; *see also id.* at 42 (Spencer-Smith: "I'm just in such an awful situation / David is gonna get away with everything / And it bothers me so much"); *id.* at 43 (O'Dell: "I'll beat the shit out of him if I ever see him tho lol"). These communications relate to the purely personal views of Spencer-Smith and O'Dell. Although those views are expressed at a time when litigation was reasonably anticipated, their production reveals nothing about the mental impressions or thoughts of counsel or the theory of Spencer-Smith's claims or the strategy for prosecuting them. They are not protected by the attorney work product doctrine.

Second, there are messages where Spencer-Smith and O'Dell discuss the fact of the dispute and anticipated litigation or the content of the complaints that were filed on March 30, 2023. Certain of these communications are protected by the work product doctrine because even though they do not mention the name of counsel, it is clear from context that they convey views formed after and based upon Spencer-Smith's meeting with counsel; they cannot be produced without giving Ehrlich an impermissible window into counsel's thinking about the litigation. *See Ghavami*, 882 F. Supp. 2d at 542 (rejecting argument that exclusion of reference to counsel deprives material of work product protection). The material at Dkt. No. 75-3 at pp. 70–71, 73 falls into this category. Other messages express Spencer-Smith's unfiltered, and uninfluenced by counsel's, view of Ehrlich's claim. That communication is not protected. *Id.* at p. 72.

Finally, there are messages in which Spencer-Smith discloses to O'Dell what happened at a mediation between herself and Ehrlich, explains the terms of settlement offers from Ehrlich, and views on settlement prospects and the pros and cons of litigation. Spencer-Smith's views

about the settlement offers and mediation, attended by counsel, cannot be divorced from the views of her counsel and cannot be disclosed without revealing counsel's mental impressions. The communications are protected by the attorney work product doctrine. *See id*. at pp. 6, 11, 12, 13, 43, 44.

In sum, Plaintiff must produce the withheld documents, Dkt. No. 75-3, but may redact the following portions:  2:29 a.m. through 2:33 a.m. messages at pp. 6–7; last two 4:52 a.m. messages at p. 10; first 4:52 a.m. message beginning with "My" and second 4:53 a.m. message ending with "wants" at p. 11; 4:54 a.m. message beginning with "Also" through 4:55 a.m. message ending with "bye" at pp. 11–12; 4:58 a.m. messages through 5:02 a.m. message ending with "lose" at pp. 12–13; 5:07 a.m. message beginning with "My" through 5:07 a.m. message ending with "fight" at p. 14; 9:24 p.m. message beginning with "Like" through 9:24 p.m. message ending with "less" at pp. 42–43; 9:26 p.m. through 9:45 p.m. messages at pp. 43–47; second, fourth, and sixth 9:55 p.m. messages at p. 47 (beginning with "Idk," "Wdym," and "Going," respectively); 10:01 p.m. message beginning with "Is" through 10:11 p.m. message ending with "later" at p. 48; final message on p. 54; 3:14 a.m. message beginning with "Yes the" through 3:18 a.m. message ending with "now" at pp. 55–56; 4:40 p.m. through 5:47 p.m. messages at pp. 70–71; 6:16 p.m. message beginning with "So" through 6:18 p.m. message ending with "words" at p. 73; 6:20 p.m. through 7:05 p.m. messages at p. 74.

Of the minimal redactions in the two redacted text chains, the Court finds that all are appropriate with one important exception.  At page 58 of Dkt. No. 75-4, Spencer-Smith writes, "Cuz my lawyer is letting the label know I need help next week in LA and shit."  The communication was made after litigation was reasonably anticipated and it contains the opinion of counsel, but Spencer-Smith has not established that the communication was "because of" the

prospect of litigation.  The message contains an attorney-client communication but not attorney work product.  When Spencer-Smith shared the communication with O'Dell, she waived the privilege.  The communication must be produced.

### B.     Communications with Noble

Two documents, representing a parent email and its attachment, between Spencer-Smith and her mother, Noble, were withheld from production.  Dkt. No. 75-1.  The parent email was sent from Jonathan Horn, the lawyer who reviewed Spencer-Smith's agreements with the Ehrlich Parties, *see* Dkt. No. 14 at ¶¶ 55–56, to David Ehrlich and contained an attachment with a comment to the draft of the Management Agreement between Spencer-Smith and the Ehrlich Parties signed at the inception of the relationship between Spencer-Smith and Ehrlich.  Dkt. No. 75-1 at 2–3.[8]  Spencer-Smith has proffered no evidence that the communication constitutes work product.  It dates from February 2021 when Spencer-Smith and Ehrlich were negotiating the agreements that Spencer-Smith would later terminate.  The parties were not at that time anticipating that Spencer-Smith would sue Ehrlich or Ehrlich would sue Spencer-Smith for breach of that agreement.  In January 2023, the Horn email and its attachment were then forwarded by Spencer-Smith, apparently on her own volition and without the input of counsel, to her mother.  But this forward does not turn it into work product created because of the litigation. While the act of sending a document can reveal information, *cf. U.S. v. Doe*, 465 U.S. 605, 612– 13 (1984) (act of producing documents may be privileged only if the very act of production would be testimonial and incriminating), there is nothing from the context of the forwarding of this document that reflects or reveals the mental impressions of strategy of counsel.  The claim of privilege is overruled and the document must be produced.

---

[8] This email pre-dated involvement of Mark as Spencer-Smith's attorney.

Nine communications between Noble and Spencer-Smith contain redactions. Dkt. No. 75-2. The first is an email from February 15, 2021, from Jonathan Horn to Spencer-Smith and her parents attaching a revised draft of the Management Agreement with the Ehrlich Parties. *Id*. at 2. At the time Horn drafted the email, he was reviewing a contract on behalf of Spencer-Smith and her parents that all three of them needed to sign. Because Spencer-Smith was a minor, her parents needed to sign the agreement and be obligated on her behalf prior to her reaching the age of majority. In that situation, Spencer-Smith and her parents shared a common interest. *See Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004). Spencer-Smith had every reason to understand that Horn's advice was being maintained in confidence and in fact was necessary to be shared with her parents since they would in fact be obligated under the contract while she was still a minor. They "share[d] the same legal interest." *Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*, 215 F.R.D. 466, 471 (S.D.N.Y. 2003). Thus, the inclusion of Spencer-Smith's parents on the email does not waive the attorney-client privilege. The document is protected from production.

The remaining eight communications in this category are text message chains between Spencer-Smith and Noble between May 8, 2022, and May 15, 2022. Dkt. No. 75-2. Some of the redactions properly protect work product as they reflect counsel's legal strategy, opinions or analysis or otherwise reflect analytical or investigative work done by a party or her representative to aid counsel in preparation for litigation—e.g., a copy/paste of an email from counsel with a bullet point analysis of litigation strategy and preparatory work on Spencer-Smith's termination letter to Ehrlich. However, not all of the redacted communications are properly withheld under the work product doctrine.

As with the O'Dell documents, the texts that are not work product can be categorized into buckets.  First, some messages reflect stray comments from Spencer-Smith's mother that do not contain work product, even if they were sent in response to messages that contain work product. *See, e.g.*, Dkt. No. 75-2 at 24 (Noble: "This is good"), 51 (Noble: "I agree").  Second, some messages simply reference the fact that Spencer-Smith is having conversations with lawyers. *See, e.g.*, Dkt. No. 75-2 at 5 (Spencer-Smith: "Spoke to my lawyer again / Great convo have to explain"), 38 (Spencer-Smith: "I'm calling Doug").  The fact of consulting with a lawyer is not work product.[9]  Second, some messages involve Spencer-Smith conveying what Mark said to her, but they do not convey Mark's legal opinion or analysis, strategy or mental impressions in anticipation of litigation and were not generated because of the prospect of litigation.  Instead, they convey Mark's non-legal opinions or legal advice about other issues related to Spencer-Smith's entertainment career, not the dispute with Ehrlich.  *See, e.g.*, Dkt. No. 75-2 at 8 (Spencer-Smith: "I have to tell u what my lawyer said it was great / He doesn't think David should manage me he agrees he has control issues cuz Doug says he's not allowed to talk to people or negotiate contracts on my behalf unless David is there even though he works as my attorney 50%. [. . .] And he thinks that's wrong [expressionless face emoji] so he says everything I said he believes cuz David does it to him."), 26 (Noble: I thought Doug was handling the publishing deal and holding them off a bit"), 29 (Screenshot of conversation between Spencer-Smith and Mark) (Mark: "Yes he's trying to force it and really rush it I believe he's afraid about getting fired and wants to get it done" Spencer-Smith: "Lol shady in my opinion" Mark: "I

---

[9] It is also not protected by the attorney-client privilege.  *See In re Application for Subpoena for Kroll*, 224 F.R.D. 326, 328–29 (E.D.N.Y. 2004) (because attorney-client privilege only protects confidential communications between client and counsel made for purpose of obtaining or providing legal advice, the mere fact that an attorney-client relationship exists or mere fact of a meeting between client and counsel are not privileged).

believe that because he said it [laughing emoji]" Spencer-Smith: "[sad emoji] [laughing emoji] ok I'll just not sign").  These messages are not protected.

For the eight text message chains between Noble and Spencer-Smith, Dkt. No. 75-2, Plaintiff must un-redact the following messages: messages on p. 5; messages on p. 8; 12:21 a.m. message from Noble on p. 24; 12:25 p.m. message from Noble on p. 26; messages on p. 29; third and fourth 10:40 p.m. messages, 10:41 p.m. message, 10:42 p.m. message, and 10:44 p.m. message on p. 32, messages on p. 34, 12:58 a.m. message on p. 38, 2:17 p.m. messages on p. 51.

## CONCLUSION

The motion to compel is GRANTED IN PART AND DENIED IN PART.  Plaintiff is directed to produce the non-privileged material as described herein by October 10, 2024.

The Clerk of Court is respectfully directed to close Dkt. No. 44.

SO ORDERED.

Dated: October 4, 2024
      New York, New York

                                        LEWIS J. LIMAN
                               United States District Judge