```
                                                      ┌─────────────────────────────┐
UNITED STATES DISTRICT COURT                          │ USDC SDNY                   │
SOUTHERN DISTRICT OF NEW YORK                         │ DOCUMENT                    │
------------------------------------------------X     │ ELECTRONICALLY FILED        │
                                          :           │ DOC #:_____       │
LAUREN SPENCER-SMITH,                     :           │ DATE FILED:__2/05/2026__    │
                                          :           └─────────────────────────────┘
                    Plaintiff,            :
                                          :
                                          :              23-cv-02652 (LJL)
        -v-                               :              23-cv-02653 (LJL)
                                          :
DAVID M. EHRLICH, et al.,                 :              OPINION AND ORDER
                                          :
                    Defendants.           :
                                          :
------------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

David Ehrlich ("Ehrlich"), David M. Ehrlich, Esq. P.C., d/b/a David M. Ehrlich &

Associates, P.C. ("Ehrlich & Associates"), and Song Collect, Inc. d/b/a DME Management

("DME Management" and collectively with Ehrlich and Ehrlich & Associates, the "Ehrlich

Parties") move, pursuant to Federal Rule of Civil Procedure 56, for an order granting them

summary judgment with respect to the Second Amended Complaint ("SAC") of Plaintiff Lauren

Spencer-Smith ("Spencer-Smith") in Case No. 23-cv-2652 and partial summary judgment with

respect to the First Amended Complaint ("FAC") of the Ehrlich Parties in Case No. 23-cv-2653.

Dkt. No. 107.[1]  Spencer-Smith moves for summary judgment with respect to all of her claims

and the claims of the Ehrlich Parties.  Dkt. No. 116.

## BACKGROUND

The following facts are undisputed except where otherwise indicated.

Spencer-Smith is a singer, songwriter, performer and recording artist.  Dkt. No. 147 ¶ 1.

She began developing her social media presence on various social media channels, including

---

[1] Citations are to the docket in Case No. 23-cv-2652 except where otherwise indicated.

YouTube, Facebook, Instagram, and TikTok in 2015. *Id.* ¶ 9. She is dual citizen of Canada and the United Kingdom. Dkt. No. 155 ¶ 1.[2]

Ehrlich is an attorney admitted to the bar of the State of New York. Dkt. No. 155 ¶ 11. He is a veteran entertainment industry lawyer. Dkt. No. 147 ¶ 3; Dkt. No. 155 ¶ 14. He is the sole shareholder of Ehrlich & Associates, which renders legal services. Dkt. No. 155 ¶ 12. He also is the sole owner and president of DME Management, through which he personally manages the careers of entertainers. Dkt. No. 147 ¶¶ 5–6; Dkt. No. 155 ¶ 13.

Spencer-Smith and Ehrlich met in March 2020, when Spencer-Smith was performing for the television show American Idol. Dkt. No. 147 ¶ 12; Dkt. No. 155 ¶ 5. On March 17, 2020, the two entered into an initial written agreement for Ehrlich to serve as Spencer-Smith's lawyer. *Id.*; Dkt. No. 124-1.[3] When Spencer-Smith first met Ehrlich, she was sixteen years old and was in the process of separating from her then-personal manager. Dkt. No. 147 ¶ 13. Ehrlich represented Spencer-Smith in connection with her separation from her then-personal manager. Dkt. No. 147 ¶ 18.

The initial agreement was superseded by an engagement agreement, dated as of April 17, 2020, between Spencer-Smith and Ehrlich and Ehrlich & Associates (the "Engagement Agreement"). Dkt. No. 147 ¶ 20; Dkt. No. 155 ¶ 14; Dkt. No. 124-2. Spencer-Smith agreed to engage Ehrlich as her "legal representative to render legal services generally" in connection with

---

[2] The paragraphs in the Ehrlich Parties' Local Rule 56.1 Statement were not sequentially numbered as originally filed. Dkt. No. 110. Spencer-Smith's Response to the Ehrlich Parties' Local Civil Rule 56.1 Statement followed the incorrect numbering. Dkt. No. 155. The Ehrlich Parties submitted to the Court a corrected Local Rule 56.1 statement and a corrected Response to the Ehrlich Parties' Local Civil Rule 56.1 Statement. Dkt. No. 184. Citations to docket entries 110 and 155 adopt the corrected numbering in Dkt. Nos. 184-1, 184-2.

[3] The engagement letter mistakenly bears the date 2019. It is undisputed that the initial agreement between the parties was in March 2020. Dkt. No. 147 ¶ 17.

her career in the entertainment industry.  Dkt. No. 124-2 § 1.  With limited exceptions, Ehrlich

agreed to be "responsible for rendering all legal services that may be necessary or desirable that

are related to [Spencer-Smith's] services and activities throughout the entertainment

industry . . . and any and all other exploitations of [her] services, talents and activities in any way

connected with or appurtenant to the entertainment industry and any related fields throughout the

world."  *Id.*  In exchange, and in lieu of an hourly fee, Spencer-Smith agreed to pay Ehrlich

pursuant to a compensation framework, which entitled him to a 5% fee on all gross monies and

any other compensation earned or received by Spencer-Smith or payable to her derived directly

or indirectly as a result of her entertainment services.  *Id.* § 2.  The Engagement Agreement also

provided for "a success fee of no less than 10% (instead of 5%) of the Gross Compensation that

[Spencer-Smith] receive[s] in the first year from an agreement . . . if [Ehrlich & Associates] [has]

been directly responsible for [Spencer-Smith] obtaining such agreement."  *Id.*

The Engagement Agreement was terminable at will by either party:

> 4.    **Termination**.  Notwithstanding anything contained herein, you or the Firm
> may terminate this Agreement at any time by giving written notice to such effect;
> provided that (i) such termination shall not affect your obligation to pay any
> expenses incurred by the Firm before the giving of the termination notice, (ii) you
> shall remain obligated to pay to the Firm any Fees owed to the Firm under the terms
> hereof including, but not limited to payments or accountants made to you after our
> termination.

*Id.* § 4.  Spencer-Smith agreed not to disaffirm the agreement on account of her age and agreed

to ratify the agreement after reaching the age of majority.  *Id* § 5.

On February 19, 2021, Spencer-Smith signed and her parents Gary Spencer-Smith and

Kerry Spencer-Smith co-signed a management agreement with Ehrlich and DME Management

(the "Management Agreement") dated as of January 1, 2021.  Dkt. No. 147 ¶¶ 30–31; Dkt. No.

155 ¶ 19–22.  At the time, Spencer-Smith was seventeen years old.  Dkt. No. 155 ¶ 20.

The parties agreed that during the five-year term of the Management Agreement, DME Management would represent Spencer-Smith as her "exclusive personal manager throughout the world in connection with all of [her] services and activities throughout the entertainment industry . . . and in connection with merchandise and commercial endorsements, commercials and any and all other exploitations of [her] services, talents and activities in any way connected with the entertainment industry and any related fields . . . throughout the world."  Dkt. No. 124-3 § 1. DME Management, which was defined as the Manager, agreed to use "reasonable efforts" to promote Spencer-Smith's career (the "Promotion Clause").  *Id.*  The Promotion Clause imposed the following obligation on DME Management:

> Manager shall use Manager's reasonable efforts to promote and enhance your career in the entertainment industry and in the use and exploitation of Entertainment Services which you are now capable of providing and those for which your talents and skills are developed following the date hereof.

*Id.*  DME Management also agreed to "be available at reasonable times and reasonable places to confer with and give [Spencer-Smith] guidance in connection with [her] Entertainment Services."  *Id.*  Ehrlich agreed to "be principally responsible for the management services provided [by the Management Agreement] provided that [he could] appoint other persons to render services [under the agreement] as long as [he] at all times retain[ed] such principal responsibility."  *Id.* § 1(g).  Subject to that qualification, Spencer-Smith agreed that DME Management could designate which DME Management employee would provide services to Spencer-Smith.  *Id.* § 1(c).

The Management Agreement contains a notice and cure provision:

> (b) As a condition precedent to any assertion by either party that the other is in default or in breach of any obligation hereunder, the claiming party must advise the other in writing of the specific facts upon which the claim is based and of the specific nature of the breach or default and the other party shall have a period of thirty (30) days after receipt of such notice to cure such alleged breach or default (or to commence curing same if not capable of immediate cure, and actually cure

4

same within a reasonable time thereafter).  During that period no breach shall be deemed incurable.

*Id.* ¶ 13(b).

The Management Agreement provides for compensation to DME Management through commission equal to "fifteen percent (15%) of [Spencer-Smith's] Gross Income."  *Id.* § 3(b).  It defines "Gross Income" as "the total of all earnings . . . whether in the form of salary, bonuses, royalties . . . or any other type of income, consideration or compensation which is reasonably related to the Entertainment Services and Artist's career in the entertainment, amusement, music recording, motion picture . . . and all similar areas."  *Id.* § 3(d).  It states that such commission shall be paid "in perpetuity and without reduction" for Gross Income with respect to "recordings, musical compositions and other intellectual properties which are the product of your Entertainment Services (collectively, the 'Properties') which are created by you prior to or during the Term and first exploited prior to or during the Term."  *Id.* § 3(c)(i).  In regard to service agreements, including recording and publishing agreements, the Management Agreement provides:

> Manager shall be paid the Manager commission in perpetuity and without reduction regardless of when such Gross Income is earned and/or received in respect of any service agreements in connection with your Entertainment Services . . . which agreements are entered into or substantially negotiated . . . during the Term and, in the case of the latter, actually concluded within six (6) months after the Term, and those agreements which are extensions, renewals, modifications, and/or replacements of any of such agreements.

*Id.* § 3(c)(ii).  For recordings and musical compositions created during the contract term but exploited following the end of the term, the Management Agreement provides for a sliding scale of commissions over a period of fifteen years, wherein the Manager would earn "100% of the otherwise applicable commission rate" for the first three years following the term, "50% of the otherwise applicable commission rate" for the fourth through seventh year following the term,

and "25% of the otherwise applicable commission rate" for the seventh through fifteenth year following the term. *Id.* § 3(c)(iii).

Two days after Spencer-Smith's eighteenth birthday, she signed a "Ratification and Affirmation of Management Agreement," dated as of September 30, 2021. Dkt. No. 147 ¶ 40; Dkt. No. 155 ¶¶ 23–24.

Both the Management Agreement and the Engagement Agreement provide that New York law shall govern the agreements. Dkt. No. 123-3 § 13(a); Dkt. No. 123-2 § 4.

Spencer-Smith's career took off. On January 5, 2022, Spencer-Smith self-released a single titled "Fingers Crossed," which went viral on TikTok and other social media. Dkt. No. 147 ¶¶ 53, 55–56; Dkt. No. 155 ¶ 25. In the wake of that release, Los Angeles-based entertainment lawyer Douglas Mark ("Mark") of Mark Music & Media Law ("MMML") contacted Ehrlich by phone and text to solicit Ehrlich's agreement to hire him as an entertainment lawyer for Spencer-Smith. Dkt. No. 155 ¶ 26. In January 2022, Ehrlich engaged Mark to provide legal services in connection with Spencer-Smith's career. Dkt. No. 147 ¶ 60. Ehrlich and Mark agreed that MMML would provide legal services in connection with Spencer-Smith's forthcoming recording agreement with UMG and her entertainment career generally for a legal fee of 2.5%, with a cap of $100,000 for services in connection with the recording agreement. Dkt. No. 147 ¶ 62.

On or about January 26, 2022, Spencer-Smith signed a "Notice of External Counsel Engagement." Dkt. Nos. 118-4, 124-4; Dkt. No. 147 ¶ 65. The notice advised that Ehrlich & Associates intended to engage MMML "to jointly act with us on your behalf in the negotiation of your recording contract and other entertainment industry related agreements" because of that firm's "substantial experience representing new artists whose careers are advancing rapidly," and

that MMML would be paid a fee in a fixed amount to be determined by Ehrlich & Associates and MMML which would be paid out of the 5% commission Spencer-Smith had agreed to pay Ehrlich & Associates.  Dkt. No. 118-4.

After the release of "Fingers Crossed," Ehrlich and Mark both negotiated for Spencer-Smith a recording agreement with Island Records and Republic Records, divisions of UMG Recordings, Inc. ("UMG").  Dkt. No. 155 ¶ 33.  Spencer-Smith signed a Recording Agreement with UMG on February 4, 2022.  Dkt. No. 147 ¶ 81; Dkt. No. 155 ¶ 34.

The parties dispute whether after January 2022 the Ehrlich Parties continued to provide legal services to Spencer-Smith.

Shortly after becoming a UMG artist, in April 2022, UMG arranged for Spencer-Smith to embark on a promotional tour in Europe and Canada (the "Tour").  Dkt. No. 155 ¶ 47.  The Tour was broken into two legs: a first leg in Europe with stops in Berlin, Stockholm, Paris, London, and Amsterdam beginning on April 25, 2022 and ending on May 9, 2022, and a second leg solely in Toronto, Canada, for rehearsals, meetings, and a performance at the Juno Awards,[4] beginning on May 10, 2022 and concluding on May 15, 2022.  Dkt. No. 147 ¶¶ 98–99; Dkt. No. 155 ¶ 49. The touring party for the Tour included Spencer-Smith, Ehrlich, a guitarist named Johnnie Murray ("Murray"), a videographer named Henry Arres ("Arres"), Ehrlich's assistant Maxwell Kagan, and UMG's International Marketing representative, Jaclyn Pinsky ("Pinsky").  Dkt. No. 155 ¶ 55.[5]  At the time of the Tour, Spencer-Smith was eighteen years old.  Dkt. No. 147 ¶ 107. Prior to the Tour, Spencer-Smith had never performed with Murray.  Dkt. No. 147 ¶ 115.  She

---

[4] The Juno Awards are Canadian music awards.  Dkt. No. 129 ¶ 9.
[5] The Ehrlich Parties dispute whether the Tour formally included Michael Alexander, who was the General Manager at Island Records and whether Kagan was a part of the Tour from inception.  Dkt. No. 155 ¶ 55.  The difference is immaterial for purposes of this motion.

rehearsed with him for the first time on the night that she arrived in Berlin, which was the first stop on the Tour.  Dkt. No. 147 ¶ 118.

Ehrlich had a strained relationship with Pinsky.  Dkt. No. 147 ¶ 124.  Much of the dispute between the parties relates to Ehrlich's conduct during the Tour.  The parties dispute Ehrlich's actual conduct during the Tour.  Construing the evidence favorably to Spencer-Smith, the record reflects:

- During the Tour, Ehrlich expressed that he did not want Spencer-Smith socializing, shopping, going to concerts, or staying out late and expressed to other members of her band that they should go through him if they wanted to communicate with her.  Dkt. No. 127 ¶¶ 18–19.  Ehrlich also was routinely late for scheduled departures to and from promotional events.  Dkt. No. 127 ¶ 15.

- During an airplane flight from Berlin to Stockholm on Thursday, April 28, 2022, while he was seated next to Spencer-Smith, Ehrlich took photographs of the flight attendant, who saw the photographs being taken and asked him to delete them.  Dkt. No. 147 ¶¶ 143–44, 146.  Spencer-Smith states she observed over thirty photographs of the flight attendant on Ehrlich's phone, while Ehrlich admits to taking one or two photographs.  *Id*.; *see also* Dkt. No. 131-4 at Request No. 81 (admitting that Ehrlich took one or two photographs of the flight attendant); Dkt. No. 131-2 at 279:18–281:11 (Ehrlich stating that he took photographs of the flight attendant).  Ehrlich complied with the request to delete the photographs.  Dkt. No. 155 ¶ 71; Dkt. No. 131-2 at 281:7–11 (Ehrlich stating that "I deleted any of the photos that were of her that she asked me to").

- On or about Friday, April 29, 2022, Ehrlich solicited a young female Swedish employee of UMG to work for him in New York and requested her personal contact information.  Dkt. No. 119 ¶¶ 156, 158. Dkt. No. 147 ¶ 158.  Ehrlich disputes that he invited her to work for him.  Dkt. No. 147 ¶ 156.

- On Saturday, April 30, 2022, Ehrlich had an issue checking his luggage at the Stockholm airport because of a misspelling of his name on his ticket for the flight and called out for Pinsky four times.  Dkt. No. 147 ¶ 162; Dkt. No. 155 ¶¶ 76–77.  The parties disagree whether Ehrlich yelled and had "an angry tone."  Dkt. No. 155 ¶ 77; Dkt. No. 127 ¶ 24.

- The Tour traveled by train from Paris to London on the evening of May 3, 2022.  Dkt. No. 147 ¶ 188.  While the Tour was in Paris on May 1 and 2, 2022, Ehrlich took multiple photographs and at least one video of a female UMG France employee

without her consent.  Dkt. No. 147 ¶¶ 170–71.  Spencer-Smith claims that Ehrlich was pretending to be on his phone or cross his arms while taking the pictures and attempted to conceal his actions, while Ehrlich disputes attempting to conceal his actions in taking these photographs.  *Id.* ¶¶ 172–174; Dkt. No. 119 ¶¶ 172–74.

- While the Tour was in Paris, Ehrlich complimented the looks of a French UMG employee and invited her to work for him and/or visit him in New York.  Dkt. No. 147 ¶ 178.  Ehrlich disputes this.  *Id.*

It is undisputed, however, that beginning in the Berlin leg of the Tour, Ehrlich complained to Michael Alexander ("Alexander") of UMG about issues that Ehrlich was having with Pinsky on the Tour.  Dkt. No. 147 ¶ 135.  Ehrlich voiced concerns to Alexander that Pinsky was "getting in the way and pushing him out" and thereby impacting his relationship with Spencer-Smith.  Dkt. No. 155 ¶ 123.  It is also undisputed that on May 2, 2022, Alexander spoke to Pinsky about Ehrlich's complaint, Dkt. No. 155 ¶ 83, that persons who were on the Tour with Ehrlich and Spencer-Smith reported to Alexander concerns about Ehrlich's conduct on the Tour, Dkt. No. 127 ¶ 30, and that Alexander reported Ehrlich's conduct to UMG's human resources department, Dkt. No. 147 ¶ 204.

On May 3, 2022, after the group arrived in London from Paris, Alexander, Pinsky and Ehrlich had a brief conversation in the lobby of their hotel.  UMG determined that the solution to the issues that had arisen during the Tour was for both Pinsky and Ehrlich to leave the Tour before it was scheduled to end.  Dkt. No. 114 ¶ 7.  After the hotel lobby meeting, Alexander instructed Pinsky to leave the Tour.  Dkt. No. 147 ¶¶ 193, 195; Dkt. No. 155 ¶¶ 85–86.  Pinsky left the Tour the next morning, May 4, 2022.  Dkt. No. 119 ¶ 19; Dkt. No. 147 ¶ 197; Dkt. No. 155 ¶ 87.  That same morning, Alexander advised Ehrlich that UMG was considering cancelling the remainder of the Tour.  Dkt. No. 147 ¶ 217; Dkt. No. 113-8 at 322:4–13.  In conversations on or about May 4, 2022 and on May 6, 2022, Alexander told Ehrlich that he had to leave the Tour if the Tour was going to continue.  Dkt. No. 147 ¶ 218-19; Dkt. No. 131-8 at 195:18–23.  Ehrlich

disputes that he was required to leave; he testified that he volunteered to leave to avoid any potential cancellation.  Dkt. No. 113-8 at 324:2–11.  It is undisputed that Ehrlich agreed to leave the Tour following his conversations with Alexander.  *Id.*; Dkt. No. 131-8 at 198:17–18.

Kagan arrived in London for the Tour on May 4, 2022.  Dkt. No. 147 ¶ 198.

On the evening of May 6, 2022, Spencer-Smith held a meeting in her hotel room with Ehrlich and with her mother.  Dkt. No. 147 ¶ 291; Dkt. No. 155 ¶ 90.  Spencer-Smith recorded the conversation.  Dkt. No. 147 ¶ 293; Dkt. No. 155 ¶ 91.  During this conversation, Ehrlich asked Spencer-Smith if it would be "okay" with her for him to return to the United States to surprise his wife, who had breast cancer, for Mother's Day and if Kagan could cover the one remaining day for promotion on the Tour.  Dkt. No. 131-20 at 6.  Spencer-Smith responded that Ehrlich could leave but that she had "heard things and seen things you've done," that Ehrlich's wife was "not why you're going home," and that she would like "the real reasoning" for his departure.  *Id.*  Ehrlich then explained that he volunteered to go home as a result of tensions with Pinsky and after learning that he had made Pinsky and others feel uncomfortable.  *Id.* at 6–7.  Ehrlich described from his perspective the source of tension with Pinsky: Pinsky had not always introduced Spencer-Smith to the senior people at each location on the Tour and had left Ehrlich out of conversations.  *Id.* at 10–11.  From her perspective, Pinsky had expressed that she was uncomfortable with Ehrlich and wanted to go home because Ehrlich was taking photographs of women.  *Id.* at 6–7.  Ehrlich acknowledged that his taking pictures was "a bit of a blind spot for me."  *Id.* at 6–7.  He agreed when Spencer-Smith stated "[t]his situation should never have happened" and "It's multiple women and multiple people, not just women, in our party that also feel uncomfortable. And nobody I work with should feel that way."  *Id.* at 8.  He affirmed "I'm going to immediately change," *id.*, and stated that he would complete a sexual harassment

seminar, *id.* at 29.  The conversation also covered the conflict between Ehrlich and Pinsky, *id.* at 9–12, differences in their communication styles and expectations, *id.* 12–17; 22–28, Spencer-Smith's objections to the control Ehrlich was exercising over her, *id.* at 11–14, Spencer-Smith's concern for her reputation, *id.* 17–21, and how they would move forward in the future, including finding someone to accompany Spencer-Smith on future travel, *id.* 28–36.

Ehrlich left the Tour on May 7, 2022.  Dkt. No. 127 ¶ 36; Dkt. No. 147 ¶ 303; Dkt. No. 155 ¶ 98.  No promotional activities involving Spencer-Smither were scheduled for Sunday, May 8, 2022.  Dkt. No. 155 ¶ 105.  Ehrlich's assistant, Kagan, remained with the Tour which then traveled to Amsterdam for the sole day of promotional activity on May 9, 2022.  Dkt. No. 127 ¶ 36; Dkt. No. 147 ¶¶ 304–05; Dkt. No. 155 ¶¶ 101, 106.

When the Tour arrived in Canada, Ehrlich attended at least one performance rehearsal for Spencer-Smith for the Juno Awards show.  Dkt. No. 155 ¶ 114.  However, he was not welcome to attend the Juno Awards events because Spencer-Smith did not want him there.  *Id.* ¶ 98.  He visited UMG's offices in Toronto and participated in business conversations with UMG personnel between May 6, 2022 and May 14, 2022.  Dkt. No. 155 ¶¶ 115–116.

On May 13, 2022, Spencer-Smith delivered a termination letter (the "Termination Letter") to Ehrlich in Toronto, Canada.  Dkt. No. 147 ¶¶ 313, 315; Dkt. No. 155 ¶ 41; Dkt. No. 190-1.  The letter recited claims that Ehrlich had engaged in inappropriate behavior by taking photographs of multiple women in France and Spain, including photographs of the Swedish flight attendant and young employees of UMG, that Ehrlich had left the Tour leaving Spencer-Smith alone at eighteen years old to fend for herself and then had lied to her about the "real reason" why he was leaving, that he had engaged in disrespectful behavior towards Pinsky, that he had taken photographs of Spencer-Smith and her boyfriend in Puerto Rico some of which

focused on her body, and that her team was uncomfortable with Ehrlich because of his actions. Dkt. No. 190-1.  It concluded:

> David, I have a huge lack of confidence and trust with you that has been caused by your actions.  You looked me straight in the eye and you lied to me.  You have not acted in my best interests; the relationship is damaged with the label and my team, which is damaging my brand.  I feel it cannot be repaired or fixed and I have no alternative but to terminate our relationship.

*Id.*

The Ehrlich Parties, though counsel, sent Spencer-Smith a letter dated June 1, 2022 (the "June 1 Letter").  Dkt. No. 132-22; Dkt. No. 147 ¶ 324.  The June 1 Letter accused Spencer-Smith of having committed a material breach of the Management Agreement by wrongfully seeking to repudiate her obligations thereunder.  Dkt. No. 132-22.  It also asserted that Spencer-Smith had committed further material breaches of the Management Agreement by excluding DME Management from its rightful role as her exclusive manager, by meeting with other managers to potentially engage them, and by failing to render timely statements and pay DME Management monies due and owing to it.  The Ehrlich Parties gave Spencer-Smith notice that she had thirty days to cure such breaches and that the term of the Management Agreement was automatically extended through the period of time she was in breach, ending only when such breaches were satisfactorily cured.  DME Management concluded that it "has stood—and continues to stand—fully ready, willing and able to perform under the Agreement[]."  *Id.* at 2.

On June 7, 2022, through counsel, Spencer-Smith rejected the Ehrlich Parties' claim that she breached the Management Agreement (the "June 7 Letter").  Dkt. No. 132-23; Dkt. No. 147 ¶¶ 327–28; Dkt, No. 155 ¶ 43.  The letter asserted that Spencer-Smith "was justified in the termination of the Management Agreement."  Dkt. No. 132-23 at 3.  It recited that DME Management and Ehrlich "took numerous actions" which were not in Spencer-Smith's interests

and damaged her relationship with her record label, and stated that Ehrlich's "inappropriate and hedonistic conduct" had shattered Spencer-Smith's trust "which can never be rebuilt." *Id.* at 2.

After Spencer-Smith terminated the Ehrlich Parties, she entered into a merchandising agreement with Bravado International Merchandising Services, Inc., dated as of September 6, 2023. Dkt. No. 155 ¶ 45. She also entered into a performance rights agreement with SOCAN. Dkt. No. 155 ¶ 46.

Spencer-Smith's Recording Agreement remains in full force and effect, without interruption or amendment. Dkt. No. 155 ¶ 142. UMG continues to advance monies for advertising, marketing, and promotional purposes in furtherance of Spencer-Smith's recording career. Dkt. No. 155 ¶ 143. UMG has arranged for, and Spencer-Smith has participated in, live appearances and/or events and touring in furtherance of her recording career, including a 42-date global concert tour, Dkt. No. 155 ¶ 145, and a concert tour is presently being conceived for Spencer-Smith in connection with the release of her second album, Dkt. No. 155 ¶ 146. Following the termination of the Ehrlich Parties, her Publishing Agreement and PR Agreement remained in full force and effect, without interruption or amendment. Dkt. No. 155 ¶¶ 147–48. Spencer-Smith also continues to employ Phil Sarna Business Management and to work with the booking agency Creative Artists Agency, both of whom she began working with prior to the termination of the Ehrlich Parties. Dkt. No. 155 ¶¶ 151–52.

## PROCEDURAL HISTORY

These consolidated actions were initiated by complaint filed by Spencer-Smith in Case No. 23-cv-2652 against the Ehrlich Parties on March 30, 2023. Dkt. No. 1. That same day, the Ehrlich Parties filed a complaint against Spencer-Smith in Case No. 23-cv-2653. *Ehrlich v. Spencer-Smith*, Case No. 23-cv-2653, Dkt. No. 1 (S.D.N.Y. filed Mar. 30, 2023).

By stipulation and order of May 18, 2023, the Court consolidated Case No. 23-cv-2652 and Case No. 23-cv-2653 pursuant to Federal Rule of Civil Procedure 42(a).  Dkt. No. 8.

Spencer-Smith filed an amended complaint against the Ehrlich Parties on June 23, 2025, Dkt. No. 14, and the Ehrlich Parties filed their FAC against Spencer-Smith on June 26, 2025, Dkt. No. 16.

On February 21, 2024, the Court granted in part and denied in part the motion of the Ehrlich Parties to dismiss Spencer-Smith's amended complaint.  Dkt. No. 39.  The Court granted the Ehrlich Parties' motion to dismiss Spencer-Smith's Fourth, Fifth and Sixth claims for relief with prejudice and the motion to dismiss the Third claim for relief without prejudice.  *Id.*  The Court denied the motion to dismiss the First, Second and Seventh claims for relief.  *Id.*

On July 3, 2024, the Court granted in part and denied in part Spencer-Smith's motion to file a Second Amended Complaint.  Dkt. No. 60.  The Court granted Spencer-Smith leave to file an amended complaint alleging that DME Management breached the "reasonable efforts" clause of its Management Agreement with Spencer-Smith but not that it breached the "Available Clause" or its representations and warranties.  The Court denied Spencer-Smith leave to file a claim for breach of the implied duty of good faith and fair dealing.  The Court permitted Spencer-Smith to amend her complaint to add a claim of breach of the Engagement Agreement but denied Spencer-Smith leave to add a claim for a declaratory judgment that the Management Agreement was properly terminated on May 13, 2022.  Spencer-Smith filed her SAC on July 10, 2024.  Dkt. No. 61.

The Ehrlich Parties filed their motion for summary judgment on March 28, 2025.  Dkt. No. 107.  The Ehrlich Parties also filed a memorandum of law in support of the motion, a Rule 56.1 statement and the declarations of Jonathan D. Davis and Saheli Datta.  Dkt. Nos. 108–114,

134.  On May 16, 2025, Spencer-Smith filed her memorandum of law in opposition to the motion for summary judgment of the Ehrlich Parties, accompanied by the declarations of Spencer-Smith, Douglas Mark, Andrew Britton, and Julie B. Wlodinguer and a counter Rule 56.1 statement.  Dkt. Nos. 150–157.  On June 4, 2025, the Ehrlich Parties filed a reply memorandum of law and the reply affirmation of Colin J. Steelsmith in support of their motion for summary judgment.  Dkt. Nos. 164–65.

Spencer-Smith also filed her motion for summary judgment on March 28, 2025.  Dkt. No. 116.  With her motion, she filed a memorandum of law, a Rule 56.1 statement, and the declarations of Spencer-Smith, Kerry Spencer-Smith, Enrique Arres, John Murray, Douglas S. Mark, and Julie B. Wlodinguer.  Dkt. Nos. 117–132.[6]  On May 16, 2025, the Ehrlich Parties filed their memorandum of law in opposition to Spencer-Smith's motion for summary judgment accompanied by a counter-statement to the Rule 56.1 statement and the declaration of Jonathan D. Davis.  Dkt. Nos. 143–48.  On June 4, 2025, Spencer-Smith filed a reply memorandum of law in further support of her motion for summary judgment.  Dkt. No. 166.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

---

[6] Spencer-Smith filed an amended memorandum of law in support of her motion for summary judgment on March 31, 2025.  Dkt. Nos. 135–36.

there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"If, as here, 'both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it.'" *Equinox F&B, Inc. v. Roots Pressed Juices LLC*, 2024 WL 2240230, at *8 (S.D.N.Y. May 17, 2024) (quoting *Heublin, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublin, Inc.*, 996 F.2d at 1461; *accord Morales v. Quintel Ent. Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

A party opposing summary judgment must present evidence "in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The principles governing admissibility of evidence do not change on a motion for

summary judgment." *Id.* at 55–56.  In particular, information that constitutes hearsay cannot create a genuine issue of material fact.  "Hearsay is any out-of-court statement offered to prove the truth of the matter asserted in the statement."  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

In her statement of undisputed facts and in her memoranda supporting and opposing summary judgment, Spencer-Smith makes numerous statements that are supported only by hearsay.  These include her claims that:

- UMG's Human Resources conducted an investigation of Ehrlich;

- Ehrlich was banned from being present in UMG's New York premises; and,

- Ehrlich was not permitted alone with any woman from UMG on a go forward basis.

In each of those instances, Spencer-Smith cites testimony or declarations only that the deponent or declarant heard of the purported fact.  *See* Dkt. No. 131-24 at 337:15–338:19 (Mark testified that he spoke to the head of UMG Human Resources about the investigation and "believe[s]" there was an arrangement that Ehrlich would not be permitted alone with a female executive); Dkt. No. 113-4 at 156:4–10 (Alexander was "made aware" that Ehrlich was banned from UMG's New York premises); Dkt. No. 129 ¶ 45; Dkt. No. 131-9 at 188:20–25, 262:16–24, 264:14–17 (Pinsky and Mark heard that Ehrlich was not permitted to be alone with any woman from UMG).  Spencer-Smith does not present any percipient witness or competent evidence to support the facts asserted.  And, to the contrary, Saheli Datta, who is Executive Vice President, Chief Compliance Officer & Employment Counsel at UMG and who swears to her personal knowledge of the matter, attests that she spoke to the French UMG employee and is aware that Pinsky and Alexander spoke to representatives of UMG-Human Relations in the United States. Dkt. No. 114 ¶ 6.  She swears that after Spencer-Smith terminated Ehrlich's employment, UMG

determined that it was unnecessary to pursue any further inquiry or action concerning Ehrlich, *id.* 8, and that prior to Spencer-Smith terminating their relationship, Ehrlich was not banned from entering UMG offices, nor was he barred from meeting with any particular UMG employee, whether male or female. *Id.* ¶ 8. Accordingly, the Court does not consider there to be evidence of a UMG investigation of Ehrlich, that Ehrlich was banned from any UMG offices, or that Ehrlich was prohibited from being with a female employee of UMG.

## DISCUSSION

Spencer-Smith alleges five claims for relief in her SAC: (1) breach of fiduciary duty against the Ehrlich Parties in their capacity as her attorney, Dkt. No. 61 ¶¶ 100–03; (2) breach of fiduciary duty against Ehrlich and DME Management in their capacity as her managers, *id.* ¶¶ 104–07; (3) breach of the Management Agreement against DME Management, *id.* ¶¶ 108–12; (4) breach of the Engagement Agreement against Ehrlich & Associates and DME Management, *id.* ¶¶ 113–16; and (5) faithless servant against the Ehrlich Parties, *id.* ¶¶ 117–22. In their FAC, the Ehrlich Parties allege five claims for relief: (1) breach of the Management Agreement, Dkt. No. 16 ¶¶ 122–28; (2) breach of the Engagement Agreement, *id.* ¶¶ 129–33; (3) declaratory judgment with respect to the Management Agreement, *id.* ¶¶ 134–39; (4) declaratory judgment with respect to the Engagement Agreement, *id.* ¶¶ 140–45; and (5) defamation, *id.* ¶¶ 146–59.

Spencer-Smith moves for summary judgment with respect to all of her claims and with respect to all of the claims of the Ehrlich Parties. The Ehrlich Parties move for summary judgment with respect to all of Spencer-Smith's claims and with respect to the first four claims of their FAC: breach of the Management Agreement, breach of the Engagement Agreement, declaratory judgment with respect to the Management Agreement and declaratory judgment with respect to the Engagement Agreement. The Court starts with Spencer-Smith's contractual claims and then moves to her fiduciary duty claims, and then addresses the Ehrlich Parties' claims.

### I.  Spencer-Smith's Claims

#### A.      Breach of the Management Agreement

The Promotion Clause of the Management Agreement required DME Management to use "reasonable efforts to promote and enhance [Spencer-Smith's] career in the entertainment industry."  Dkt. No. 124-3 ¶ 1.  The Ehrlich Parties argue that they are entitled to summary judgment because Spencer-Smith failed to honor the notice and cure provision of the Management Agreement and because the conduct of DME Management, even construed favorably to Spencer-Smith, did not violate the Promotion Clause.  For her part, Spencer-Smith argues that the Termination Letter satisfied the notice provision of the Management Agreement, Dkt. No. 157 at 22–23, and that the conduct of Ehrlich that is not subject to genuine dispute violated the Promotion Clause.  Dkt. No. 136 at 28.

"'Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.'" *Spencer-Smith v. Ehrlich*, 2024 WL 709291, at *12 (S.D.N.Y. Feb. 21, 2024) (quoting *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021)); *see also Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

#### 1.      Spencer-Smith Did Not Give DME Management an Opportunity to Cure

"The failure of the performing party to satisfy a notice-and-cure provision such as that contained in Paragraph 13(b) . . . is an affirmative defense" to a breach of contract claim. *Spencer-Smith v. Ehrlich*, 347 F.R.D. 606, 621 (S.D.N.Y. 2024); *see, e.g.*, *Wengryn v. Provisions Consultants Corp.*, 667 Fed. App'x 10, 11 (2d Cir. 2016) (summary order) (discussing notice-and-cure provision raised as affirmative defense); *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 697 (S.D.N.Y. 2017) (same).  "'Such written notice requirements are fully

enforceable.'" *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 181 (S.D.N.Y. 2011) (quoting *Art of War Music Publ'g, Inc. v. Andrews,* 2000 WL 245908, at *2 (S.D.N.Y. Mar. 3, 2000)). They "serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination." *Id.* (quoting *Art of War*, 2000 WL 245908, at *2); *see Actava TV Inc. v. Joint Stock Co.*, 2024 WL 1156614, at *13 (S.D.N.Y. Mar. 18, 2024).

However, "the Second Circuit has cautioned against construing a contractual 'notice provision as if it were a common law pleading requirement under which every slip would be fatal.'" *ChemImage Corp. v. Johnson & Johnson*, 2025 WL 1883908, at *9 (S.D.N.Y. July 8, 2025) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977)). "Rather, the law requires that the court look to see if defendant's actions in terminating a contract served the general purpose of the contract's pretermination notice provision." *Schwartz v. Fortune Mag.,* 89 F. Supp. 2d 429, 433 (S.D.N.Y. Dec. 16, 1999) (citing *Contemporary Mission,* 557 F.2d at 925). Further, "New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless, or if the breach undermines the entire contractual relationship such that it cannot be cured." *Giuffre Hyundai, Ltd. v. Hyundai Motor America*, 756 F.3d 204, 209–10 (2d Cir. 2014) (collecting cases); *see also Sea Tow Servs. Intern., Inc. v. Pontin*, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009) ("[A]dherence to the cure provision of a contract is not required where it would be a futile act.").

Spencer-Smith argues that she complied with the notice and cure provision of the Management Agreement. She posits two separate theories: (1) because the contract stated that the breaching party "shall" have 30 days to cure, there was no need for the Termination Letter to

explicitly set forth the 30 day period to cure (in effect, the "cure" portion of the provision was self-executing); and (2) notice and an opportunity to cure would have been futile. Dkt. No. 157 at 24–25. She states that "Ehrlich and DME Management did not cure, and could not have cured, the alleged breaches, within thirty (30) days of May 13, 2022 or otherwise." *Id.* at 25. Neither argument has merit.

Spencer-Smith's letter of May 13, 2022 was an unambiguous repudiation of the contract that left no room for cure. Dkt. No. 190-1. It concluded, based on what Spencer-Smith deemed to be Ehrlich's wrongful actions, that Spencer-Smith had "no alternative but to terminate our relationship." Dkt. No. 190-1. Spencer-Smith expressed the view that the relationship could not "be repaired or fixed." *Id.* It is undisputed that through the May 13 letter, Spencer-Smith sought to immediately terminate the relationship between herself and the Ehrlich Parties. Dkt. No. 147 ¶ 315; Dkt. No. 178-1 ¶ 7 (Spencer-Smith stating "[t]he term of the Management Agreement ended on May 13, 2022" in her supplemental 56.1 statement). She did not understand herself to remain bound by the Management Agreement for thirty days to allow Ehrlich to cure. *See e.g.*, Dkt. No. 131-23 (June 7 Letter, sent within thirty days following the Termination Letter, noting that "Ms. Spencer Smith was justified in the termination of the Management Agreement"). After the Termination Letter was delivered, Spencer-Smith further impeded Ehrlich's ability to cure: she "exclude[ed] DME from its rightful role as exclusive manager," Dkt. No. 131-22 at 1, and, as a result of her letter, Ehrlich and DME Management had no right to act for Spencer-Smith and thus no way to make right what Spencer-Smith alleged he had done wrong. *See L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 434–35 (2d Cir. 2011) (finding sufficiently pled claim of breach of notice and cure provision where Defendant terminated contract effective immediately, giving Plaintiff no opportunity to cure alleged breach); *Rebh v. Lake George Ventures, Inc.*, 636

N.Y.S.2d 504, 505 (3d Dep't 1996), *aff'd as modified*, 660 N.Y.S.2d 901 (3d Dep't 1997)

(finding defendants breached employment contract's notice and cure provision where they

terminated plaintiffs' employment, effective immediately, due to substandard performance).  At

the point the letter was delivered, Spencer-Smith had repudiated her obligations under the

Management Agreement.  *See Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 587

(2d Cir. 2005) ("Repudiation occurs when a party manifests an intent not to perform, either by

words or by deeds."); *Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 230 (N.Y. 2012) ("Where

one party to a contract repudiates it and refuses to perform, the other party by reason of such

repudiation is excused from further performance, or the ceremony of a futile tender.").  By

repudiating the contract, Spencer-Smith removed any obligation for Ehrlich and DME

Management to perform under the agreement, including any obligation to attempt to cure the

breach.  *See Martell Strategic Funding LLC v. Am. Hosp. Acad.*, 2019 WL 632364, at *10

(S.D.N.Y. Feb. 14, 2019) ("It is well established that a party's duty to perform under a contract is

excused when the other party repudiates the agreement.")*.*  The cure provision could not be

self-executing in these circumstances.

Spencer-Smith's further argument is that she was not required to give notice because any

attempt by DME Management to cure would have been futile.  Dkt. No. 157 at 25.  But that

argument too has no merit.  "[T]he [futility] exception to the general rule favoring enforcement

of notice and cure provisions is a narrow one."  *Drapkin v. Mafo Consol. Grp., Inc.*, 818 F. Supp.

2d 678, 689 (S.D.N.Y. 2011) (quoting *Point Prod. A.G. v. Song Music Entm't, Inc.*, 2000 WL

1006236, at *4 (S.D.N.Y. July 20, 2000)).  "Futility is found 'only in limited circumstances,'

which include 'where the non-performing party (1) expressly repudiated the parties' contract or

(2) abandons performance thereunder.'"  *Id.* (quoting *Point Prod. A.G.*, 2000 WL 1006236, at

*4); *see e.g.*, *Bausch & Lomb Inc. v. Bressler,* 977 F.2d 720, 728 (2d Cir.1992) ("repudiating party expressly disavowed any further duties under the contract at issue, in effect declaring the contract at an end"); *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) ("strict adherence to the . . . cure provision would have been a 'useless act' in the face of [plaintiff's] abandonment of the job and its unjustified ultimatums"); *see also City of New York v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 693 (S.D.N.Y. 2018) (holding that failure to provide cure period was excused as useless in the face of a continued breach).  DME Management neither repudiated nor abandoned the Management Agreement. After Ehrlich left the European leg of the Tour, DME Management continued to perform under the contract.  Ehrlich participated in business conversations with UMG personnel between May 6 and May 14, 2022, Dkt. No. 155 ¶ 116, and participated in promotional activities, radio visits, and a photo shoot in Canada, Dkt. No. 390:13–17.  Following Spencer-Smith's Termination Letter, DME Management gave Spencer-Smith thirty days to cure her breach and expressed willingness to resolve the issue.  Dkt. No. 131-22 at 2.  It was Spencer-Smith who did not want DME Management to continue performing under the contract after the European leg of the Tour was completed, Dkt. No. 123 ("Spencer-Smith Decl.") ¶ 139 ("I did not particularly want Ehrlich to be there [at the Juno Awards] given how his time on the Promotional Tour had ended, but I did not feel I had a choice"), and who prevented DME Management from performing after the Termination Letter by excluding DME Management from its role as exclusive manager, Dkt. No. 132-22 at 2.

Cure is also deemed futile where circumstances render cure impossible, even if the breaching party seeks to perform under the contract.  *See, e.g., Filmline (Cross-County) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989); *Sea Tow Servs.*, 607 F. Supp. 2d

at 390 (if defendants have no ability to obtain a Coast Guard license within the ten-day notice

and cure period, then cure of breach resulting from unlicensed operation of vessels would be

futile).  However, Spencer-Smith has not established that it would have been futile for DME

Management to attempt to cure its alleged breaches.  Following the Termination Letter, DME

Management wrote Spencer-Smith that it stood "fully ready, willing and able to perform under

the Agreements."  Dkt. No. 132-22 at 2.  The parties, who understood the nature of their

relationship, agreed in advance that no breach would be deemed incurable for the thirty-day cure

period.  Dkt. No. 124-3 § 13(b) (noting that a party shall have thirty days "to cure such alleged

breach . . . or to commence curing same if not capable of immediate cure" and that during the

thirty-day period, "no breach shall be deemed incurable.").  If, in fact, DME Management had

undermined Spencer-Smith's relationship with UMG by Ehrlich's conduct, Ehrlich in theory

could have taken action to repair that relationship.  He could have apologized or explained his

actions.  Likewise, if during the brief period of the Tour, DME Management had negatively

affected Spencer-Smith's career by preventing her from having unchaperoned conversations and

contact with certain Tour members, Ehrlich could have permitted such contact.  It may be that in

Spencer-Smith's view the damage was irreparable, but the whole point of a notice and cure

provision is that the party who has not satisfied a contractual obligation is given the opportunity

to try to remedy the harm as long as such efforts would not be futile.  And, indeed, in this case,

the very fact that Spencer-Smith's relationship with UMG and her other service providers

remained unchanged after the termination of Ehrlich demonstrates that, to the extent that his

conduct impacted her relationship with UMG, any rupture caused by Ehrlich was not irreparable.

### 2.    There Are No Genuine Facts that Establish a Breach of the Promotion Clause

In any event, drawing all inferences in her favor, Spencer-Smith has not demonstrated that DME Management breached the Promotion Clause, which required DME Management to use "reasonable efforts" to promote Spencer-Smith's career.  Dkt. No. 124-3 ¶ 1.  Spencer-Smith claims that DME Management breached the Promotion Clause in two distinct ways: (1) "Ehrlich exerted unwarranted unilateral control over Spencer-Smith's dealings, activities, and communications causing her to be isolated from individuals who were critical to her career," including the guitarist, videographer, lawyer, and record label executives; and (2) "Ehrlich engaged in extremely unprofessional conduct during the Tour which undermined, rather than promoted, Spencer-Smith's career."  Dkt. No. 121 at 31.  Both sets of conduct challenge Ehrlich's behavior on the Tour.  Outside of the Tour, Ehrlich arranged meetings for Spencer-Smith with major record labels, including UMG, Capitol Records, and Atlantic Records, and negotiated her Recording Agreement with UMG.  Dkt. No. 155 ¶¶ 214–25.  Ehrlich also arranged meetings with music publishers and was involved in securing five proposals for music publishing.  *Id.* ¶¶ 231–38.  Ehrlich introduced Spencer-Smith to her immigration lawyer, entertainment lawyer, business manager, vocal coach, music producers, and music director Jon Perry, with whom she worked in advance of the Tour.  *Id.* ¶¶ 240–45, 254–55, 260.  He also coordinated music sessions and studio time for recording, *id.* ¶¶ 261–62, 264, 267, and arranged or coordinated the public release of her music, along with artwork and music videos, *id.* ¶¶ 268–270, 275–76.  The two singles Spencer-Smith released while Ehrlich was her manager achieved equal or higher music charting numbers than the five singles she released between May 13, 2022 and September 19, 2024.  *Id.* ¶ 278.

New York courts construe a "reasonable efforts" clause to impose similar obligations to a "best efforts" standard.  *See Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 470 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order); *Soroff Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012) ("When interpreting the meaning of a 'reasonable efforts' clause, New York courts use the term 'reasonable efforts' interchangeable with 'best efforts') (internal quotation marks and citation omitted).  "[A] 'best efforts' clause imposes an obligation to act with good faith in light of one's own capabilities."  *Soroff Trading*, 842 F. Supp. 2d at 511 (quoting *Monex Fin. Serv. Ltd. v. Nova Info. Sys., Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009)); *see also W. Geophysical Co. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1171 (2d Cir. 1978) (best efforts to promote clause "indicates a degree of discretion in the selection of the promotional plan" and requires "active exploitation in good faith" (internal quotations omitted)); *Res. Mine, Inc. v. Gravity Microsystem LLC*, 2018 WL 11510914, at *9 (E.D.N.Y. Oct. 2, 2018) ("While the exact contours of such clauses are 'far from clear,' the Second Circuit has found that such clauses at least impose 'an obligation to act with good faith in light of one's own capabilities.'" (quoting *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 (2d Cir. 1979))).  A best efforts clause "necessarily takes its meaning from the circumstances."  *Hollander Loader*, 313 F. Supp. 3d at 470 (quoting *Perma Research & Development v. Singer Co.*, 308 F. Supp. 743, 748 (S.D.N.Y. 1970)).

Courts in this Circuit have interpreted promotion clauses requiring "best efforts" to include both positive and negative obligations.  On the positive obligations, a party breaches an obligation to use "best efforts" to promote when it fails to take the steps towards promotion that an "average, prudent, comparable" person in that party's position should and would have taken.  *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 269 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d

Cir. 1979).  A manager, however, also has "the right, and even the duty to use in good faith its best business judgment in all matters arising under the contract, and also . . . the right to look to its own interest."  *Id.*

In *Bloor*, the court held that the defendant breached its contractual obligation to use best efforts to market a brewery's products where the defendant did not research the impact of closing four of six retail distribution centers, ignored an opportunity to promote distribution in the New York metropolitan area, hired a distributor who had conflicting interests, and "virtually eliminated its promotion and advertising."  454 F. Supp. at 267–72.  In *Contemporary Mission Inc. v. Famous Music Corp.*, the Second Circuit affirmed the jury's finding that a musical group's management breached its obligation to use reasonable efforts to promote the group's album "on a nationwide basis" where the management "prematurely terminated the promotion" of the first single record from the album, "limited its promotion of the second record . . . to a single city, rather than promoting it nationwide," and "underwent a budget reduction and cut back its promotional staff." 557 F.2d 918, 923–24 (2d Cir. 1977).  Though the manager had "obvious commitment to the success of [the album]" and the "[t]he question [wa]s a close one," the Second Circuit found that the manager's efforts fell short of the best efforts standard.  *Id.* at 923.

A promotion clause requiring "best efforts" also includes a negative obligation to refrain from affirmatively harming marketing efforts.  A party does not "necessarily breach[] that obligation by dealing in a competitor's goods."  *Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 322 (S.D.N.Y. 2020).  A party under a "best efforts" clause can simultaneously promote a competitor or otherwise work in their own best interest despite adverse effects on the other party, but "there may be a point where that activity is so manifestly harmful

. . . as to justify the court in saying there was a breach of the covenant to promote." *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 2002 WL 31749396, at \*14 (S.D.N.Y. Dec. 9, 2002) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)); *see id.* ("New York law does not impose an implied obligation not to market a competing product, so long as defendants made reasonable efforts to market [contracted for product].").

The leading case is *Van Valkenburgh*, in which the defendant publisher was required under a contract with the plaintiff author to use best efforts to promote the author's books.  281 N.E.2d at 144.  After the author declined to agree to a lower rate of royalties, the publisher secretly hired a second author to write books with a similar subject matter and promoted those books with advertising similar to that previously used for plaintiff's books while at the same time suspending advertisement of plaintiff's books.  *Id.* at 143–44.  The New York Court of Appeals found that the "best efforts" requirement does not "close off the right of a publisher to issue books on the same subject, to negotiate with and pay authors to write such books and to promote them fully according to the publisher's economic interests, even though those later publications adversely affect the contracting author's sales."  *Id.* at 144.  Yet, the Court of Appeals affirmed the Appellate Division's finding of "a narrow breach in the failure of the publisher to use its best efforts" on the notion that "there may be a point where th[e] activity [of the publisher] is so manifestly harmful to the author, and must have been seen by the publisher so to be harmful, as to justify the court in saying there was a breach of the covenant to promote the author's work."  *Id.* at 145.  Courts have elsewhere found such manifest harm where the party obligated to use best efforts to promote directly impedes promotion in favor of a competitor.  *See e.g.*, *Fike Corp. v. Great Lakes Chem. Corp.*, 332 F.3d 520, 523 (8th Cir. 2003) (finding breach where party

tasked with promotion "devoted fewer resources to the promotion of [product] in order to accelerate promotion of [competitor].  And most importantly, it explicitly advertised that [competitor] could be used in place of [product]."); *Joyce Beverages of N.Y., Inc. v. Royal Crown Cola Co.*, 555 F. Supp. 271, 275 (S.D.N.Y. 1983) (evidence "establish[ed] beyond peradventure of doubt" that the party's effort to sell competing product to customers of the contracted-for product and use of the contracted-for product's "advertising and distribution method" for the competing product "breaches the best efforts clause both factually and legally"); *Gilson v. Rainin Inst., LLC*, 2005 WL 955251, at *9 (W.D. Wis. 2005) (relying on the *Van Valkenburgh* "manifestly harmful" standard and denying summary judgment for either party where Plaintiffs allege that Defendants failed to use best efforts to promote their product where, *inter alia*, they refer to competitor product as "upgraded version" of Plaintiffs' product, disparage their product, and train their sales force to sell their product "only as a last resort").

Spencer-Smith has not adduced evidence that would support the conclusion that DME Management breached the Promotion Clause of the Management Agreement.  She did not allege in the SAC that DME Management failed to affirmatively promote her career.  Nor could she demonstrate such failure.  Ehrlich negotiated her first recording agreement with a major record label, introduced her to crucial professionals, such as her business manager, with whom she continues to work, and aided in the promotion of her music.  Dkt. No. 155 ¶¶ 226, 243–45, 272, 276.  Spencer-Smith also does not allege or adduce evidence of the type in *Van Valkenburgh* that DME Management promoted competing artists at Spencer-Smith's expense and for its own benefit.  Ehrlich and DME Management had a financial interest in Spencer-Smith's promotion and in her success.  Under the Engagement Agreement and Management Agreement together, the Ehrlich Parties were entitled to receive twenty cents of every dollar in gross profits earned by

Spencer-Smith as a result of her entertainment services, defined broadly to include her music and any professional agreements.  Dkt. No. 123-3 § 3(d); Dkt. No. 123-2 ¶ 2.  There is no evidence they had any greater or even equivalent interest in any other artist.  They had every interest to ensure that she would become a star.

Rather, Spencer-Smith's claim rests upon the allegations that during the Tour, Ehrlich told the guitarist and videographer not to have direct contract with her, Dkt. No. 147 ¶ 236–39, 242, 306, did not give Mark a telephone number or other forms of contact information to reach Spencer-Smith, *id.* ¶¶ 69–71, had disputes with the UMG marketing representative Pinsky, *id.* ¶ 124, and discouraged her from attending concerts, Dkt. No. 112-4 at 114:2–7; Spencer-Smith Decl. ¶ 76.  Spencer-Smith also relies on Ehrlich's alleged unprofessional conduct during the Tour: (1) taking photographs of a flight attendant on the flight from Berlin to Sweden, Dkt. No. 147 ¶¶ 139–48; (2) taking pictures of a UMG professional in France, *id.* ¶¶ 168–177; Dkt. No. 126 ¶ 24; (3) recruiting female UMG employees to work with him in New York, Dkt. No. 147 ¶¶ 154–59, 178; Dkt. No. 126 ¶ 25–26; (4) arguing with Pinsky, Dkt. No. 147 ¶¶ 128–130, 163–67; and (5) commenting on the physical attractiveness of women on the tour, *id.* ¶¶ 131–32, 134. Taking all of those allegations individually and together, they do not give rise to a jury question whether DME Management violated the Promotion Clause.

Accepting as the Court must at this stage, having drawn all inferences in Spencer-Smith's favor, that Ehrlich attempted during the Tour to recruit two UMG employees to work for him in New York, such conduct does not violate or implicate the Promotion Clause.  Ehrlich had a right to act in his own self-interest in trying to recruit employees to work for him even if such efforts had an indirect incidental effect on Ehrlich's relationship with UMG.  *Von Valkenburgh*, 281

N.E.2d at 144.  Tellingly, Spencer-Smith identifies no evidence that such conduct would be imputed to her.

Similarly, evidence that Ehrlich engaged in inappropriate or even boorish behavior, in his recruitment of employees or otherwise, on the Tour would not give rise to a violation of the Promotion Clause.  "[A] defendant's uncouth or immoral behavior outside the workplace that has a mere incidental effect on the artist's career is not a breach of a best efforts promotional clause." *Spencer-Smith*, 347 F.R.D. at 622.  Drawing all inferences in favor of Spencer-Smith, Ehrlich's conduct disrupted her relationship with Pinsky, caused both Pinsky and Ehrlich to leave the Tour early, and made Spencer-Smith and others on the Tour feel uncomfortable.  But that does not establish a violation of the Promotion Clause.  Spencer-Smith had no right to have Ehrlich on the Tour in the first place.  The Management Agreement specifies that Spencer-Smith "shall not be entitled to the exclusive services of any of Manager and Manager's employees or representatives" and gives DME Management "the right to designate which of its employees and/or representatives shall provide services."  Dkt. No. 123-3 § 1(c).  The Promotion Clause must be read *in pari materia* with that clause.  *See State St. Glob. Advisors Tr. Co. v. Visbal*, 677 F. Supp. 3d 209, 253 (S.D.N.Y. 2023) ("[U]nder New York law, contracts should be read as a whole, and every part . . . interpreted with reference to the whole." (internal quotation marks and citation omitted)); *accord POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 754 (S.D.N.Y. 2021).  Ehrlich's departure from the Tour when he was replaced by another employee of DME Management cannot be construed as a violation of the Promotion Clause.[7] Likewise, the rupture of the Spencer-Smith-Pinsky relationship is not a violation of the Promotion Clause.  Pinsky was an International Marketing Representative employed with UMG.

---

[7] Indeed, Spencer-Smith makes no such allegation.  Dkt. No. 136 at 28.

Dkt. No. 155 ¶ 55. She was replaced on the Tour by Alexander, who was her senior and direct supervisor, Dkt. No. 131-9 at 19:19, and her departure left no gap in coverage for Spencer-Smith, as it is undisputed that "the international marketing responsibilities for Spencer-Smith were handled by someone else" following her departure, Dkt. No. 147 ¶ 288. And, while Spencer-Smith testified she was comfortable with Pinsky and desired her continued presence, there is no evidence that Pinsky's departure led to, or reasonably could have been feared to lead to, a rupture with UMG. There is no evidence that Pinksy was critical to the UMG relationship. Spencer-Smith's contract with her label has remained unchanged and she does not dispute that neither she nor her mother could identify any UMG executive, employee, or other representative at UMG who refused to work with Spencer-Smith prior to or after her relationship with Ehrlich was terminated. Dkt. No. 155 ¶¶ 139–42. Nor does she dispute that "UMG continued to advance monies for advertising, marketing, and promotional purposes in furtherance of Spencer-Smith's recording career" on and after the date of terminating her relationship with Ehrlich, *id.* ¶ 143, or that both her Publishing Agreement and PR Agreement "remain[] in full force and effect, without interruption or amendment," *id.* ¶¶ 142, 147. UMG remained supportive of Spencer-Smith and distinguished between her and Ehrlich's conduct. *See, e.g.,* Dkt. No. 113-4 at 180:5–11 (Alexander noting he "ma[de] sure that she was aware that she wasn't in trouble, I wasn't upset with her despite what was going on and she's totally supported"); Dkt. No. 113-1 at 427:7–17 (Spencer-Smith testifying that no one in the press criticized her because she was managed by Ehrlich).

Finally, even accepting Spencer-Smith's allegations that Ehrlich was a boor, that does not mean that he breached the Management Agreement. The parties neither bargained for nor included a morals clause in the Management Agreement, and to read one into the Management

Agreement would be to violate "the canon that a court should be reluctant to read a clause into a contract that the parties have neglected to specifically include." *Id.*; *see Vt. Teddy Bear Co. Inc. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004); *cf. Nader v. ABC Television, Inc.*, 150 Fed. App'x 54, 56 (2d Cir. 2005) (summary order) (party did not breach contract by firing plaintiff due to his arrest and subsequent media attention because the contract included a "morals clause" which is enforceable under New York law).[8]  While Spencer-Smith might have expressed the fear that Ehrlich's conduct would have been imputed to her, there is no evidence that it was.  *Cf.* Restatement (Second) of Agency § 380 (1958) ("an agent is subject to a duty not to conduct himself with such impropriety that he brings disrepute upon the principal or upon the business in which he is engaged.").  Ehrlich's conduct might give rise to a decision by Spencer-Smith to replace him as manager but it would not mean that he did not do his job ably or as the contract required.

That leaves only Ehrlich's conduct in limiting Spencer-Smith's interaction during the Tour with the videographer and the guitarist and in attending the concerts of other musicians. Spencer-Smith asserts that the instruction to her videographer not to contact her directly was contrary to her best interests, as the videographer's job "is to bond and form relationships with the artists he works with, which helps the artist be more comfortable around him and yields better work product."  Dkt. No. 147 ¶ 243; *see* Dkt. No. 126 ¶ 14.  She asserts that due to the limited direct contact she was permitted with her guitarist she "had to stay up late the night before her first day of promotional activities for the Promotional Tour in order to rehearse with Murray."  Dkt. No. 147 ¶ 119.  She swears in her declaration that Ehrlich "told [her] that he did not think [she] should attend musical concerts of other artists in the evenings during the

---

[8] The Court expresses no view as to whether Ehrlich's conduct would violate a morals clause.

Promotional Tour, even though those concerts would not interfere with my ability to be successful . . . and, in the case where I could go backstage, might be opportunities to bond with those artists and potentially further my career." Spencer-Smith Decl. ¶ 76. She expressed all of these same concerns regarding the control Ehrlich was exercising over her during her conversation on the Tour with her mother and Ehrlich. Dkt. No. 131-20 at 11–14. None of this conduct was "manifestly harmful" to Spencer-Smith nor would it have been understood by Ehrlich to be harmful. They fall squarely within a manager's business judgment. *See Zilg v. Prentice-Hall, Inc.*, 717 F. 2d 671, 681 (2d Cir. 1983) (no breach of contract if failure to pursue "greater printing and promotional efforts" was due to "good faith business judgment."); *Western Geophysical Co.*, 584 F.2d at 1171 (best efforts clause "indicates a degree of discretion").

Spencer-Smith has proffered no evidence that the videographer's work product was deficient or harmed her career. She does not allege that the late-night rehearsal impeded her performance or participation in promotional activities.[9] She points to two concerts during the Tour: a Fletcher concert and a James Bay concert. Dkt. No. 131-2 at 269:7–13 (discussing Fletcher concert); Dkt. No. 151-3 at 142:13–143:2 (discussing James Bay concert). Spencer-Smith attended the Fletcher concert with members of the Tour, including Ehrlich. Dkt. No. 151-3 at 114:2–7; Dkt. No. 131-2 at 276:10–14; Dkt. No. 147 ¶ 250. Ehrlich's expression of concern about her attending another concert while she was performing did not cause manifest harm, and would not have been understood to cause it. Alexander testified to his belief that Ehrlich was concerned that late night activities by Spencer-Smith such as attending a concert could affect her voice, Dkt. No. 151-3 at 142:13–143:2, a point he "understood," *id.* at 143:21.

---

[9] Spencer-Smith also does not allege any harm due to Ehrlich's failure to provide her contact information to Mark or MMML, other than her broad allegation of isolation from those critical to her career. Dkt. No. 121 at 31.

There is no evidence that Spencer-Smith could have performed at the concert. Dkt. No. 131-9 at 224:16–19 (Pinsky testifying that she does not know "whether Mr. Alexander ever reached out to anyone to inquire about whether Ms. Spencer-Smith could perform"). Nor is there evidence that Ehrlich prevented her from attending the concert. *Id.* at 196:14–17 ("Did Mr. Ehrlich ever, to your knowledge, express any objection to Ms. Spencer-Smith attending those concerts? A. Not to my knowledge."); Dkt. No. 151-3 at 143:2 (Alexander testifying "ultimately, the decision was made for her not to go" without stating who made the decision). Even if Ehrlich had clearly prevented Spencer-Smith from attending the concert, evidence that Ehrlich impeded a potential connection with an artist in the interest of her preserving her voice does not constitute manifest harm.

For these two independent reasons, the Ehrlich Parties are entitled to summary judgment on Spencer-Smith's claim that DME Management breached the Management Agreement.

### B.    Breach of the Engagement Agreement

In her fourth claim for relief, Spencer-Smith alleges that Ehrlich & Associates breached the Engagement Agreement. Dkt. No. 61 ¶¶ 113–16. In her memorandum in support of summary judgment, Spencer-Smith argues that "[b]y delegating the day-to-day legal services for Spencer-Smith to MMML, Ehrlich and [Ehrlich & Associates] breached its contractual obligation to render 'all legal services that may be necessary or desirable that are related to [Spencer-Smith's] services and activities throughout the entertainment industry.'" Dkt. No. 136 at 32 (quoting Dkt. No. 123-2). Spencer-Smith argues that Ehrlich did not act as co-counsel and delivered no legal services to Spencer-Smith after January 26, 2022. Dkt. No. 157 at 28–29. Ehrlich & Associates is entitled to summary judgment.

To refresh, under the Engagement Agreement, Spencer-Smith and Ehrlich & Associates agreed as follows:

> This Agreement will confirm that as of the date hereof, and in accordance with the provisions hereof, you are engaging us as your legal representative to render legal services generally in connection with your career in the entertainment industry as provided in this Agreement. . . . It is understood and agreed that we will be responsible for rendering all legal services that may be necessary or desirable that are related to your services and activities throughout the entertainment industry including, but not limited to your services as a recording artist, song writer, literary writer, producer of music, director, theatrical performer and producer for television, film and all other performances and activities throughout all fields of the entertainment industry, including, without limitation, in the fields of television, motion pictures, radio, internet, and in connection with merchandise and commercial endorsements, television commercials and any and all other exploitations of your services, talents and activities in any way connected with or appurtenant to the entertainment industry and any related fields throughout the world ("Entertainment Services").

Dkt. No. 123-2 § 1.

In exchange, Spencer-Smith agreed that Ehrlich & Associates would be entitled to "five percent (5%) compensation on all gross monies and any other compensation earned or received by [Spencer-Smith] or payable to [Spencer-Smith's] behalf" as a result of Spencer-Smith's Entertainment Services. Dkt. No. 123-2 § 2.

Spencer-Smith does not assert that Ehrlich breached the Engagement Agreement by engaging Mark to assist in Spencer-Smith's representation. Before Mark did any work on Spencer-Smith's behalf, Ehrlich & Associates had her sign a Notice of External Counsel Engagement. That Notice provided:

> I write to advise that David M. Ehrlich & Associates, P.C. (collectively "DME," "we," or "us") intends to engage the firm of Mark Media Law ("MML") to jointly act with us on your behalf in the negotiation of your recording contract and other entertainment industry related agreements. DME is engaging MML because MML has substantial experience representing new artists who careers are advancing rapidly. MML's past and current client roster includes, among other artists, Billie Eilish, Christina Aguilera, Sara Bareilles, Benny Blanco, and Jojo. I have known Doug Mark, the senior partner of the firm, for many years, and therefore know from personal experience that MML is a high-quality law firm.
>
> Compensation for MML's services will be paid out of the the [sic] five (5%) percent commission you previously agreed to pay us, meaning there will be no additional fees due from you in consideration for MML's work on your behalf. MML will be

paid for its work in a fixed amount to be determined by us and both MML and DME will be jointly responsible for your representation.

If you are comfortable with this arrangement, please indicate by signing below and return your executed version to me.  Of course, before doing so please feel free to consult with independent counsel if you wish.

Dkt. No. 123-4.

Rather, Spencer-Smith claims that, even if she agreed that Mark could perform legal services for her, she did not agree that Ehrlich could abdicate his representation of her.  *See* Dkt. No. 136 at 32 (stating the Ehrlich Parties "could not wholesale delegate all those [legal] services to MMML").  Spencer-Smith's claim is flawed.

First, as a contractual matter, Ehrlich was not bound to perform any specific quantum of work or bill any particular amount of hours on behalf of Spencer-Smith.  Rather, he agreed to be "responsible" for rendering the legal services that may be necessary or desirable with respect to Spencer-Smith's career.  Dkt. No. 123-2 § 1.  The use of that term was undoubtedly intended.  It does not connote that Ehrlich himself was required to personally perform all of the legal work Spencer-Smith required.  It permitted him to use others to assist in that work.  It required only that he be "responsible" that the work be performed.  And there is no evidence that Ehrlich breached his obligations in that respect.  The fact that Ehrlich engaged Mark to assist in the provision of legal services to Spencer-Smith did not "relieve [him] of his duty to supervise" the representation or of responsibility if the services were rendered deficiently.  *J.M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338, 348 n.5 (D. Conn. 1981) (citing *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 234 (2d Cir. 1977)).  As the party with the engagement letter with Spencer-Smith, Ehrlich—and not Mark—assumed responsibility for the representation and "indeed he would have been liable . . . in a malpractice action."  *Prudential Equity Grp., LLC v. Ajamie*, 538 F. Supp. 2d 605, 610 (S.D.N.Y. 2008); *see Hernandez v. Berlin*

*Newington Assocs., LLC*, 2016 WL 5339720, at *5 (D. Conn. Sept. 22, 2016) ("The duties that an appearing attorney owes to their client and to the court cannot be discharged by agreement with another attorney."), *aff'd*, 699 F. App'x 96 (2d Cir. 2017) (summary order). That Ehrlich, with Spencer-Smith's consent, chose to entrust Mark with a portion of the representation does not lessen Ehrlich's responsibility for the quality of that representation nor relieve Spencer-Smith of her obligation to compensate Ehrlich for assuming that responsibility. Regardless of the number of hours he spent doing legal work for Spencer-Smith and the number of hours devoted by Mark, Ehrlich continued to be responsible for the engagement and never disowned that responsibility. He thus did not breach.

Second, as a factual matter, there is no genuine dispute that Ehrlich remained involved in Spencer-Smith's representation. It is undisputed that Ehrlich and Mark both negotiated the Recording Agreement and that Ehrlich remained abreast of the legal services provided to Spencer-Smith. Dkt. No. 155 ¶ 33. While Mark characterized Ehrlich's participation as "purely managerial in nature," Dkt. No. 130 ¶ 14, and responded in the negative when asked if he co-represented Spencer-Smith with Ehrlich's firm, Dkt. No. 131-24 at 18:17–22, Mark also affirmed that Ehrlich "did have input and suggestions into the commercial terms of Spencer-Smith's Recording Agreement" and would "forward[] the offers [from music publishers] to me and my colleague to handle the legal work and negotiation needed." Dkt. No. 130 ¶¶ 16, 23; *see also* Dkt. No. 129-1 (email from Ehrlich to Mark attaching publishing proposals and stating "Let's discuss."); Dkt. No. 129-2 (email from Ehrlich to third party and Mark, noting specific terms for the agreement). During his deposition, Mark acknowledged that he expressed to Ehrlich in writing that "he was co-counsel." Dkt. No. 112-2 at 79:24–80:11. Mark also testified that "work on an offer" refers to "essential points of a record contract that

you discuss . . . royalties, advances, the term of the agreement, the foreign royalty" and affirmed

that he and Ehrlich determined these points for the recording agreement together.  Dkt. No.

112-2 at 87:17–88:3.  Mark also testified as to Ehrlich's involvement with the publishing

agreement between Spencer-Smith and Warner Chappell, stating that Ehrlich "had substantial

input, into the, for example, advance that he would be expecting her to get from the publishing

companies."  Dkt. No. 112 at 153:11–13.  It may be that a person who was not admitted to the

bar could have performed the work that Ehrlich performed.  The work is best characterized as

being mixed business and legal.  *See, e.g.*, *Rossi v. Blue Cross & Blue Shield of Greater New*

*York*, 540 N.E.2d 703, 705 (N.Y. 1989) (recognizing that lawyers may have roles that "blur the

line" between legal and nonlegal).  But that does not mean that in the discharge of his

responsibilities he would be held to a standard lesser than that to which an attorney is held or that

his work in that respect was not legal work.  *Cf., United States v. Daugerdas*, 757 F. Supp. 2d

364, 371 (S.D.N.Y. 2010) (communications between attorney and client pertaining to the

negotiation of compensation agreement, for which the attorney was retained, are protected by

attorney-client privilege).  Morever, Ehrlich's responsibility under the Engagement Agreement

was, at least in part, to negotiate Spencer-Smith's agreements.  Dkt. No. 123-2 ¶¶ 1–2, 4 (noting

"success fee" in regard to successfully negotiated agreements and the possibility of conflicts in

negotiations within the entertainment industry).  It is undisputed that he continued to perform

under that obligation after retaining MMML.

Thus, as both a contractual and factual matter, there is no genuine issue that Ehrlich did

not "abandon" his role as lawyer for Spencer-Smith.

### C.    Breach of Fiduciary Duty

In her first and second claims for relief, Spencer-Smith alleges that the Ehrlich Parties

breached their fiduciary duties to Spencer-Smith as her attorneys and managers.  Dkt. No. 61

¶¶ 100–07.  "Under New York law, a claim for '[b]reach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the defendant; (2) a breach of that duty; and (3) resulting damages.'"  *Spencer-Smith*, 2024 WL 709291, at \*6 (quoting *Jones v. Voskresenskaya*, 5 N.Y.S.3d 16, 17 (1st Dep't 2015); *Johnson v. Nextel Commc'ns*, 660 F.3d 131, 138 (2d Cir. 2011)).  "A fiduciary is obliged to exercise the 'highest degree of good faith, honesty, integrity, fairness and fidelity' in its dealings with those to whom the duty is owed."  *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y. 2007) (quoting *U.S. Ice Cream Corp. v. Bizar*, 659 N.Y.S.2d 492, 492 (2d Dep't 1997)).  "Once a fiduciary duty is established, it is so 'inflexible' that the fiduciary must avoid not only self-dealing, but also 'situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.'"  *Id.* (quoting *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989)).  "A fiduciary is obligated not to take the trust reposed in him and use it for his own personal benefit and to the detriment of the *cestui que* trust."  *Spencer-Smith,* 2024 WL 709291, at \*10; *see also Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 50, 528 (E.D.N.Y. 2018) ("[A] cause of action based upon breach of fiduciary duty rests not on the violation of a generalized professional standard, but on the abuse of a particularized relationship of trust." (quoting *Wende C. v. United Methodist Church*, 776 N.Y.S.2d 390, 397 (4th Dep't 2004)).

The Ehrlich Parties do not dispute that they owed fiduciary duties to Spencer-Smith. Ehrlich and Ehrlich & Associates owed such duties in their capacities as attorney to Spencer-Smith and Ehrlich and DME Management owed such duties in their capacity as manager.  The parties dispute instead whether the Ehrlich Parties breached their fiduciary duties and, if so, whether such breach resulted in damage.

Spencer-Smith identifies several respects in which she claims that the Ehrlich Parties breached their fiduciary duties: (1) the Ehrlich Parties retained MMML to render legal services to Spencer-Smith in connection with the Recording Agreement for half of the 5% legal commission owed to Ehrlich & Associates, limited to $100,000, without disclosing that fee to Spencer-Smith and without Ehrlich & Associates itself doing any work on the Recording Agreement, Dkt. No. 121 at 25–26; (2) Ehrlich failed to disclose to Spencer-Smith that UMG had conducted an internal investigation of Ehrlich's conduct during the Tour and had advised Ehrlich that the Tour could not continue if he remained present on the Tour, *id.* at 26–27; and (3) during the Tour, the Ehrlich Parties placed their own desires above the needs of Spencer-Smith, *id.* at 27–28. Spencer-Smith has adduced no evidence that would establish a breach of fiduciary duty.

First, there can be no claim that Ehrlich and Ehrlich & Associates breached their fiduciary duties to Spencer-Smith by sharing a portion of the compensation that Spencer-Smith would owe to Ehrlich & Associates with Mark. There was no self-dealing with the transaction. Ehrlich & Associates did not profit at Spencer-Smith's expense. As discussed above, Ehrlich remained responsible for the representation. And it was disclosed to and agreed upon by Spencer-Smith that Mark would perform services on behalf of Spencer-Smith. That Ehrlich decided that it would be in Spencer-Smith's interest that someone else rather than he alone participate in the negotiation of the Recording Agreement and that he agreed to share some of what he was owed by Spencer-Smith with that other attorney does not establish that Ehrlich acted to Spencer-Smith's detriment and Ehrlich's benefit. To the contrary, it suggests that he acted to Spencer-Smith's benefit and at his expense.

Likewise, there was no violation of the duty of disclosure. Failure to disclose material facts can give rise to a breach of fiduciary duty where those facts would influence the decision-making of the person to whom the duty is owed. *See, e.g., Meisel v. Grunberg*, 2010 WL 4966443, at *2 (S.D.N.Y. Nov. 30, 2010) (granting summary judgment for plaintiff on breach of fiduciary duty claim where defendant knew about and did not provide the original appraisal of properties prior to plaintiff selling his interest in the properties); *Gershunoff v. Panov*, 430 N.Y.S.2d 299, 301 (1st Dep't 1980) (manager's failure to disclose fee arrangements for performances constituted breach of fiduciary duty). There is no evidence that knowledge of the details of the fee sharing arrangement would have influenced Spencer-Smith's decision to authorize joint representation or that lack of knowledge negatively affected her. Spencer-Smith was aware that Ehrlich & Associates entered a joint representation arrangement with MMML and that MMML's legal fees would be paid out of the 5% commission paid to Ehrlich & Associates. The details of the fee arrangement did not increase the cost of legal services for Spencer-Smith, nor does she allege that the fee arrangement had any influence on the provision of legal services.[10]

Spencer-Smith suggests that the arrangement violated New York's Rules of Professional Conduct. Dkt. No. 157 at 31. Under those rules, fee sharing is permissible provided that, *inter alia*, "the client agrees to the employment of the other lawyer after a full disclosure that a division of fees will be made, including the share each lawyer will receive, and the client's

---

[10] Unlike *Gershunoff*, upon which Spencer-Smith relies, the failure to disclose the fee arrangement did not obscure an inequitable scheme resulting in direct financial loss to her. 430 N.Y.S.2d at 301 (finding breach of fiduciary duty where manager of ballet dancers refused to share fee arrangement for performance upon request and where fee arrangement provided for manager to receive both a commission on dancers' earnings and a direct advance from the venue, resulting in manager receiving payment greater than that which he would pay the dancers).

agreement is confirmed in writing." 22 N.Y.C.R.R. 1200.0 § 1.5(g). Spencer-Smith claims she

was unaware of the share each of Ehrlich & Associates and MMML would receive. The Ehrlich

Parties responded at oral argument that they discharged their obligation because they disclosed to

Spencer-Smith that MMML's compensation would be paid out of the compensation due Ehrlich

& Associates from Spencer-Smith and that she gave the Ehrlich Parties discretion to determine

the precise percentage to which MMML would be entitled depending on the project MMML

worked on. Transcript of January 29, 2026 Oral Argument ("Jan. 29, 2026 Tr.") at 7:10–16.

The Court need not address, however, whether the Rules of Professional Conduct were satisfied,

however, because "it is well-established that the violation of a disciplinary rule, without more,

does not establish a claim for breach of fiduciary duty." *Trautenberg v. Paul, Weiss, Rifkind,*

*Wharton & Garrison LLP*, 629 F. Supp. 2d 259, 263 (S.D.N.Y. 2007), *aff'd*, 351 F. App'x 472

(2d Cir. 2009) (summary order); *see also Cooke-Zwiebach v. Oziel*, 2011 WL 6141670, at *3

(Sup. Ct. N.Y. Cnty. Dec. 2, 2011) ("even assuming that SFVOS failed to disclose the division

of fee agreement with Finz & Finz, this 'technical violation' of the disciplinary rules is not

actionable because Plaintiffs cannot establish that the fee sharing arrangement breached a

fiduciary duty."), *aff'd*, 962 N.Y.S.2d 64 (1st Dep't 2013).

    Spencer-Smith's allegation that Ehrlich failed to disclose to her that UMG lawyers and

human resources department had conducted an internal investigation regarding his conduct, had

considered canceling the Tour, and had asked him to leave the Tour, Dkt. No. 136 at 24–35, also

cannot support a claim of breach of fiduciary duty. As discussed *supra*, there is no admissible

evidence that UMG had conducted an internal investigation of Ehrlich. *See* Dkt. No. 131-24 at

337:15–338:19 (Mark testifying only that he heard of the investigation). The failure to disclose

something that never occurred is not a breach of fiduciary duty. *See Meador v. Albanese L. Off.*,

2010 WL 3807163, at *8 (N.D.N.Y. Sept. 23, 2010) (denying summary judgment on breach of fiduciary duty claim where evidence suggests that defendant did not have knowledge of information he failed to disclose).

There is evidence that when Ehrlich initially told Spencer-Smith and her mother that he was leaving the Tour, he initially ascribed the decision to his wife's illness and his desire to be with her over Mother's Day.  Spencer-Smith Decl. ¶ 125.  After Spencer-Smith confronted Ehrlich about the reasons for his departure besides visiting his wife, he acknowledged that he volunteered to leave in part due to allegations that he made people uncomfortable.  Dkt. No. 131-20 at 6–8.  That evidence does not give rise to a claim of breach of fiduciary duty.

A fiduciary breaches their duty where they misrepresent material facts to the person to whom the duty is owed, and the person relies on the misrepresentation to their detriment.  *See, e.g., Ruso v. Morrison*, 695 F. Supp. 2d 33, 51 (S.D.N.Y. 2010) (denying defendants' motion for summary judgment where there remains disputed questions of fact regarding whether defendant made false "representations to the plaintiff regarding the investment structure and risk level" of investments); *Russell-Stanley Holdings, Inc. v. Buonanno*, 327 F. Supp. 2d 252, 257 (S.D.N.Y. 2002) (denying motion to dismiss breach of fiduciary duty claim where "complaint does in fact allege that defendant made false and misleading statements" causing plaintiff injury); *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 171 (1st Dep't 1986) (auction house would be in breach of its fiduciary duty to consignor if evidence supports that it misrepresented prices that could be obtained at auction, thereby inducing consignor to sell paintings at auction).  Leaving aside whether Ehrlich's initial statement can even be characterized as a misstatement (rather than at most an omission), there is no evidence either that Spencer-Smith did not know of the fact that Ehrlich had been asked to leave the Tour (she

admitted knowing it during the conversation) or that the reason for his departure was material, much less that Spencer-Smith relied to her detriment upon Ehrlich's failure to mention the request in the conversation before he was forced to admit to it minutes later. The conversation may have contributed to a loss of confidence but it does not give rise to a claim for breach of fiduciary duty.

Finally, Spencer-Smith argues that Ehrlich violated his fiduciary duty by "berating Pinsky and escalating his personal issues with Pinsky to her boss." Dkt. No. 136 at 26. Spencer-Smith claims that Ehrlich's decision to speak to Alexander about Pinsky rather than address Pinsky directly was unprofessional and "detrimental to Spencer-Smith's UMG relationship." Dkt. No. 136 at 12; Dkt. No. 130 ¶ 38 (Mark affirming that "I advised Ehrlich that he should raise his issues with Ms. Pinsky to Ms. Pinsky directly . . . In my view, going to Ms. Pinsky's boss was not a preferred strategy . . . given that Ms. Pinsky was an employee at Spencer-Smith's record label with whom Ehrlich and Spencer-Smith would have to work in the future"). She claims that, through this conduct, Ehrlich prioritized his issues with Pinsky over the interests of Spencer-Smith. Spencer-Smith's argument is just another way of her saying that she disagrees with Ehrlich's handling of Pinsky. It does not establish a breach of fiduciary duty.

There is no evidence that Ehrlich had a personal interest in whether Pinsky remained on the Tour or not. He did not stand to benefit financially or otherwise from her presence on the Tour as opposed to the presence of another UMG representative. To the contrary, the undisputed evidence is that Ehrlich would only stand to benefit from a positive relationship between Spencer-Smith and her recording company. Ehrlich and Pinsky may have differed regarding the management of Spencer-Smith and Ehrlich may have desired that Pinsky not be on the Tour. Much of Ehrlich's conflict with Pinsky pertained to differing perspectives on how to best support

Spencer-Smith and her career, not instances where Ehrlich prioritized his own interests above hers. *See e.g.* Dkt. No. 131-9 at 176:25 (testifying regarding her conversation with Ehrlich and Alexander, stating "I remember David . . . being like, you know I have a lot of experience, you can learn a lot from me. I see potential in you but there's some things, you know, that should be handled differently"); *id.* 177:8–14 ("my focus was us getting on the same team and focusing on communication and how we can best move forward . . . I wanted to focus on how we best all work together for Lauren"); Dkt. No. 131-2 at 271:22–272:5 (noting that, in regard to disagreement with Pinsky regarding the Fletcher concert, he "was chagrined that . . . it had not been discussed in a—in a collaborative way to determine if it was the best course of action given [Spencer-Smith's] schedule"). But from those facts, it does not follow that Ehrlich's personal dispute with Pinsky can be ascribed to a motive to benefit himself at the expense of Spencer-Smith.

### D. Faithless Servant

In her fifth claim for relief, Spencer-Smith alleges that the Ehrlich Parties were faithless servants and must therefore disgorge any and all commissions and monies paid by her. Dkt. No. 61 ¶¶ 117–122. "Under the faithless servant doctrine, the faithless agent forfeits to his principal all compensation paid or earned during the period of his disloyalty." *Spencer-Smith*, 2024 WL 709291, at *16; *see Mar. Fish Prods., Inc. v. World-Wide Fish Prods., Inc.*, 474 N.Y.S.2d 281, 287 (1st Dep't 1984); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (per curiam); Restatement (Third) of Agency § 8.01 cmt. d ("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty."). "New York's faithless servant doctrine holds that '[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his

compensation, whether commissions or salary.'" *CBRE, Inc. v. Pace Gallery of N.Y., Inc.*, 2021 WL 1198644, at \*11 (S.D.N.Y. Mar. 30, 2021) (quoting *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 229 (2d Cir. 2020)); *accord Feiger v. Iral Jewelry*, 363 N.E.2d 350, 351 (N.Y. 1977).

The Court has determined that the Ehrlich Parties did not breach their fiduciary duties, either as manager or attorney, to Spencer-Smith. Her claim under the faithless servant doctrine is premised on the same underlying facts and fiduciary duties, Dkt. No. 136 at 34–36, and therefore also fails.

## II. The Ehrlich Parties' Claims

### A.      Breach of Contract & Declaratory Judgment

The Ehrlich Parties seek summary judgment on their claims for breach of the Management Agreement and the Engagement Agreement and their claim for declaratory judgment with respect to the legal fees and commissions they are entitled to under the terms of those agreements. Dkt. No. 108 at 38. The Ehrlich Parties claim that Spencer-Smith failed to pay them what was due under those agreements. Dkt. No. 16 ¶¶ 124, 126, 131. Spencer-Smith claims that her failure to perform under the agreements is excused by the Ehrlich Parties' material breach of contract. Dkt. No. 136 at 36–37; *see Envy Branding, LLC v. William Gerard Grp., LLC*, 2024 WL 869156, at \*14 (S.D.N.Y. Feb. 29, 2024) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."). There is no dispute that following the May 13, 2022 Letter, Spencer-Smith did not pay commission and legal fees to the Ehrlich Parties pursuant to the Management and Engagement Agreements. Dkt. No. 155 ¶¶ 298, 300, 303, 304, 305, 308.

The Court has determined that there is no genuine issue of material fact that DME Management performed under the Management Agreement and that Ehrlich and Ehrlich &

Associates performed under the Engagement Agreement.  Accordingly, Spencer-Smith remained

bound by her obligations under the agreements, her failure to pay the legal fees and commissions

owed under the agreements is not excused, and the Ehrlich Parties are entitled to contract

damages for Spencer-Smith's breach of contract.[11]  The Ehrlich Parties are entitled to summary

judgment on their third and fourth claims for declaratory relief.  Dkt. No. 108 at 38–39.  The

Management and Engagement Agreements remain enforceable, and DME Management and

Ehrlich & Associates are entitled to prospective compensation based on commissions earned by

Spencer-Smith under the terms of the Management Agreement and Engagement Agreement.[12]

The principal disputes between the parties pertain to the Ehrlich Parties' claim for damages

based on sums they allege Spencer-Smith owes them but failed to pay.

---

[11] Spencer-Smith argues in opposition to the Ehrlich Parties' motion for summary judgment that an attorney who violates a disciplinary rule is not entitled to fees for any services rendered.  Dkt. No. 157 at 31.  The Second Circuit has held that "[i]f a lawyer is discharged for cause, he or she is not entitled to legal fees."  *Rasmy v. Diederich*, 2025 WL 3552719, at *2 (2d Cir. Dec. 11, 2025) (summary order) (quoting *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004)).  "[I]mpropriety or misconduct on the part of the attorney, or the violation of a disciplinary rule is sufficient to show just cause[.]"  *Id.* (quoting *Holcombe v. Matisborchuk*, 747 F. App'x 875, 877 (2d Cir. 2018) (summary order)).  "Poor client relations, differences of opinion, or personality conflicts do not amount to cause." *Garcia v. Teitler*, 443 F.3d 202, 212 (2d Cir. 2006).  Spencer-Smith terminated her relationship with Ehrlich & Associates due to a "huge lack of confidence and trust" stemming from his conduct on the Tour.  Dkt. No. 123-12.  She did not terminate the attorney-client relationship for cause due to impropriety or a violation of a disciplinary rule.  Ehrlich & Associates is therefore not barred from receiving damages under the Engagement Agreement.

[12] The Ehrlich Parties' claim for declaratory judgment does different work than their claims for breach of contract and therefore are not duplicative. The Ehrlich Parties' claim for breach of contract looks backward and seeks damages for the sums already due them under the Management and Engagement Agreement and which, in violation of those agreements, they were not paid.  By contrast, the declaratory judgment is forward-looking and seeks to clarify that the compensation the Ehrlich Parties will be entitled to in the future under those same agreements. Declaratory relief therefore is appropriate for its role "is to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued."  *Starr Indemnity & Liability Co. v. Exist, Inc.*, 2023 WL 4029821, at *4 (S.D.N.Y. June 14, 2023) (citation omitted).

### 1.    The Management Agreement

DME Management claims damages for breach of the Management Agreement in the amount of the "commission [it] would have earned if the contract [had] been performed" under the full five-year-term of the Management Agreement.  Dkt. No. 108 at 39 (quoting *D.S. Magazines, Inc. v. Warner Publisher Servs. Inc.*, 640 F. Supp. 1194, 1209 (S.D.N.Y. 1986)).  Spencer-Smith disputes whether as a matter of law, Ehrlich and DME Management are entitled to commissions due as of the date of termination.  She contends that the term of the Management Agreement ended on May 13, 2022, the date of the Termination Letter, and thus DME Management would only be entitled to commission due under an abbreviated term of January 1, 2021 to May 13, 2022.  Dkt. No. 178-1 ¶ 7.  The Ehrlich Parties have the better reading of the Management Agreement.

In signing the Management Agreement, Spencer-Smith agreed to retain DME Management for a term of five years following January 1, 2021 and DME Management agreed to perform services for Spencer-Smith for a term of five years.  Dkt. No. 124-3 §§ 2, 3(b).  The agreement represented an investment by both sides.  DME Management agreed to provide services for five years regardless of Spencer-Smith's success.  Even if Spencer-Smith's career was not successful, it would be bound to represent her and to use its reasonable efforts to promote her.  And, in exchange, Spencer-Smith agreed that if her career was a success and she generated income as a result of her artistic product exploited during and prior to that five-year term, the Ehrlich Parties would be entitled to share in that success.

The Management Agreement only provides for modification of the five-year "Term" of the contract where Ehrlich becomes unable to be the principal person rendering management services, including by death or disability, and DME Management is unable to find a substitute approved by Spencer-Smith.  Dkt. No. 123-3 § 1(g).  In that circumstance, termination would not

affect DME Management's "right to continue to receive all compensation to which [it] is entitled hereunder up to the date of termination, and as further provided in 3(c) below," which section details the commissions owed, including those owed in perpetuity. *Id.* By the terms of the Management Agreement, DME Management remains entitled to all commissions owed under the agreement even after Ehrlich's death, and the "Term" of the agreement can only be cut short if Ehrlich is rendered unavailable and DME Management is unable to find an adequate substitute for Ehrlich. The Management Agreement further provides that "[t]ermination of this Agreement shall not affect your or your Parents' obligation to pay any commissions, monies or other consideration due Manager or expenses incurred by Manager." Dkt. No. 123-3 § 1(d).

The parties dispute the "Term" of the Management Agreement and, as a consequence, which agreements and recordings DME Management was entitled to commissions from that Spencer-Smith failed to pay, and what commissions DME Management is entitled to in the future. The "Term" is a defined term that runs five years from the date of contract execution. Dkt. No. 124-3 § 2. And Spencer-Smith had no right to cut the term short or give it different meaning by preemptively stating that she would no longer perform. *See Graham v. James*, 144 F.3d 229, 238 (2d Cir. 1998) ("One party's breach does not automatically cause [recission] of a bilateral contract." (quoting *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997)). DME Management did not agree to rescind the contract but offered to continue to perform. *See Marvel Ent. Grp., Inc. v. ARP Films, Inc.*, 684 F. Supp. 818, 819 (S.D.N.Y. 1988) (the nonbreaching party has the option to either "cancel the contract and sue for total breach, or he can affirm the contract and sue for partial breach" (internal citation omitted)). Spencer-Smith, as the breaching party, therefore remained obligated under the terms of the contract. *See Graham*, 144 F.3d at 238.

In the June 1, 2022 letter response to Spencer-Smith's Termination Letter, counsel for DME Management stated, "It is DME's hope that, notwithstanding all of this harmful conduct exhibited by Artist against DME, Artist will come to the realization that this is not the right avenue to take and will cure these breaches."  Dkt. No. 131-22 at 2.  It affirmed that "DME has stood—and continues to stand—fully ready, willing and able to perform under the Agreements." *Id.*  There is no evidence that DME Management took affirmative steps to rescind the agreement following Spencer-Smith's breach—Ehrlich tried to perform under the agreement but was unable to communicate with Spencer-Smith.  Dkt. No. 178-1 ¶¶ 12–13, 19–20.

Further, DME Management is entitled to damages and declaratory relief pursuant to the full term of the contract because "[d]amages on a breach of contract claim are intended to place the nonbreaching party in as good a position as it would have been had the contract been performed."  *Hobish v. AXA Equitable Life Ins. Co.*, 264 N.E.3d 223, 229 (N.Y. 2025).  Absent Spencer-Smith's breach, DME Management would have earned commission for all gross income under the full term of the Management Agreement, including any agreements entered after May 13, 2022 until the end of the term on January 1, 2026.  The proper measure of damages is the expected commission earnings under the full term of the contract.  *See In re Ninety-Five Madison Co., L.P.*, 669 B.R. 1, 26 (Bankr. S.D.N.Y. 2025) ("By reason of such breach of contract on the defendant's part the plaintiff became entitled to recover damages, measured by the amount of the commissions to which it would have been entitled in the absence of such breach of contract" (quoting *Gaillard Realty Co. v. Rogers Wire Works, Inc.*, 213 N.Y.S. 616, 622 (1st Dep't 1926)); *D.S. Magazines, Inc. v. Warner Publisher Servs. Inc.*, 640 F. Supp. 1194, 1209 (S.D.N.Y. 1986) (party is entitled to recover amount "representing the 5% commission it would have earned . . . for the balance of the contracts' period); *Katz Communications, Inc. v.*

*Evening News Ass'n*, 705 F.2d 20, 25 (2d Cir. 1983) (damages should be calculated based on "what Katz would have netted, after deductions, from commissions . . . which would have been procured" through the end of the contract); *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109–10 (2d Cir. 2007) ("The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.").  DME Management is thus entitled to the value of those unpaid commission payments that are already due as damages and declaratory relief with respect to commission payments in the future.

DME Management is entitled to be paid over the five-year term of the Management Agreement from January 1, 2021 to January 1, 2026 according to the formula in that agreement. That formula includes a 15% commission on all gross income generated during the term of the agreement and a 15% commission in perpetuity for gross income derived from "recordings, musical compositions and other intellectual properties" which are both created and first exploited prior to or during the term of the agreement.  *Id.* § 3(c)(i).  Further, DME Management is entitled to a 15% commission in perpetuity for gross income earned or received with respect to service agreements "entered into or substantially negotiated . . . during the Term," provided that agreements substantially negotiated but not entered into during the term are "actually concluded within six (6) months after the Term," as well as "those agreements which are extensions, renewals, modifications, and/or replacements of any such agreements (regardless of when such extensions, renewals, modifications and/or replacements are entered)."  *Id.* § 3(c)(ii).  DME Management is also entitled to commission for "Gross Income derived from recordings and musical compositions which are created by [Spencer-Smith] during the Term hereof, and are first

exploited following the end of the Term" according to a sliding scale of commissions over a fifteen-year period. *Id.* § 3(c)(iii).

### 2.    The Engagement Agreement

For breach of the Engagement Agreement, Ehrlich & Associates claims damages in the amount of a percentage of the monies Spencer-Smith earned or received from (1) the Recording Agreement; (2) the music publishing agreement with Warner Chappell entered into on June 8, 2022, Dkt. No. 178-1 ¶ 18, (3) the performance rights agreement with the Society of Composers, Authors and Music Publishers of Canada ("SOCAN") entered into on June 2, 2022, *id.* ¶ 26 (4) the agreement with Broadcast Music, Inc. ("BMI") entered into on May 22, 2023, *id.* ¶ 22, and (5) the License of Trademark and Merchandising Rights agreement with Bravado International Merchandising Servs., Inc. ("Bravado") entered September 6, 2023, *id.* ¶ 30, in addition to a percentage of the monies earned from Spencer-Smith's music. *See* Dkt. Nos. 163, 163-25 (financial chart and declaration calculating damages based on a percentage of income generated from the above agreements and her music). Ehrlich & Associates is entitled to damages with respect to monies earned by Spencer-Smith from the Recording Agreement and materials created prior to May 13, 2022, and any other post-termination entitlements provided under the terms of the Engagement Agreement. It is also entitled to declaratory judgment that the terms of the Engagement Agreement pertaining to post-termination obligations remain valid, binding, and enforceable. Its remaining arguments are without merit.

The Engagement Agreement entitled Ehrlich & Associates to be paid as compensation an amount equal to "five percent (5%) compensation on all gross monies and any other compensation earned or received . . . as a result of your Entertainment Services." Dkt. No. 124-2 ¶ 2. Ehrlich & Associates is also entitled to a "success fee" of "no less than 10% (instead of 5%) of the Gross Compensation that you receive in the first year from an agreement for your

Entertainment Services . . . if we have been directly responsible for you obtaining such agreement." *Id.* Entertainment Services is defined as:

> services and activities throughout the entertainment industry including, but not limited to your services as a recording artist, song writer, literary writer, producer of music, director, theatrical performer and producer for television, film and all other performances and activities throughout all fields of the entertainment industry, including, without limitation, in the fields of television, motion pictures, radio, internet, and in connection with merchandise and commercial endorsements, television commercials and any and all other exploitations of your services, talents and activities in any way connected with or appurtenant to the entertainment industry and any related fields throughout the world ("Entertainment Services").

*Id.*

Section 2 of the Engagement Agreement provides that "the sums payable to us hereunder shall be paid to us in connection with your Entertainment Services and with agreements and engagements entered into by you prior to and during our engagement under this Agreement, and materials created, such as copyrights, that generate Gross compensation for you ("materials"), irrespective of the termination of our relationship, and such shall payable for as long as you receive payment pursuant to those agreements and materials which generate income." *Id.* § 2. For "agreements concerning music materials (i.e. songs and master recordings), [Ehrlich & Associates'] Fee shall apply to those materials created prior to and during the term of our Agreement . . . and within three (3) months thereafter." *Id.* It further adds: "With respect to additional time periods of agreements and additional option periods, renewals, renegotiations, spinoffs, motion pictures, merchandise and/or any other ancillary activities related to your Entertainment Services which arose out of agreements entered into while we were engaged by you, ("Related Agreements"), our Fee shall apply to Gross Compensation received with respect to such Related Agreements, irrespective of whether the Firm still represents you." *Id.*

Unlike the Management Agreement, the Engagement Agreement does not entitle Ehrlich & Associates to compensation based on agreements "substantially negotiated" during the term of the Engagement Agreement. Moreover, unlike the Management Agreement which has a fixed five-year term, the Engagement Agreement is terminable at will by either Spencer-Smith or Ehrlich & Associates. *Id.* § 4. The only condition on that right to terminate at will is that if Spencer-Smith terminated, she would still be liable for expenses incurred by Ehrlich & Associates prior to the notice of termination and would "remain obligated to pay to the Firm any Fees owed to the Firm under the terms hereof including, but not limited to payments or accountants made to you after our termination." *Id.* It is not disputed that the engagement between Spencer-Smith and Ehrlich terminated on May 13, 2022. Dkt. No. 178-1 ¶ 11; Dkt. No. 162 at 25.

Reading the Engagement Agreement as a whole and giving meaning to each of its terms, *see Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165 (2d Cir. 2024); *Walmart Inc. v. Capital One, NA*, 725 F. Supp. 3d 450, 467 (S.D.N.Y. Mar. 26, 2024) ("A court faced with an issue of contractual interpretation is obligated to read the contract as a whole, to give effect and meaning to every term." (cleaned up)), Ehrlich & Associates is entitled to compensation of 5% of the monies or compensation earned or received by Spencer-Smith from Entertainment Services agreements entered into by Spencer-Smith prior to and during Ehrlich & Associates' engagement, *i.e.*, prior to May 13, 2022. It is not entitled to compensation for agreements substantially negotiated before Spencer-Smith terminated the Engagement Agreement. Spencer-Smith would be liable to Ehrlich & Associates for a percentage of her compensation from agreements entered into after termination only if those agreements "arose out of agreements entered into while" Ehrlich & Associates was engaged by Spencer-Smith.

Accordingly, Ehrlich & Associates is entitled to summary judgment with respect to its claim that Spencer-Smith breached the Engagement Agreement by failing to pay Ehrlich & Associates 5% of compensation earned or received by her from the Recording Agreement.  The Recording Agreement was entered into on February 4, 2022, after the Engagement Agreement was entered on April 17, 2020 and prior to its termination.  Dkt. No. 155 ¶¶ 17, 34.  The Recording Agreement was entered into during the engagement, and Spencer-Smith is therefore liable for the 5% fee owed from compensation derived from that agreement and any agreements that arose from it.  Ehrlich & Associates is further entitled to summary judgment with respect to its claim that Spencer-Smith failed to pay 5% of compensation earned or received by her from any music or other materials created prior to May 13, 2022.  Dkt. No. 155 ¶ 304.  Spencer-Smith is entitled to summary judgment with respect to monies earned by Spencer-Smith pursuant to (1) the music publishing agreement with Warner Chappell, (2) the performance rights agreement with SOCAN (3) the agreement with BMI, and (4) the License of Trademark and Merchandising Rights agreement with Bravado.

Ehrlich & Associates' arguments for compensation based on the music publishing agreement, the SOCAN Agreement, the BMI agreement, and the license with Bravado are without merit.  None of these agreements were entered into prior to Spencer-Smith terminating the Engagement Agreement on May 13, 2022, Dkt. No. 178-1 ¶¶ 18, 22, 26, 30, and the Ehrlich Parties do not argue that these agreements arose out of previously entered agreements.  Therefore, under the plain language of the Engagement Agreement, Ehrlich & Associates is not entitled to compensation based on commissions received or monies earned or received from those agreements.

Ehrlich & Associates does not take issue with the plain language of the Engagement Agreement. It argues instead that it is entitled to the 5% fee for monies received by Spencer-Smith under the music publishing agreement because the agreement was on the eve of being finalized prior to termination of the Engagement Agreement and Spencer-Smith's failure to sign the music publishing agreement was a deliberate effort to prevent Ehrlich from receiving commission from the agreement. Jan. 29, 2026 Tr. at 64:3–22. Ehrlich & Associates rely on a text exchange between Spencer-Smith and her mother, wherein Spencer-Smith tells her mother "[Ehrlich's] tryna get me to sign my pub deal today" and "out of know [sic] where cuz [Ehrlich] is shady he wants to sign the pub so he can commission . . . He didn't wanna sign until after the Juno's and now he's all over it tryna force me to sign." Dkt. No. 112-7 at 4–5.[13] Her mother advised her "Do not sign that deal . . . If he gives it to you Just say I wanna think about it" *Id.* at 6. Ehrlich & Associates argues that Spencer-Smith's termination of the Engagement Agreement prior to signing the agreement was a violation of the implied covenant of good faith and fair dealing. There are two flaws in Ehrlich & Associates' argument.

First, Ehrlich & Associates raised this claim for the first time at oral argument with no prior notice to Spencer-Smith. "Under Fed. R. Civ. P. 15(b), a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir. 2000). "Claims that are entirely new—that is, claims based [on] new facts and new legal theories with no relation to the previously pled claims—are commonly rejected at the summary judgment stage due to the prejudice to the defendant, who may not have had fair notice of the claim and consequently may not have had an adequate opportunity for discovery." *Local 3621 v. City of New York*, 2025 WL 2781280, at *15

---

[13] Citations to this docket entry use ECF pagination.

(S.D.N.Y. Sept. 30, 2025) (quoting *Henry v. Metro. Transp. Auth.*, 2014 WL 4783014, at *10 (S.D.N.Y. Sept. 25, 2014)).  Raising a claim for the first time at oral argument is highly prejudicial to the opposing party, as that party has neither an opportunity for discovery regarding the claim nor an opportunity to brief the issue.  *See Jimenez v. GWB Acquisitions LLC*, 2026 WL 252527, at *7 (S.D.N.Y. Jan. 30, 2026) (declining to consider claims raised after oral argument, noting "[defendants] would be prejudiced if, only after moving for summary judgment and after the completion of all briefing and oral argument, Plaintiff could simply remove the legal and factual terrain out from under them."); *US Airways, Inc. v. Sabre Holdings Corp.*, 2015 WL 997699, at *3 (S.D.N.Y. Mar. 5, 2015) (declining to consider claim raised for the first time at oral argument because it was both "unwarranted and unfair to [d]efendant, which had no advance notice of [p]laintiff's new argument and no opportunity to brief its opposition").

The Ehrlich Parties have consistently predicated their claim of breach of the Engagement Agreement solely on Spencer-Smith's failure to pay outstanding legal fees.  Dkt. No. 16 ¶ 131 (alleging that Spencer-Smith "failed and refused to pay the outstanding legal fees and costs"); Dkt. No. 108 at 39 (arguing that Spencer-Smith breached the Engagement Agreement due to her failure to pay "legal fees . . . they are owed now and thereafter").  Neither the Ehrlich Parties' Amended Complaint nor their summary judgment papers allege that Spencer-Smith violated the implied covenant of good faith and fair dealing or otherwise argue that they should be entitled to damages due to her termination of the Engagement Agreement prior to signing the publishing agreement.  *See* Dkt. Nos. 16, 108.  The only mention of this delay appears in the Ehrlich Parties' summary of relevant facts at summary judgment, in which they state, in the context of Ehrlich's management services, that "Spencer-Smith purposely delayed signing the Publishing Agreement until after firing Ehrlich, believing it would excuse paying him a commission."  Dkt.

No. 108 at 10.  This brief mention of the facts underlying their new claim is insufficient to give Spencer-Smith notice of a claim under the implied covenant of good faith and fair dealing.  *See Armstrong v. Metro. Transp. Auth.*, 2015 WL 992737, at *11–12 (S.D.N.Y. Mar. 3, 2015) (finding prejudice to defendants where amended complaint made no reference to the new claim and there is no evidence defendants had notice of it before it was raised in summary judgment motion); *Henry*, 2014 WL 4783014, at *10 ("The Amended Complaint's statement that 'the MTA has denied [Henry's] promotion' is too general to put Defendants on notice of Plaintiff's additional promotion-related claims, based on facts not alleged in the Amended Complaint." (internal citation omitted)).  The Court accordingly is entitled to disregard the Ehrlich Parties' claim for damages pursuant to the covenant of good faith and fair dealing.

Second, Ehrlich's claim would fail in any event because the implied covenant could not defeat the right of Spencer-Smith to terminate the Engagement Agreement at any time and for any reason.  Under New York law, a covenant of good faith and fair dealing is implied in all contracts."  *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 747 N.Y.S.2d 29, 31 (2d Dep't 2002)).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)).  "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties."  *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983).  Accordingly, "'[n]o obligation can be implied . . . which would be inconsistent with other terms of the agreement of the parties.'"  *S. Telecom Inc. v. ThreeSixty Brands Grp.*, LLC, 520 F. Supp. 3d 497, 504 (S.D.N.Y. 2021) (quoting *Murphy*, 448 N.E.2d at 91); *see also In*

*Touch Concepts, Inc. v. Cellco P'Ship*, 788 F.3d 98, 102 (2d Cir. 2015) ("[T]he implied covenant of good faith and fair dealing cannot be used to impose an obligation that is inconsistent with express contractual terms."); *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020) ("It cannot be a breach of the implied covenant of good faith and fair dealing to do what a contract explicitly authorizes a party to do.").

The agreement here gave Spencer-Smith the explicit right to "terminate [the] Agreement at any time" and specified the consequences for doing so: "(i) such termination shall not affect your obligation to pay any expenses incurred by the Firm before the giving of the termination notice, (ii) you shall remain obligated to pay to the Firm any Fees owed to the Firm under the terms hereof including, but not limited to payments or accountants made to you after our termination." Dkt. No. 123-3 § 4. Her right to terminate the contract was not conditioned on an obligation to pay legal fees from compensation generated through future agreements, even if those were substantially negotiated prior to the termination of the engagement. Furthermore, it is a bedrock principle under New York law that "notwithstanding the terms of the agreement between them, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney." *Campagnola v. Mulholland, Minion & Roe*, 555 N.E.2d 611, 614 (N.Y. 1990); *see id* ("Because of the uniqueness of the attorney-client relationship, traditional contract principles are not always applied to govern disputes between attorneys and clients."); *accord Garcia v. Teitler*, 443 F.3d 202, 211 (2d Cir. 2006). Whereas an attorney can only withdraw from representation under certain conditions, *see* 22 N.Y.C.R.R. 1200.0 § 1.16(b), (c), "a client retains at all times the right to terminate the attorney-client relationship." *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 444 (S.D.N.Y. 1998). "[I]t follows as a corollary that the client cannot be compelled to pay damages for exercising a right which is

an implied [or here, explicit] condition of the contract." *Id.* (quoting *Martin v. Camp*, 114 N.E. 46, 48 (N.Y. 1916)).

Ehrlich & Associates' argument sounds, if at all, in quantum meruit. Ehrlich & Associates claims that they provided services in negotiating the publishing agreement, Spencer-Smith ultimately accepted those services by signing the publishing agreement, and Ehrlich & Associates were denied their expected compensation for those services because she terminated their representation prior to signing the agreement. *See Athayde v. Dogpound Fitness, Inc.*, 2024 WL 3876181, at *4 (S.D.N.Y. Aug. 20, 2024) ("To establish quantum meruit, a plaintiff must show '(1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of services.'" (quoting *Farina v. Bastianich*, 116 A.D.3d 546, 548 (1st Dep't 2014))); *see Garcia*, 443 F.3d at 211–12 (an attorney discharged without cause properly recovers reasonable value of services rendered through quantum meruit). However, the Ehrlich Parties have not alleged a claim in quantum meruit for the value of their services in negotiating agreements not entered into prior to termination. They cannot recover damages for the value of these services under breach of contract: under the terms of the Engagement Agreement, they are not entitled to any legal fees for agreements entered into following termination of the agreement, regardless of work performed in negotiating those agreements. Ehrlich & Associates are only entitled to damages for unpaid legal fees due under the terms of the Engagement Agreement. *See Byline Bank v. SDS Dining Corp.*, 2024 WL 1422812, at *4 (S.D.N.Y. Apr. 3, 2024) ("[W]here the breach of contract was a failure to pay money, the plaintiff is entitled to recover the unpaid amount due under the contract plus interest." (quoting *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 172 (S.D.N.Y. 2010))).

### 3.      There Are Disputed Issues with Respect to the Quantum of Damages

There are genuine issues of disputed fact in regard to the amount of damages from Spencer-Smith's breaches of both the Management Agreement and the Engagement Agreement. The Ehrlich Parties state that their estimated damages with regard to both the Management Agreement and Engagement Agreement are subject to verification, do not include any earnings after June 30, 2024, and need to be adjusted to account for prior applicable payments. Dkt. No. 108 at 21–22, 39–40. The Ehrlich Parties have not specified the amount of "prior applicable payments." Dkt. No. 157 at 34. The parties further dispute whether Ehrlich received commission payments from income derived from Spencer-Smith's music through at least February 2022, Dkt. No. 178-1 ¶ 45, whether Spencer-Smith paid DME Management and Ehrlich & Associates commission from the Recording Agreement in or about mid-March 2022, Dkt. No. 155 ¶ 296, and whether Spencer-Smith failed to pay to the Ehrlich Parties out-of-pocket expenses associated with management and legal work, *id.* ¶306. The Court therefore cannot determine the amount of damages as a matter of law. That issue remains for trial.

### B.      Defamation

Ehrlich alleges that during the period from May 10 to May 13, 2022, Spencer-Smith uttered and published a number of defamatory statements to UMG representatives, as well as to her parents, including that Ehrlich had (1) engaged in "inappropriate behavior with multiple women in France and Sweden by secretly taking photos of them and making inappropriate commentary"; (2) had "complimented and inappropriately solicited a female UMG employee to work for him in New York"; (3) had "berated" Ms. Pinsky and made her feel "uncomfortable"; and (4) had engaged in "inappropriate sexual behavior." Dkt. No. 16 ¶ 147.

Spencer-Smith argues that she is entitled to summary judgment on Ehrlich's claim for defamation because (i) to the extent they are made in Spencer-Smith's initial complaint or in the

context of pending litigation, they are protected by the litigation privilege; (ii) they are not defamatory per se and did not cause harm; and (iii) they are substantially true.  Dkt. No. 121 at 41–43.

"The gravamen of an action alleging defamation is an injury to reputation."  *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000).  "Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability."  *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019); *see also Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 307 (S.D.N.Y. 2017) ("There are seven elements of defamation under New York law: (1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) 'of and concerning' the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing harm or constituting slander *per se*; and (7) not protected by privilege." (citing *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001))).

Ehrlich abandons any claim that the statements made by Spencer-Smith in this litigation could support a claim for defamation.  Dkt. No. 145 at 38 ("Ehrlich's defamation claim is premised on multiple slanderous statements Spencer-Smith admittedly uttered before the lawsuit began, not allegations in her pleading").  "[S]tatements uttered in the course of a judicial proceeding are absolutely privileged, 'as long as such statements are material and pertinent to the questions involved' in the proceeding."  *Stega v. New York Downtown Hosp.*, 31 N.Y.3d 661, 82 N.Y.S.3d 323, 107 N.E.3d 543, 549 (2018) (quoting *Wiener v. Weintraub*, 22 N.Y.2d 330, 292 N.Y.S.2d 667, 239 N.E.2d 540, 540 (1968)); *see also Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 455–56 (E.D.N.Y. 2013) ("New York has traditionally accorded an absolute

privilege to oral or written communications made in the course of judicial proceedings and which relate to the litigation." (quoting *D'Annunzio v. Ayken, Inc.*, 876 F. Supp. 2d 211, 216 (E.D.N.Y. 2012))).

He claims instead that the statements that Spencer-Smith made outside of court were defamatory *per se*. Dkt. No. 145 at 39–40. Those statements were few in number and are not actionable. Ehrlich challenges the following statements as defamatory: Spencer-Smith's statement to Alexander that Ehrlich engaged in "disgusting" behavior, including that she witnessed Ehrlich taking photographs of the flight attendant and that, as Ehrlich was swiping through his phone, she saw additional photographs on the phone of the legs of young women, Dkt. No. 153-3 at 219–220; her testimony that she informed a UMG employee "about the things that I had observed [during the Tour] and how I felt and how the rests of my team felt, which was extremely uncomfortable," Dkt. No. 153-2 at 351; her text to her mother, stating "I have something gross to tell u about Puerto Rico," Dkt. No. 144-4; and her characterization of Ehrlich's conduct as "inappropriate sexual behaviors" in the Termination Letter, Dkt. No. 190-1.[14] Ehrlich does not identify evidence regarding what Spencer-Smith said to the UMG employee about the events on the Tour. Evidence that Spencer-Smith described things she observed and how she felt to a third party is insufficient to demonstrate a defamatory statement. There is further no evidence whether Spencer-Smith had a follow-up conversation with her mother about the trip to Puerto Rico or, if so, what she said. The text message about Puerto

---

[14] The Ehrlich Parties allege that Spencer-Smith stated "that Ehrlich engaged in 'inappropriate sexual conduct'" but provide no citation for this assertion, Dkt. No. 145 at 39, and at oral argument were not able to identify any other location where such language appears other than in the Termination Letter which notes "inappropriate sexual behaviors," Dkt. No. 131-23 at 4. *See* Dkt. No. 111 at 21 (Ehrlich Parties' Rule 56.1 statement only noting the phrase "inappropriate sexual behavior" in the context of the Termination Letter and noting no other instance of the phrase "inappropriate sexual conduct").

Rico, without more, does not reference Ehrlich and cannot be defamatory. *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002) ("[A]n individual plaintiff must be clearly identifiable to support a claim for defamation.").

The Court's analysis of Ehrlich's defamation claim is limited to these identified statements.[15] *Coleman v. Grand*, 158 F.4th 132, 144 (2d Cir. 2025) ("[U]nder New York's strict standard for pleading and proving defamation, we must focus our analysis on the precise statements that [plaintiff] . . . identifies as defamatory" (citing *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993))); *see also id.* (declining to consider whether statements not specifically challenged by plaintiff are defamatory).

"New York recognizes only four types of *per se* defamation, none of which applies here: statements that (1) 'imput[e] unchastity to a woman'; (2) assert that a plaintiff has a 'loathsome disease'; (3) tend to injure a plaintiff in his profession by reflecting on his ability to perform or properly conduct his business; and (4) charge a plaintiff with a serious crime." *Coleman*, 158 F.4th at 138 (quoting *Liberman v. Gelstein*, 605 N.E.2d 344, 348 (N.Y. 1992)). "Otherwise, a defamatory statement must cause actual and special harm by exposing an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace,' by 'induc[ing] an evil opinion of one in the minds of right-thinking persons.'" *Id.* (quoting *Celle*, 209 F.3d at 177).

Ehrlich asserts that Spencer-Smith accused him of "serious 'inappropriate sexual misconduct" and that "Spencer-Smith's statements were particularly egregious because they implied sexual misconduct by Ehrlich concerning the manner in which he conducted his business

---

[15] During oral argument, the Ehrlich Parties did not identify any additional defamatory statements. *See* Jan. 29, 2026 Tr. at 16:13–19 (noting statements cited in reply brief).

and profession." Dkt. No. 145 at 39–40.  However, statements that are defamatory *per se* because they harm the plaintiff in his "trade, business, or profession" are limited to those "'made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities.'" *Harris v. Hirsh*, 643 N.Y.S.2d 556, 559 (1st Dept. 1996) (quoting *Liberman,* 605 N.E.2d at 348); *see Coleman*, 158 F.4th at 138 (stating that none of the forms of *per se* defamation are applicable to a letter characterizing conduct within a professional relationship as sexual harassment).  Ehrlich does not identify any statements made by Spencer-Smith asserting or implying that Ehrlich had engaged in serious sexual misconduct.  Dkt. No. 146 at 38–39.[16]  The only statement from Spencer-Smith that Ehrlich engaged in "inappropriate sexual behaviors" is found within the Termination Letter, which was given directly to Ehrlich at his hotel.  Ehrlich has not alleged that Spencer-Smith shared this letter with a third party.  Jan. 29, 2026 Tr. at 23:14–21 (counsel stating he does not have evidence that Spencer-Smith shared the statement "inappropriate sexual behaviors" with her mother).  It therefore does not satisfy the publication requirement.  *See Medcalf v. Walsh*, 938 F. Supp. 2d 478, 485 (S.D.N.Y. 2013) ("To establish a claim for defamation under New York law, a plaintiff must prove that . . . the defendant published a defamatory statement of fact

---

[16] Some New York courts have held that a statement which "impute[s] serious sexual misconduct" on a person of any gender is defamatory *per se*, rather than only a statement which "impute[s] unchastity to a woman." *Rejent v. Liberation Publications, Inc.* 611 N.Y.S.2d 866, 869 (1st Dep't 1994); *see Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 486 (S.D.N.Y. 2021) ("New York courts require a publication to 'impute[] serious sexual misconduct' to be defamatory per se." (quoting *Rejent*, 611 N.Y.S.2d at 869)).  However, the Second Circuit has not adopted this expansion of *per se* defamation. *See Coleman*, 158 F.4th at 138.  The Court "is, of course, 'bound to follow the Second Circuit's interpretation of New York law' until such time as it is clarified or overruled" by the Second Circuit or New York Court of Appeals. *Stevens & Co., LLC v. Espat*, 2025 WL 950989, at *5 (S.D.N.Y. Mar. 28, 2025) (quoting *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 94 (S.D.N.Y. 2021)).  In any event, Spencer-Smith's statements do not impute "serious sexual misconduct."

to a third party). Even if this statement was published to a third party, it does not imply serious sexual misconduct but rather characterizes Ehrlich's actions in "secretly taking photos" of women, "making inappropriate commentary," and "[p]hotographing other young female employees of [UMG]" as "inappropriate sexual behavior." Dkt. No. 131-23 at 4. Such statements do not suggest that Ehrlich committed a serious crime or otherwise constitute *per se* defamation.

Furthermore, "it is well established that pure opinions, 'no matter how offensive, cannot be the subject of an action for defamation.'" *Coleman*, 158 F.4th at 139. "Under New York law, such opinions come in two forms: (1) 'a statement of opinion which is accompanied by a recitation of the acts upon which it is based'; and (2) 'an opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts.'" *Id.* (quoting *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014)). An unadorned statement that an individual committed sexual misconduct can be defamatory, as it implies undisclosed facts known only to the speaker. *Id.* at 145. However, where a description of behavior is followed by a statement characterizing such behavior as sexual misconduct, the characterization is pure opinion. In that instance, "the statement of opinion would not be actionable as defamation because a reasonable reader would not view the opinion as a distinct factual assertion, but instead as the speaker's personal assessment of known facts." *Id.* at 139; *see id.* at 140 ("[R]easonable readers could only have understood [defendant's] assessment that [plaintiff] sexually harassed her (and similar statements of opinion) as [defendant's] personal characterization of the facts set forth in the letter, rather than as a distinct assertion of fact.").

To the extent that Ehrlich's claim of defamation is based on Spencer-Smith's characterization of his conduct as "inappropriate sexual behaviors" and "disgusting," Dkt. No.

145 at 39, these statements lie in pure opinion and are not defamatory.  These statements constitute her characterization of Ehrlich's behavior in photographing women and making comments to UMG employees and are thus statements of opinion, based on disclosed facts.  *Id.* at 140.  To the extent that Ehrlich claims the factual allegations underlying these characterizations are defamatory, statements that Ehrlich took photographs of women, made inappropriate commentary, and had photographs of women's legs on his phone are not sufficiently defamatory under New York defamation law.  *Id.* (noting "a statement must do more than cause discomfort or affront" and finding the assertion that plaintiff "convinced [defendant] to be intimate with him" is not sufficiently defamatory).  In any event, Ehrlich does not identify any harm from the statements.  *See Kerik v. Tacopina*, 64 F. Supp. 3d 42, 569 (S.D.N.Y. 2014) ("The plaintiff must show, as an element of his prima facie case of defamation, that he was 'harmed by the alleged defamation.'").  Accordingly, Spencer-Smith is granted summary judgment on Ehrlich's claim for defamation.

**CONCLUSION**

Spencer-Smith's motion for summary judgment is DENIED IN PART and GRANTED IN PART.  Her motion for summary judgment with respect to her claims and Counts I–IV of the Ehrlich Parties' claims is DENIED.  Her motion for summary judgment with respect to Ehrlich's claim of defamation is GRANTED.

The Ehrlich Parties' motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART.  Their motion for summary judgment with respect to Spencer-Smith's claims and Counts III and IV of their claims is granted.  Their motion for summary judgment with respect to Counts I and II of their claims is granted with respect to liability and denied with respect to damages.  The Court will schedule a trial on the issue of damages.

The Clerk of Court is respectfully directed to close Dkt. Nos. 107 and 116.

SO ORDERED.

Dated: February 5, 2026
       New York, New York

_____
                LEWIS J. LIMAN
            United States District Judge